**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| INTERACTIVE GAMES LLC,<br><br>Plaintiff,<br><br>v.<br><br>DRAFTKINGS INC.,<br><br>Defendant. | Case No.<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Interactive Games LLC files this complaint for patent infringement against defendant DraftKings Inc., and alleges as follows:

1.      Interactive Games brings this action to protect its novel innovations related to mobile gambling, sports betting, and fantasy sports betting from DraftKings' infringement. Interactive Games' predecessor, Cantor Gaming, was the first to develop systems that allowed users to gamble, place sports wagers, and play casino games on mobile devices. In the mid-2000s, Cantor Gaming pioneered systems that allowed users to gamble on newly emerging smartphones of the time, such as iOS and Android smartphones and tablets.[1] But, to allow secure gambling on open devices over which it had no control, Cantor Gaming had to solve numerous technological problems. Among other things, Cantor Gaming had to confirm the identity and location of users, confirm that they were in (and did not leave) a jurisdiction where gambling was permitted, and ensure that their smartphones were not "rooted" (*i.e.*, hacked to obtain

---

[1] This complaint discusses mobile applications running on "smartphones." In addition to iOS and Android smartphones, the term "smartphone" is intended to also refer to iOS and Android tablets and other mobile devices. All allegations apply equally to such devices.

1

administrative privileges) or otherwise tampered with. Cantor Gaming protected the research, development, and innovations of its employees with patents as it expanded its mobile-gaming business. *See, e.g.*, Exhibits 1–5.

2.      DraftKings, founded in 2012, is a digital sports entertainment and gaming company offering online sports betting, daily fantasy sports, and online casino games. Its services are implemented through certain mobile applications publicly available on the Apple App Store and the Google Play Store. The infringing mobile applications include at least the iOS and Android versions of DraftKings Sportsbook & Casino (Sportsbook), DraftKings Casino (Casino), Golden Nugget Online Casino (Golden Nugget), DraftKings Fantasy Sports (Fantasy Sports), DraftKings Pick6 (Pick6), and DK Horse Racing & Betting (DK Horse) (collectively, DraftKings' Mobile Apps).



DraftKings' Mobile Apps can also be accessed online through https://www.draftkings.com,[2] including its sub-domains.

3.      On information and belief, based on publicly available websites, regulatory filings, public descriptions, and an analysis of DraftKings' Mobile Apps, DraftKings has willfully infringed Interactive Games' intellectual property. Specifically, as described in nearly 275 pages of claim charts (*see* Exhibits 6–10), DraftKings has been developing, distributing, and

---

[2] *See* Exhibit 11.

profiting from DraftKings' Mobile Apps that infringe Interactive Games' patents without a license.

## NATURE OF THIS ACTION

4.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 100 *et seq*. Interactive Games alleges that DraftKings infringes U.S. Patent Nos. 12,409,382, 8,974,302, 12,548,404, 12,400,518, and 12,406,284 (collectively, the Asserted Patents, and the '382, '302, '404, '518, and '284 patents, respectively).

## PARTIES

5.      Interactive Games is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business at 110 East 59th Street, New York, New York, 10022. Interactive Games is a successor of Cantor Gaming.

6.      On information and belief, DraftKings is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business located at 222 Berkeley Street, Boston, Massachusetts, 02110. DraftKings is a publicly traded company. DraftKings operates in the State of Massachusetts through a number of subsidiaries, including DraftKings Holdings, Inc., DK Crown Holdings Inc., Crown Gaming Inc., and Crown MA Gaming LLC.[3]

---

[3] *See* https://massgaming.com/wp-content/uploads/DraftKings-redacted.pdf at 8 (Exhibit 12).



## JURISDICTION AND VENUE

7.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over DraftKings because it is at home in this District through the operation of its principal place of business in this District.

9.      Additionally, this Court has personal jurisdiction over DraftKings at least because DraftKings has committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; regularly conducts or solicits business in this District; derives substantial revenue by offering infringing products and services in this District; and has purposefully established substantial, systematic, and continuous contacts with this District. DraftKings should have reasonably expected to be subject to suit here by offering infringing products and services in this District. Moreover, DraftKings has registered for and received a Sports Wagering license with the Massachusetts Gaming Commission.[4]

---

[4] *See* https://massgaming.com/about/sports-wagering-in-massachusetts/sports-wagering-licensees/draftkings/ (Exhibit 13).

10.      On information and belief, DraftKings has operated and continues to operate an interactive website and mobile applications that are accessible to all residents of Massachusetts, through which DraftKings advertises and makes available DraftKings' Mobile Apps and associated services that infringe the Asserted Patents.[5]

11.      DraftKings specifically identifies Massachusetts on its website as a state where its infringing products and services are available.[6]



12.      DraftKings is subject to Massachusetts rules and regulations through its operation of gaming within the state. *See, e.g.*, Mass. Gen. Laws ch. 23k, § 4(10) & (11) (Jan. 10, 2025) (the Massachusetts Gaming Commission must "require an applicant for a position which requires a license under this chapter to apply for such license and approve or disapprove any such

---

[5] *See, e.g.*, https://www.draftkings.com (Exhibit 11).

[6] *See, e.g.*, https://sportsbook.draftkings.com/sportsbook (annotated) (Exhibit 14) (stating that its products are available in Massachusetts).

application or other transactions, events and processes" and "require a person who has a business association of any kind with a gaming licensee or applicant to be qualified for licensure").

13.     DraftKings actively advertises, solicits business, and obtains revenues from its operation in Massachusetts.

14.     DraftKings purposefully avails itself of the benefit of conducting business in Massachusetts by marketing and selling its products and services to citizens in the state. DraftKings has purposefully and voluntarily placed its infringing products and services into this District and into the stream of commerce with the intention and expectation that the infringing products and services will be purchased and used in this District. This litigation arises from DraftKings' contacts with this District.

15.     Further, on information and belief, DraftKings' Mobile Apps are all developed, at least in part, in this District by a team of engineers located in DraftKings' Boston headquarters. Also on information and belief, DraftKings' Mobile Apps are distributed and offered for sale from this District.

16.     Venue is proper in this District under at least 28 U.S.C. §§ 1391(b) and (c), and 1400(b), at least because DraftKings has a regular and established place of business in this District and has committed acts of infringement in this District.

## INTERACTIVE GAMES' HISTORY OF INNOVATION

### A.     The Problem of Online Gambling in the Era of Mobile Devices

17.     In the early to mid-2000s, mobile devices like phones and tablets were getting smarter and more sophisticated. The iPhone launched in 2007, and Android devices launched a year later. Cantor Gaming recognized that smartphones, untethered from the floor of a casino or other brick-and-mortar gambling locations, would provide an entirely new way for people to play traditional casino games, such as blackjack and other table games, and to bet on sporting events.

The idea to develop a system that allowed users to gamble and wager on mobile devices was the brainchild of Cantor Gaming inventors, who faced enormous problems unique to smartphones. Such devices (1) could be removed from the casino, which created challenges for verifying the identity and location of users, and (2) were always in the control of users, who could tamper with their devices. Smartphones thus created technical problems in terms of security, access, location confirmation, and fraud detection.

18.     At that time, the inventors faced a confusing and complicated patchwork of federal and state-specific gambling and betting regulations. Within the United States, each state had its own gambling commission and regulations, making it exceedingly difficult to create a mobile-gambling platform that could meet the needs of each state. Most states, at a minimum, limited the location where a user could gamble or place wagers, and these requirements changed over time.[7]

19.     Before Cantor Gaming began developing its mobile-wagering systems, gambling games were only legal onsite at casinos or other authorized locations in certain states, where the identity and location of users could be confirmed via in-person verification. As an example, if a person wishing to gamble walked into a casino, the casino could simply ask for identification, confirm that the person met certain requirements (*e.g.*, is over 21 years of age), and, through physical surveillance, confirm the user was not circumventing applicable gambling and betting regulations. While Nevada allowed users to play casino games on a desktop computer, users still

---

[7] *See, e.g.*, Government Accountability Office (GAO), Internet Gambling: An Overview of the Issues, GAO-03-89 at 1 (Dec. 2002), located at: https://www.gao.gov/assets/gao-03-89.pdf (Exhibit 15) ("The global legal framework for Internet gambling is a complicated mix of laws and regulations.").

had to confirm their identities in person and then be provided with a username and password. *See* '302 patent 37:10–17, 37:45–61; '518 patent 1:41–48.

20.    Sports wagering—legal solely in Nevada until 2018—faced similar restrictions. It required either in-person wagering at sportsbooks or establishing a remote sports-wagering account through an in-person signup procedure.[8] In the case of remote wagering, after an in-person account had been set up, the bettor's location was verified by low-powered pagers that were physically limited to operate only in legal betting areas and required to be on the bettor's person at all times. Further, voice inquiries about the bettor's account were used to confirm the bettor's identity. If the bettor was using a dial-up system, location was confirmed using the local area telephone switch to which the dial-up modem was connected. For cable internet connections, a bettor's location was verified by the location of the cable modem. These methods either required the use of stationary modems or secondary devices and technologies for compliance with state and federal laws.

21.    Cantor Gaming had to develop methods to keep mobile applications intended for smartphones secure and compliant with state and federal regulations. A smartphone user could be hundreds of miles away from the casino, thus making any in-person identification and oversight impractical. Cantor Gaming needed to find a technological solution for: verifying the identity of a user on a mobile device, confirming that the user was in (and stayed within) a location where gambling was allowed (and had not spoofed their location), confirming that the user had not implemented any software on the mobile device that would allow them to circumvent gambling and betting regulations, and detecting fraud. *See* '382 patent 23:18–24:2,

---

[8] *See* https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html at 2 (Exhibit 16).

8

25:4–49; '302 patent 38:33–39:17, 40:17–63, '404 patent 4:56–5:6, 5:23–43; '518 patent 1:33–51, 2:56–3:30. These types of problems simply did not exist in brick-and-mortar casinos since a person could only gamble while physically present on the premises.

22.    These problems presented not just a regulatory issue, but a technological one. Specifically, there was no existing technology that allowed for mobile gambling. Before 2006, the most popular Internet-enabled mobile device was the Blackberry, which did not have the necessary hardware or software to implement online gambling. *See* '518 patent 1:41–51. The Blackberry was also a closed system that did not allow third parties to develop mobile applications at the time.[9] The opportunity for third parties to develop applications was not prevalent until long after the Apple App Store had dominated the market,[10] and Apple did not release the iPhone or the App Store until 2007 and 2008, respectively.[11] The first Android phone was not released until October 2008.[12]

23.    Further, as discussed above, there were no technological solutions to reliably track the location of a user with a smartphone. The technology available at the time, which involved stationary equipment or secondary devices, did not allow for such tracking to be implemented.[13] Cellular towers, GPS, or WiFi alone could not reliably pinpoint the location of

---

[9] *See* https://d3.harvard.edu/platform-digit/submission/the-rise-and-fall-and-rise-again-of-blackberry/ at 3 (Exhibit 17).

[10] *See* https://www.makeuseof.com/the-reasons-blackberry-failed-spectacularlyand-why-they-might-rise-again/ at 4–5 (Exhibit 18).

[11] *See* https://www.fastcompany.com/90903224/15-years-ago-apple-launched-the-app-store-last-year-it-brought-in-1-1-trillion-for-developers/ (Exhibit 19).

[12] *See* https://www.cnet.com/tech/mobile/a-brief-history-of-android-phones/ (Exhibit 20).

[13] *See* Statement of Jeff Schmidt, in U.S. House of Representatives, Committee on Financial Services, Can Internet Gambling Be Effectively Regulated to Protect Consumers and the Payments System? 110th Cong., 1st Session, June 8, 2007, at 18–19, located at: https://www.govinfo.gov/content/pkg/CHRG-110hhrg37553/pdf/CHRG-110hhrg37553.pdf

users to the extent necessary to meet state-specific regulations. *See* '382 patent 38:20–45, 52:49–53:47; '302 patent 52:65–53:3, 62:12–63:8; '404 patent 13:21–33, 14:3–15:7 (discussing "error[s]" that "may occur in location determination," as well low signal strength that adds difficulty in "verify[ing] that the device is still in the area that is supposed to be covered by the network"); '518 patent 7:13–50, 7:65–8:21; '284 patent 13:33–14:9. In fact, the inventors looked for third-party technology that could pinpoint a user's location with the requisite precision, but they were unable to find anything that could do so. *See* '382 patent 38:20–45, 52:49–53:47; '302 patent 52:65–53:3, 62:12–63:8; '404 patent 13:21–33, 14:3–15:7; '518 patent 7:13–50, 7:65–8:21; '284 patent 13:33–14:9.

### B.    Interactive Games' Technological Solutions

24.    Cantor Gaming developed novel, technological solutions to these technological problems. *See* '382 patent 38:20–45, 52:49–53:47; '302 patent 52:65–53:3, 62:12–63:8; '404 patent 13:21–33, 14:3–15:7 (discussing "multi-level location determination" techniques in response to, *e.g.*, "a signal strength reported being lower than some threshold"); '518 patent 7:13–50, 7:65–8:21; '284 patent 13:33–14:9. No other company was innovating in this area, and many thought the technological hurdles were insurmountable. Yet the Cantor Gaming inventors, including Howard Lutnick, Lee Amaitis, and Dean Alderucci, persisted, creating novel inventions that both proved mobile gaming was feasible and paved the way for regulatory and state-law changes. *See* '382 patent 25:4–37; '302 patent 40:17–20 (inventing "a multisystem

---

(Exhibit 21) ("These technologies are not reliable in their current form today. Technologies that attempt to identify a person's age as well as identify their geographic location will fail on the order of 20 percent."); *see also* Paul A. Zandbergen, Accuracy of iPhone Locations: A Comparison of Assisted GPS, WiFi, and Cellular Positioning, *Transactions in GIS*, 13:5–26 (June 26, 2009), located at: https://www.globe.gov/documents/2631933/6965868/42534991.pdf (Exhibit 22).

secure authentication protocol that may facilitate compliance with one or more regulatory requirements"); '404 patent 28:66–29:32; '518 patent 14:19–34 ("The invention provides a high-speed, reliable, accurate, and secure mobile gaming environment that complies with regulatory requirements for identification and location verification of the bettor."). Cantor Gaming innovated and iterated over several years to implement novel technological solutions, and protected its innovations through patents.

25.    In 2011, Cantor Gaming released its Android sports betting application, which implemented some of its inventions related to mobile gaming. Cantor Gaming's application worked solely in the State of Nevada and prevented customers from placing wagers from outside the state. At the time, Cantor Gaming's CEO noted that the company's "primary goal and focus is to constantly enhance [its] customers' experience through innovative, superior technology," and that its "team ha[d] developed an application that is real-time, convenient and enjoyable."[14] That technology, he explained, "incorporat[ed] the most advanced and reliable security" known at that time.[15]

26.    The technology solved many technological problems, including those described below.

### 1.    Detecting Rooted Smartphones Among Different Devices

27.    The inventors faced the challenge of finding a reliable and foolproof method of verifying the user of a smartphone and confirming that the user had not hacked or otherwise secured unauthorized access to the device. *See* '382 patent 23:18–28, 23:50–57, Fig. 3; '302 patent 38:33–34, 38:64–39:1 ("verifying a mobile device for use with a gaming service" by

---

[14] *See* https://www.prnewswire.com/news-releases/cantor-gaming-launches-android-compatible-mobile-sports-wagering-application-132609713.html at 1 (Exhibit 23).

[15] *See id.*

"determin[ing] that the device has not been rooted"), Fig. 3; '404 patent 24:4–14, 24:36–44. This was an important challenge because, if a user could hack their device (also known as "rooting" or "jailbreaking"), they could potentially spoof their location and thus gamble in jurisdictions that prohibit such activity or place wagers on behalf of unsuspecting customers.

28.    When a person uses a mobile device to place wagers, they have full control of the device and can freely make modifications to it. But, in order to comply with gambling and betting regulations, a gaming operator needs to ensure that users are in a jurisdiction where gambling is legal (and remain there for the duration of their gambling or betting). Because a user can modify their smartphone, they can modify it in a manner that spoofs or fakes the location of the device.[16] *See* '382 patent 23:18–28, 23:50–57, Fig. 3; '302 patent 38:33–34, 38:64–39:1 ("verifying a mobile device for use with a gaming service" by "determin[ing] that the device has not been rooted"), Fig. 3; '404 patent 24:4–14, 24:36–44. Put differently, the user could make the device appear to be in a location where gambling is allowed, when in fact the device is located in a jurisdiction where gambling is not permitted. And indeed, almost as quickly as smartphones were launched, software was created that would allow users to fake their location, including by faking GPS locations or obscuring the smartphone's IP address (*e.g.*, through the use of virtual private networks).[17] Thus, mobile-gambling systems needed to take into account ways users may be able to trick mobile applications into violating state-specific regulations. A gambling operator needed to detect when a user was spoofing a location and prevent such a user from gambling. *See* '382 patent 23:18–28, 23:50–57, Fig. 3; '302 patent 38:33–34, 38:64–39:1, Fig. 3; '404 patent 24:4–14, 24:36–44.

---

[16] *See* https://us.norton.com/blog/emerging-threats/gps-spoofing (Exhibit 24).

[17] *See id.*

29.     These issues were specific to gambling on smartphones. As discussed above, prior to mobile gaming, user verification was done in person. A person could confirm their eligibility to gamble in person if required and then be monitored by casino or sportsbook staff. Even when casinos offered onsite mobile devices, the devices were owned and maintained by the casino with superior surveillance capabilities and proprietary security. As such, casinos did not need to worry about a device being hacked, modified, or rooted.

30.     The inventors also realized that the mobile applications would need solutions to combat the types of fraud unique to smartphones. For example, a user could develop something called a "betting bot," which is a script that is written and developed to perform pre-defined actions on a mobile-betting platform without any human interaction.[18] Betting bots also posed significant problems for gambling operators since they can skew odds by, for example, placing bets on every possible outcome across multiple bookmakers.

31.     To address these concerns, the inventors developed a system that could detect whether a device has bypassed security restrictions and other restrictions on the smartphone (*i.e.*, whether the device was rooted or jailbroken). *See* '382 patent 23:18–28, 23:50–57, Fig. 3; '302 patent 38:33–34, 38:64–39:1 ("verifying a mobile device for use with a gaming service" by "determin[ing] that the device has not been rooted"), Fig. 3 ("[c]heck if phone is rooted"); '404 patent 24:4–14, 24:36–44. Rather than checking whether the user's device location is spoofed, the inventors devised a system that confirms the device has not been modified in the first place. *See* '382 patent 23:18–24:2, Fig. 3; '302 patent 38:33–39:17, Fig. 3; '404 patent 24:4–55. The system does this by confirming, through a number of different methods, that the user is in a location where gambling is permitted, and then looking for unapproved processes, applications,

---

[18] *See* https://www.nytimes.com/2011/03/14/science/14poker.html?_r=0 (Exhibit 25).

or operating systems being run or installed on the device. *See* '382 patent 23:18–24:2, Fig. 3; '302 patent 38:33–39:17, Fig. 3; '404 patent 24:4–55. If the system finds an unapproved process, application, or operating system, the system automatically prevents the user from gambling and placing bets. *See* '382 patent 36:52–61; '302 patent 51:37–46; '404 patent 41:40–49.

32.    These systems worked across different hardware and devices because the inventors also developed a novel "wrapper" that allowed common software to run on different devices regardless of their specific hardware or operating system. *See* '302 patent 39:26–36, 40:64–41:65, 45:40–48, 51:47–64, 67:19–45; '382 patent 24:11–21, 25:53–26:56, 30:36–44, 36:62–37:12, 58:1–28. The wrapper allowed the gambling application to be written in a single programming language, like Java, while the wrapper itself was written in a programming language specifically compatible with each device. *See* '302 patent 39:26–36, 40:64–41:65, 45:40–48, 51:47–64, 67:19–45; '382 patent 24:11–21, 25:53–26:56, 30:36–44, 36:62–37:12, 58:1–28. This was critically important because, while today's U.S. market is largely dominated by Apple and Samsung, that was not true at the time of the inventions. At that time, the market was more fractured, and it was unclear which devices (or whether any then-existing devices) would become dominant in the marketplace. Consequently, a single version of the gambling application was needed that was compatible with all devices.

### 2.    Hierarchical Location Determination

33.    The inventors also confronted the problem of people using smartphones within a gambling jurisdiction but outside premises in which gambling is legal (like a casino). As an example, Nevada required all gambling and wagers made in the state to originate within state lines. *See* Nevada Gaming Control Board, Regulation 5A: Operation of Interactive Gaming (adopted Dec. 2011, revised May 2024), located at: https://gaming.nv.gov/uploadedFiles/ gamingnvgov/content/Home/Features/Regulation5A.pdf. But, at various times, gambling was not

14

permitted in every location within the state (*e.g.*, in hotel rooms). Nevada Gaming Control

Board, Regulation 5, Operation of Gaming Establishments (effective Mar. 23, 2006), located at:

https://gaming.nv.gov/uploadedFiles/gamingnvgov/content/divisions/administration/history/

regulation-5-220-date-03-23-2006-7212.pdf (*see* Regulation 5.220(1)(i)). Thus, Cantor Gaming

needed a technological solution that would allow a mobile-gambling platform to (1) accurately

and reliably determine a user's location to confirm that the user was within the State of Nevada

*and* not in a place that disallowed gambling, and then (2) verify the user's identity. If Cantor

Gaming failed to follow these regulations, it would be subject to fines and penalties from the

state.

34.     But, at that time, the process of determining the location of a user with a

smartphone (*i.e.*, their geolocation) was not an easy task.[19] And, as explained above, all the

means known for doing so were unreliable. Nor could the technology determine whether the

user's mobile device subsequently moved outside the jurisdiction. '404 patent 9:63–10:12 (the

"ability to move" typically provides "low confidence in the location of the device"). Moreover,

the inventors needed to tackle the prospect of a user traveling in a vehicle, and potentially

heading out of state, or being near a border. '404 patent 13:52–67 (discussing solutions for

determining location "based on speed of movement" or "distance to a border"), 26:16–29. In

addition, certain locations had unreliable GPS and cellular signals, making it impossible to rely

on those technologies alone for location tracking. *See* '404 patent 13:21–33, 14:3–15:7

(discussing "error[s]" that "may occur in location determination," as well low signal strength that

adds difficulty in "verify[ing] that the device is still in the area that is supposed to be covered by

---

[19] *See, e.g.*, https://www.bettingusa.com/geolocation/ (Exhibit 26) ("When Delaware, Nevada, and New Jersey launched online gambling and poker in 2013, geolocation problems were more frequent than they are today.").

the network"). Accordingly, the location determination also needed to take into account a user's speed vis-à-vis their location. '404 patent 13:52–67, 14:30–37, 14:62–15:7, 26:16–54, 50:9–23, 60:38–48.

35.     Other technology required the use of a computer's IP address to detect location. '404 patent 5:47–7:13. However, smartphones made capturing IP addresses unreliable because whether the IP address would change as a user traveled would depend on a number of factors, including whether the user was accessing certain WiFi networks or cellular towers. *See* '404 patent 9:8–10:13, 12:38–64, 13:52–67, 14:62–15:7, 44:54–65 ("[I]f a device is moved from a location covered by a Wi-Fi network of a casino into a location that is not covered by that Wi-Fi network, a location determination (e.g., performed in response to the device accessing the gaming provider from a new IP address and/or through a different interface) may reveal a new location of the device."). In addition, users could cause their devices to have "static" IP addresses so that the IP addresses would not change even as users change their location. '404 patent 7:62–8:37. A static IP address could indicate that a user is in a jurisdiction where gambling is permitted regardless of the user's actual location. '404 patent 7:62–8:37.

36.     GPS, a technology that was nascent for mobile devices at the time, was likewise unreliable. '404 patent 7:23–48, 13:21–33, 14:3–15:7. For example, while GPS is accessible nearly everywhere outside (with a clear view of the sky), it is generally inaccessible indoors and lacks precision—*e.g.*, it is challenging to determine when a user approaches a state border.[20] '404 patent 7:23–48, 13:21–33, 14:3–15:7. Further, the user's location could quickly change (*e.g.*, when the user is in a vehicle), causing the GPS location to be accurate one moment and

---

[20] *See* http://spcomnav.uab.cat/docs/journals/Seco_Challenges_Indoor_GNSS_IEEE_SPMAG _2012.pdf (Exhibit 27).

inaccurate the next. *See* '382 patent 34:41–35:24, 39:9–19; '302 patent 49:31–61, 53:58–62; '404 patent 50:9–23 (discussing the need for increased location checks based on speed of movement). Thus, the use of GPS alone was not conducive to detecting the location of a user for mobile gambling. '404 patent 7:23–48, 13:21–33, 14:3–15:7.

37.    WiFi was also unsuitable for detecting the location of a smartphone. Although WiFi location tracking was somewhat precise, it could not be reliably used when a person with a smartphone was traveling over long distances because there was no guarantee of WiFi coverage outside of urban areas. '404 patent 14:3–58. And verifying locations with cellular towers was imprecise because such towers likewise lacked coverage in certain areas. *See* '382 patent 38:20–45, 52:49–53:47; '302 patent 52:65–53:3, 62:12–63:8; '404 patent 14:3–58 (when cellular signal strength is "reported being lower than some threshold," other location-verification methods must "be used to verify that the device is still in the area that is supposed to be covered by the network"). It was also expensive, as obtaining location data from cellular towers incurred a fee from the mobile phone companies. *See* '382 patent 39:9–19; '302 patent 53:52–56 ("a location service may charge a fee").

38.    Further, verifying the location of smartphones was technically challenging for several reasons. For one, Cantor Gaming was required to ensure the mobile devices could operate at or near a border with significant precision, since one foot could be the difference between a user legally or illegally gambling. *See* '382 patent 34:41–35:24, 39:9–19; '302 patent 49:31–61, 53:58–62; '404 patent 14:30–37, 14:62–15:7, 49:14–58. But constantly running location checks using cellular towers was costly (as noted above) and also drained a

17

smartphone's battery.[21] '404 patent 12:21–27. Further, Cantor Gaming had to also account for a user modifying their smartphone to give false location responses or manipulate mobile-gaming applications. *See* '382 patent 23:18–24:2, Fig. 3; '302 patent 38:33–39:17, Fig. 3; '404 patent 24:4–55.

39.     Cantor Gaming's inventors developed a system that could reliably detect a user's geographic location by repeatedly performing checks on the device's location. *See* '382 patent 25:38–49, 34:41–35:24, 39:9–19; '302 patent 40:51–63, 49:31–61, 53:58–62; '404 patent 29:33–51, 50:9–23. Under the system, the timing of the checks depends on the location of the device. *See* '382 patent 34:41–35:24, 39:9–19; '302 patent 49:31–61, 53:58–62; '404 patent 49:37–50:23, 57:8–40. For example, if a user is located well within Nevada state lines, the location of the device will be checked less often. *See* '382 patent 34:41–35:24, 39:9–19; '302 patent 49:31–61, 53:58–62; '404 patent 49:37–50:23, 57:8–40. However, the system allows more frequent location checks the closer a device gets to state lines so that the user's access to the gaming application can be turned off if they cross from a state where gambling is legal to a state where it is not. *See* '382 patent 34:41–35:24, 36:52–61, 38:47–55, 39:9–19; '302 patent 49:31–61, 51:37–46, 53:23–32, 53:58–62; '404 patent 41:40–49, 48:62–49:4, 49:37–50:23, 57:8–40.

40.     The inventors also developed a system that determines a user's location using a hierarchy of techniques. *See* '404 patent 7:15–48, 10:31–11:6, 11:66–12:64. For instance, a first location determination attempt could use GPS. However, for all the reasons stated above, GPS is not always sufficiently accurate. The inventors developed confidence and error levels associated with the reliability of the signal to determine whether GPS data could be trusted. Thus, if GPS is

---

[21] *See* https://arxiv.org/pdf/1303.5943 at 1 (Exhibit 28) (discussing, in 2013, phone battery drain due to GPS).

not reliable, the system can determine the user's location based on another form of location verification, such as cellular triangulation. *See* '404 patent 7:15–48, 10:31–11:6, 11:66–12:64. Once location verification is completed, the user could proceed to place bets. *See* '404 patent 40:14–41:35. This allowed the mobile application and system to balance costs, battery life, and accuracy, all while determining the precise location of a smartphone (regardless of its specific location).

### 3.     Peer-to-Peer Connections for Gambling

41.     In another invention, Cantor Gaming developed the ability for users to engage in peer-to-peer gambling, which required the mobile-gaming platforms to have functionality that could verify users, and then identify nearby users in a secure manner. *See* '518 patent 14:1–34, 22:4–25, 22:46–50, 22:66–23:35, 23:55–25:21; '284 patent 12:24–15:53. The inventors needed a solution permitting mobile systems to find nearby users while maintaining privacy and confidentiality of their personally identifiable information. *See* '518 patent 9:37–52, 12:34–48, 22:4–25, 22:46–50, 22:66–23:35, 23:55–25:21; '284 patent 12:24–15:53.

42.     The inventors set out to develop their own proprietary location-tracking technology. This invention included identifying nearby users via Bluetooth or WiFi. *See* '518 patent 22:4–25, 22:43–50.

43.     In particular, the inventors developed a system that can determine whether a smartphone is in a particular geographic area where gambling is permitted. Using the smartphone's known location, the system can then use radio frequency (RF) signals from Bluetooth or WiFi to locate nearby smartphones. *See* '518 patent 7:13–50, 22:4–50.

44.     Once connected, the system can use the RF signals to determine the contact information of an identified smartphone, all while ensuring the privacy of both users and that both smartphones are in a geographical location where gambling is permitted. *See* '518 patent

19

7:13–50, 22:4–50. Specifically, to maintain privacy, a person is only notified of nearby users if those users are already known to the person. *See* '518 patent 21:19–29 ("[A] user may be made aware of the proximity of friends or colleagues.").

### 4.    Smartphone Screen Reformatting

45.    Finally, to improve the commercial value of mobile gaming, the inventors had to come up with unique ways to advertise gambling on smartphones. As explained, prior to mobile devices, people gambled onsite at casinos and other locations where gambling and betting were permitted. Casinos could thus directly advertise to consumers through various means, including brochures, word of mouth, and speaker systems. But such advertising was no longer possible as gambling shifted from an in-person activity to a mobile one.

46.    One major problem with advertising on smartphones relates to smartphone screen formatting. Smartphone hardware and software can vary dramatically and change over time. As such, advertisements designed for display on one device may not display properly on another device. Individual smartphones did not have a standard screen setting, so an individual's screen specification would vary based on the make and model of their device. The inventors needed a way to ensure that the mobile application was running smoothly on a user's device, regardless of the type of smartphone the user had. *See* '284 patent 59:26–40 (discussing converting advertisements for use on "a mobile gaming device" by, for example, "converting formats, converting size of images, converting amount of storage size needed (e.g., compressing, lowering fidelity, lowering resolution, etc.), converting colors, and so on," such that "the advertiser would not need to submit an advertisement formatted for each possible device").

47.    Further, the inventors had to take into account technological limitations of the internet and cellular connections. At that time, download speeds on mobile devices were slow,

20

making it difficult to process and display high-resolution images used in advertising. *See* '284 patent 59:26–40.

48.    In addition, while advertisements are an important tool for generating revenue, the primary revenue-generation tool for a mobile-gambling platform is the gambling experience itself. For that reason, it is important that the download, display, modification, and adaptation of advertisements do not interrupt or conflict with gambling. *See, e.g.*, '284 patent 23:37–63 ("For example, promotions may be presented in between games played on a mobile device."), 47:53–66. Still further, how and where such advertisements might be displayed so as not to disrupt the gambling experience depends on the type of device at issue. *See* '284 patent 28:61–29:3 ("Images and videos may be presented on the display screen in different places, and under different circumstances. For example, an image may be presented in the foreground or background, during a game or between games.").

49.    Accordingly, the inventors developed a system where the mobile application could determine how to format and display an advertisement on a mobile-device screen without affecting the user's gameplay. The technological solution consisted of first determining the user's type of smartphone and determining which types of advertisements could be displayed on their device. Next, the system determines where to display the advertisements and how big the display should be, and then adapts the advertisements to fit that area. *See* '284 patent 27:62–28:28, 28:61–29:3, 29:20–25, 30:14–23, 30:33–31:8, 31:18–29, 59:26–40, 74:50–75:13. The inventors did this by allowing a system to connect to a server, receive advertising data, identify where the advertising could be displayed on the screen relative to where gameplay would be displayed, and then transform the advertising data into an advertisement that could be so displayed. *See* '284 patent 27:62–28:28, 28:61–29:3, 29:20–25, 30:14–23, 30:33–31:8, 31:18–29,

59:26–40, 74:50–75:13. The inventors' system also allowed the users to interact with the advertisement to receive more information. *See, e.g.*, '284 patent 47:26–52 (A user may "respond[] to the promotion, e.g., by touching the display screen in an area labeled 'touch here to get more information about this product.'").

**THE ASSERTED PATENTS**

50.     The inventions discussed above are protected by a number of patents, including the Asserted Patents.

### A.     U.S. Patent No. 12,409,382

51.     On September 9, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,409,382, entitled "Smart Phone With Wrapper Application That Checks Whether the Smart Phone May Use a Gambling Application." A true and correct copy of the '382 patent is attached hereto as **Exhibit 1**. The '382 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '382 patent, including equitable relief and damages.

52.     The '382 patent claims priority to a number of patent applications with a priority date as early as August 13, 2010. The '382 patent is a continuation of U.S. Patent Application No. 18/198,572, filed May 17, 2023, which is a continuation of U.S. Patent Application No. 17/835,022, filed June 8, 2022, which is a continuation of U.S. Patent Application No. 16/900,494, filed June 12, 2020, which is a continuation of U.S. Patent Application No. 14/640,439, filed March 6, 2015, which is a continuation of U.S. Patent No. 8,974,302, filed April 5, 2011, and issued March 10, 2015, which is a continuation-in-part of U.S. Patent No. 8,956,231, filed March 24, 2011, and issued February 17, 2015. The '382 patent also claims priority to U.S. Provisional Application No. 61/373,435, filed August 13, 2010, U.S. Provisional Application No. 61/405,439, filed October 21, 2010, U.S. Provisional Application No.

61/405,309, filed October 21, 2010, U.S. Provisional Application No. 61/413,098, filed November 12, 2010, and U.S. Provisional Application No. 61/413,089, filed November 12, 2010.

53.     As explained above, the advent of mobile devices such as smartphones brought about technological challenges for ensuring that the users of such devices could lawfully gamble while also ensuring a unified experience regardless of the device they are using. The '382 patent addresses aspects of these challenges. Its claims are generally directed to root detection and device authentication. Specifically, the '382 patent claims the ability of a system to determine whether a device is permitted to execute a gambling application by determining whether the device is running unapproved processes, applications, or operating systems. *See* '382 patent claim 1. Importantly, by leveraging a "wrapper," authorization can be ensured across numerous types of devices because the wrapper enables using a unified programming language across a range of devices regardless of their specific requirements. And, as explained above, this was critical because the market at the time of invention was more fractured and had many device types that needed to be supported.

54.     The '382 patent discloses "various procedures" that "may be used to ensure security, authenticity, and/or locations of a customer and/or device" such that, "when in [a] location where such gaming is allowed [and] when a device is properly authorized and/or controlled, a customer may operate a mobile device to place one or more wagers from a wagering or other account over [a] communication network." '382 patent 20:17–32. These procedures address technological challenges specific to the use of wirelessly connected mobile devices, "designed to provide a desired level of confidence that a mobile device is not being accessed remotely, a mobile device has not been hacked, and/or a mobile device is at a location

23

where gaming is allowed." '382 patent 21:25–28. As explained above, this was critical because, if a user could root or jailbreak their device, they could potentially modify the device to make it appear as if it was in a different location (*e.g.*, a location where mobile gambling is legal) than where it actually was. The user could also leverage a rooted or jailbroken device to make it appear as if it is not rooted or jailbroken. Thus, the inventors needed to develop techniques that not only determined that a device was actually rooted or jailbroken, but also looked for fingerprints of a rooted or jailbroken device in case the user was intentionally trying to obfuscate that the device had been rooted or jailbroken.

55.     The '382 patent states that "[s]ome embodiments may include verifying a mobile device for use with a gaming service." '382 patent 23:18–19. "Such verification may include, for example, determining an authenticity of software, determining an operating system version, determining a communication network, and/or any other actions as desired." '382 patent 23:18–23. The '382 patent further states that the system can determine whether the mobile device is running an approved operating system "by reading a memory location, comparing files, comparing an operating system with a listing of approved operating systems, and so on." '382 patent 23:35–41. For example, "such a determination may include a determination that the device has not been rooted." '382 patent 23:53–55.

56.     The '382 patent further discloses that the system can determine whether there are any unapproved processes running or unapproved applications installed on the mobile device (*e.g.*, processes that might allow for jailbreaking, rooting, and location spoofing). *See* '382 patent 24:3–10. This determination can be made by performing "a search of a memory, a comparison of running and/or stored programs with a listing of approved and/or unapproved programs, and so on." '382 patent 24:3–10.

24

57.    After the system has searched for and determined that no unapproved systems, applications, or processes are installed on the mobile device, the device can be authorized, and the user can proceed to place wagers so long as they are in a gambling-approved location. An example of this process is shown in Figure 3, reproduced below.



FIG. 3

*See* '382 patent Fig. 3. As the '382 patent describes, the verification process depicted in Figure 3 involves "requesting an initiation of [] location tracking of a mobile device, tracking a mobile device, providing location information about a mobile device, determining if a customer has tampered with a client and/or operating system, determining whether one or more communication interfaces are enabled and/or active, and so on." '382 patent 36:63–37:10. By performing these specific checks, the system can verify that a user's mobile device has not been rooted or otherwise altered and is therefore permitted to engage in gambling.

58.     These techniques were unconventional at the time of the '382 patent. Monitoring gambling activities at brick-and-mortar casinos did not present similar technological challenges. Mobile gambling was in its infancy at the time of the '382 patent, as discussed above, and gambling applications carried a risk of fraud that was of little concern in other forms of mobile gaming. The devices could also be trivially rooted or jailbroken to spoof location, and there was a wide range of devices that needed to be supported and thus verified. The unconventional verification techniques recited in the '382 patent claims address these concerns by ensuring that the user's device has not been rooted or otherwise altered in an unapproved manner. For example, claim 1 recites "determining that the smart phone is not running an unapproved process; determining that the smart phone does not have an unapproved application installed; and determining that an operating system running on the smart phone is approved for use with the gambling service." '382 patent claim 1.

### B.      U.S. Patent No. 8,974,302

59.     On March 10, 2015, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 8,974,302, entitled "Multi-Process Communication Regarding Gaming Information." A true and correct copy of the '302 patent is attached hereto as **Exhibit 2**. The '302 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '302 patent, including equitable relief and damages. On April 12, 2024, a reexamination certificate issued amending claim 15 and adding claims 26–40.

60.     The '302 patent claims priority to a number of patent applications with a priority date as early as August 13, 2010. The '302 patent is a continuation-in-part of U.S. Patent No. 8,956,231, filed March 24, 2011, and issued February 17, 2015. The '302 patent also claims priority to U.S. Provisional Application No. 61/373,435, filed August 13, 2010, U.S. Provisional Application No. 61/405,439, filed October 21, 2010, U.S. Provisional Application

26

No. 61/405,309, filed October 21, 2010, U.S. Provisional Application No. 61/413,098, filed November 12, 2010, and U.S. Provisional Application No. 61/413,089, filed November 12, 2010.

61. As explained above, the advent of smartphones brought about technological challenges for ensuring that users of such devices are located where they purport to be and stay there while gambling. The '302 patent addresses these challenges. Its claims are generally directed to complex techniques for repeatedly checking a user's location in time intervals that are determined by the user's location, as well as checking the authorization status of a user's device—*i.e.*, whether the device is jailbroken or otherwise compromised. To "help ensure that a customer is/was at an approved area (e.g., when a location check is performed, when a wager request is received … , etc.)," the system may employ geofencing technology. '302 patent 52:20–24. These techniques address technological challenges specific to the use of wirelessly connected mobile devices and are "designed to provide a desired level of confidence that a mobile device is not being accessed remotely," "has not been hacked," and "is at a location where gaming is allowed." '302 patent 36:44–51. Moreover, there were technical limitations on how often a device's location could be checked due to battery life and cost concerns. These concerns were mitigated by the novel dynamic location checks disclosed in the '302 patent.

62. The '302 patent discloses the use of information received from these checks to determine whether the device is allowed to place bets in accordance with state-specific regulations. For example, the claimed apparatus performs a verification procedure that determines the eligibility of a device to meet state-specific regulations and, therefore, be permitted to allow mobile gaming. *See* '302 patent 35:46–56. An example of this procedure is shown in Figure 3, reproduced below.

27



*See* '302 patent Fig. 3. As the '302 patent describes, the verification process depicted in Figure 3 involves "requesting an initiation of [] location tracking of a mobile device, tracking a mobile device, providing location information about a mobile device, determining if a customer has tampered with a client and/or operating system, determining whether one or more communication interfaces are enabled and/or active, and so on." '302 patent 51:55–62.

63.     The specification of the '302 patent notes that, "[i]n some embodiments, to implement a geofencing technology, a gaming operator may work with Sprint, another geofencing provider, and/or a third party provider to ensure that desired locations are geofenced (e.g., the city of Las Vegas, Reno, Tahoe and/or other gaming locations within the state of Nevada and/or elsewhere)." '302 patent 36:29–35. The specification provides a further example, noting that "[s]uch a process may include use of a Soft tag and/or other location determination to locate the device." '302 patent 41:15–17.

64.     The specification provides additional examples of location tracking options, including an "architecture that may be used in some embodiments for location determination," as illustrated in Figure 7 ('302 patent 61:40–41), reproduced below.



FIGURE 7

*See* '302 patent Fig. 7.

65.    As the '302 patent specification notes, "one or more mobile device[s] may communicate with a gateway. Such a gateway may communicate with a location determination service. In some embodiments, the gateway may determine whether a location determination is desired (e.g., in response to a wager, periodically, in response to a variable becoming invalid, etc.)." '302 patent 53:33–41; 61:42–47.

66.    The '302 patent identifies a number of potential techniques for determining location, including soft tags, GPS, network identification, cellular towers, access points, and signal strengths. *See, e.g.,* '302 patent 62:60–63:8.

67.    The '302 patent goes a step further by checking whether the device itself is authorized and reliable. For example, the claims require the mobile application to ensure that the smartphone is not jailbroken or rooted such that the location may be spoofed. *See, e.g.,* '302 patent claim 1 ("determine whether a mobile device is authorized to use a gaming service"); claim 7 ("determine whether an operating system of the mobile device is authorized to use the

29

gaming service"). This can be done in a variety of ways, including by checking for any "jailbreak" applications, processes, or code located on the device. *See, e.g.*, '302 patent claim 34 ("access a list of applications installed on the mobile device" and "determine whether an application in the list of installed applications is disallowed from being installed"); claim 37 ("access a list of running processes on the mobile device" and "determine whether at least one of the running processes is disallowed").

68.     The '302 patent states that "verification may include, for example, determining an authenticity of software, determining an operating system version, determining a communication network, and/or any other actions as desired." '302 patent 38:34–42. Further, the '302 patent states that, "[i]n some embodiments software on the gaming device may be executed to perform verification. In some embodiments, a third party and/or second machine may perform verification." '302 patent 38:45–48.

69.     The '302 patent's claimed techniques are unconventional as compared to prior approaches. Monitoring gambling activities at brick-and-mortar casinos did not present similar technological challenges. Mobile gambling was in its infancy at the time of the '302 patent, as discussed above, and gambling applications carried a risk of fraud that was of little concern in other forms of mobile gaming. The unconventional techniques recited in the '302 patent claims address these concerns by ensuring that the user's precise location is approved and repeatedly checked, all while efficiently managing the device's battery life and location-checking costs. For example, claim 1 recites a combination of a mobile device, a user, and location verification, and "repeatedly … determine[s] whether the mobile device is within or without a geographical area in which the user is allowed to engage in gaming activity on the mobile device." '302 patent claim 1. And the dependent claims recite unconventional location-determination techniques to

ensure the user remains in an authorized area. *See, e.g.*, '302 patent claim 6 ("determining whether the mobile device is located within or without the gaming-allowed geographical area by querying a geofencing service"); claim 10 (determining frequency of location checks based on "speed of travel of the mobile device and the distance to the boundary" of an authorized area).

70.     Indeed, the validity of the '302 patent has been extensively litigated and upheld. For example, the Patent Trial and Appeal Board denied a petition for *inter partes* review of the '302 patent. *See* IPR2020-01108, Paper 10 at 23 (holding that "the Petition does not demonstrate a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim of the '302 patent"). Further, in November 2022, the U.S. Patent Office conducted an *ex parte* reexamination of the '302 patent and, in April 2024, issued an *ex parte* reexamination certificate upholding all claims of the '302 patent (and adding new patentable claims).

### C.     U.S. Patent No. 12,548,404

71.     On February 10, 2026, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,548,404, entitled "Multi-Level Device Verification for Mobile Gambling Applications." A true and correct copy of the '404 patent is attached hereto as **Exhibit 3**. The '404 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '404 patent, including equitable relief and damages. On March 24, 2026, a certificate of correction issued for the '404 patent, which corrected non-substantive, typographical errors in the issued claims.

72.     The '404 patent claims priority to a number of patent applications with priority dates as early as December 12, 2012. The '404 patent is a continuation of U.S. Patent Application No. 18/380,716, filed October 17, 2023, which is a continuation of U.S. Patent No. 11,842,607, filed May 24, 2021, and issued December 12, 2023, which is a continuation of U.S. Patent No. 11,017,630, filed November 3, 2016, and issued May 25, 2021, which is a

31

continuation of U.S. Patent No. 9,489,793, filed February 28, 2013, and issued November 8, 2016, which claims priority to U.S. Provisional Application No. 61/604,115, filed February 28, 2012, U.S. Provisional Application No. 61/680,168, filed August 6, 2012, and U.S. Provisional Application No. 61/736,087, filed December 12, 2012.

73.     The '404 patent claims a system using hierarchical location-determination services in order to determine whether a user is in the proper geolocation to utilize mobile-gaming services.

74.     As explained above, the advent of mobile devices brought about technological challenges for ensuring that the users of such devices are in a location where the user is authorized to gamble. Achieving the location precision required to ensure that a user was in a location where gambling was legal, all while the user could be moving or located in a variety of structures or areas with blocked or obstructed views of the sky, presented numerous challenges. The '404 patent addresses these challenges. Its claims are generally directed to a tiered, "multi-level" approach for detecting the location of a mobile device and its user, even when one or more location-determination techniques are insufficient or unavailable.

75.     The '404 patent's tiered approach uses several means by which to determine a user's location with unprecedented precision. In particular, the mobile application first attempts to determine the user's location through one means, such as GPS. However, GPS may not always be able to give a precise location or even any location at all, such as when a user is located indoors or has obstructed views of the sky. In those instances, a secondary location-determination means can be used, such as "triangulation through communication devices (e.g., cell towers)" or "a telephone network to determine a location of a cellular telephone or other device having a telephone number." '404 patent 7:15–48, 10:62–11:6, 48:36–46. That way,

32

if one means for identifying a user's location fails or is insufficient to achieve the requisite level of precision, another means can be employed.

76.    Ultimately, the location information is then used to determine whether the user of the device is authorized to gamble, and location "tracking may be performed continually" to ensure gambling is still authorized. *See* '404 patent 5:23–43, 49:5–13.

77.    These multi-level location-determination techniques were unconventional at the time of the '404 patent. Again, monitoring gambling activities at brick-and-mortar casinos did not present similar technological challenges because the user's location was known. Mobile gambling was in its infancy at the time of the '404 patent, as discussed above, and gambling applications carried a risk that a user may attempt to gamble outside of states in which mobile gambling was authorized. And the difference between legal gambling and illegal gambling could literally come down to inches or feet, especially as a user approaches a border or an area where gambling is restricted. The '404 patent addresses these technological challenges, which were specific to the use of wirelessly connected mobile devices. And the claims recite a specific solution to ensure that a user's precise location can be determined at all times, including by, for example, "attempt[ing] to determine a location of the smartphone based on GPS data of the smartphone," and if "GPS data is not determinable," "attempt[ing] to determine the location of the smartphone based on triangulation." '404 patent claim 1. The determined location is then correlated to "a U.S. state" to determine whether gambling is allowed. *Id.*

**D.    U.S. Patent No. 12,400,518**

78.    On August 26, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,400,518, entitled "System for Facilitating Online Wagering With Nearby Mobile Phones." A true and correct copy of the '518 patent is attached hereto as **Exhibit 4**. The '518 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of

33

recovery for any past, present, or future infringement of the '518 patent, including equitable relief and damages.

79.    The '518 patent claims priority to a number of patent applications with a priority date as early as May 5, 2006. The '518 patent is a continuation of U.S. Patent Application No. 18/093,007, filed January 4, 2023, which is a continuation of U.S. Patent Application No. 17/332,985, filed May 27, 2021, which is a continuation of U.S. Patent No. 11,024,120, filed December 20, 2019, and issued June 1, 2021, which is a continuation of U.S. Patent No. 10,535,223, filed January 26, 2015, and issued January 14, 2020, which is a continuation of U.S. Patent No. 8,939,359, filed March 15, 2007, and issued January 27, 2015, which is a continuation-in-part of U.S. Patent No. 7,549,576, filed May 5, 2006, and issued June 23, 2009.

80.    As explained above, the advent of mobile devices led to technological challenges to securely identify nearby users to facilitate peer-to-peer gambling. The '518 patent addresses these challenges. Its claims are generally directed to identifying such users by way of RF signals transmitted between mobile devices, particularly where the users already know each other.

81.    Figure 2 of the '518 patent, reproduced below, illustrates an environment in which two users may communicate over a "wireless network." '518 patent 2:21–23.



FIG. 2

*See* '518 patent Fig. 2. The figure illustrates two "mobile stations 24, which function as the gaming communication devices used by users to access [a] convenience gaming system and participate in the activities available on the convenience gaming system." '518 patent 5:2–6. Within that environment, the '518 patent explains that there are "[v]arious technologies [that] may allow a first device to recognize and/or to react to the presence of a second device." '518 patent 2:46–48. Examples of relevant technology in the '518 patent include WiFi, Bluetooth, infrared data transmission, and photographs. *See* '518 patent 22:45–23:35.

82.     The '518 patent specification also notes that "one or more devices may use positioning technologies to determine their own location." '518 patent 23:36–40. Examples of how to determine a mobile device's location can include GPS, long-range navigation, and radiolocation. *See* '518 patent 23:41–54. From there, the first cellular device may come into contact with the second device through RF signals. *See* '518 patent 24:8–20. The devices also determine whether they are within a defined geographic area using geometric algorithms. *See* '518 patent 24:17–20.

83.     The '518 patent also describes the ability for the signal from the second device to be associated with the user's name, and for the name of the second device's user to be displayed on the first mobile device. *See* '518 patent 21:19–29. Specifically, the specification notes that, "[i]f a friend of the user comes close enough that the device can detect the friend's apparatus, the device may display the name of the friend. The user may then look up to find his friend. A device may be configured to recognize one or more friends of a user. The device may be configured to recognize a particular signal and to match such signals with the names of the user's friends." '518 patent 21:30–43. The '518 patent achieves this by matching "a pattern associated

35

with the [] signal to … signal patterns" that are "maintained in a table stored on the mobile phone." '518 patent claim 1.

84.    The '518 patent claims expressly recite unconventional techniques for detecting the presence of other nearby mobile devices to enable peer gambling, all while ensuring appropriate privacy controls (*e.g.*, the patterns and names are already stored in a table on the mobile device). For example, claim 1 recites "detect[ing] a radio frequency (RF) signal from another mobile phone in the defined geographical area via at least one of a Bluetooth-based connection or a Wi-Fi-based connection," "determin[ing] that the other mobile phone in the defined geographical area is located nearby the mobile phone based on detecting the RF signal," "match[ing] a pattern associated with the RF signal to a plurality of signal patterns maintained in a table stored on the mobile phone, wherein the table associates different names with different signal patterns," and "enabl[ing] a user to submit a wager for a gambling event via the mobile phone based on detecting that the other mobile phone in the defined geographical area is located nearby the mobile phone." '518 patent claim 1. These techniques for enabling gambling based on the presence of a nearby device solve specific technological privacy issues arising in the mobile-gaming space.

### E.    U.S. Patent No. 12,406,284

85.    On September 2, 2025, the U.S. Patent Office duly and lawfully issued U.S. Patent No. 12,406,284, entitled "Mobile Device Proximity Tracking For Selective Content Delivery and Formatting." A true and correct copy of the '284 patent is attached hereto as **Exhibit 5**. The '284 patent is assigned to Interactive Games, and Interactive Games possesses the exclusive right of recovery for any past, present, or future infringement of the '284 patent, including equitable relief and damages.

36

86.     The '284 patent claims priority to a number of patent applications with a priority date as early as February 13, 2009. The '284 patent is a continuation of U.S. Patent Application No. 18/209,541, filed June 14, 2023, which is a continuation of U.S. Patent Application No. 17/750,536, filed May 23, 2022, which is a continuation of U.S. Patent No. 11,341,538, filed October 30, 2020, and issued May 24, 2022, which is a continuation of U.S. Patent No. 10,825,055, filed March 1, 2018, and issued November 3, 2020, which is a continuation of U.S. Patent No. 9,940,643, filed March 31, 2014, and issued April 10, 2018, which is a continuation of U.S. Patent No. 8,688,517, filed February 13, 2009, and issued April 1, 2014.

87.     As explained above, the advent of mobile devices brought about technological challenges for effectively curating, formatting, and displaying advertisements without disrupting gameplay. The '284 patent addresses these challenges. Its claims are generally directed to formatting and placing "low priority data," such as "image, text, or video data," on mobile-device screens without preventing the user from gambling. *See* '284 patent claim 1. These challenges have no analog in traditional brick-and-mortar casinos where advertisement data and gambling activities need not share a display.

88.     The '284 patent explains that a mobile device communicates with one or more server computers as shown in Figure 4, reproduced below.

37



*See* '284 patent Fig. 4. The servers can contain a promotion database (440) that stores "data associated with promotions," including image data, video data, audio data, text data, data descriptive of a promotion, and other qualifying data. '284 patent 22:1–39. The server then determines which promotion to provide to the user based on various factors, including the location of the mobile device. *See* '284 patent 74:28–39. "For example, some promotions may be shown in a particular casino or based on a player's location within a casino. Each casino may have its own ad server from which promotions are transmitted to devices." '284 patent 74:28–39, 93:37–49.

89.    The '284 patent further describes reformatting the promotion to fit on various mobile device screens. The '284 patent specification notes that this reformatting can include "converting formats, converting size of images, converting amount of storage size needed (e.g.,

compressing, lowering fidelity, lowering resolution, etc.), converting colors, and so on. By so converting, an advertiser may have an easier time interfacing with the devices because the advertiser would not need to submit an advertisement formatted for each possible device." '284 patent 59:22–25.

90.    The '284 patent also describes displaying the advertisement on an output device, which can include display monitors, speakers, and other communication devices. *See* '284 patent 21:42–67.

91.    These techniques were unconventional at the time of the '284 patent. Advertising at brick-and-mortar casinos did not present similar technological challenges, as advertising platforms were fixed in size and capability. Mobile gambling was in its infancy at the time of the '284 patent, as discussed above, and the inventors of the '284 patent recognized the importance of advertising and marketing but also understood that such advertising and marketing could not disrupt gameplay. This problem was exacerbated by the wide variety of devices with different screen sizes and functionality that needed to be supported. Accordingly, claim 1 recites "receiv[ing] … low priority data [that] includes an image, text, or video data, and wherein the low priority data is based at least on a type of the mobile phone or the location data." '284 patent claim 1. Claim 1 further recites "identify[ing] an area of the user interface to display the low priority data … such that the low priority data does not interfere with high priority data displayed on the user interface" and automatically "reformat[ting] the low priority data to fit the identified area." '284 patent claim 1. Through these unconventional techniques, advertisers need not create multiple versions of advertisements for each device, and users may receive appropriate advertisements without disrupting their gameplay.

39

## DRAFTKINGS' INFRINGING TECHNOLOGY AND CONDUCT

### A.    DraftKings' Mobile Apps

92.    On information and belief, DraftKings is a digital sports entertainment and gaming company.

93.    On information and belief, DraftKings was established in 2012 as a fantasy sports service company. Fantasy sports allow users to create and develop sports teams utilizing real-world athletes who score points during games.

94.    On information and belief, as of today, DraftKings operates a number of mobile applications and web-based interfaces offering sports betting, casino games, and fantasy sports, including the Sportsbook, Casino, Golden Nugget, Fantasy Sports, Pick6, and DK Horse applications.[22] DraftKings' Mobile Apps can be downloaded and used on any iOS or Android device.[23]

---

[22] *See* https://www.draftkings.com/mobileapps (Exhibit 29).

[23] The six images below are screenshots of DraftKings' Mobile Apps as they appear on an iOS device.









41




95.     Further, DraftKings' Mobile Apps can be used through a web browser from a desktop, laptop, or other computer, as shown below.



*See* https://www.draftkings.com/[24] (last accessed April 16, 2025).

---

[24] *See* Exhibit 11.



*See* https://sportsbook.draftkings.com/[25] (last accessed April 16, 2025).



*See* https://casino.draftkings.com/[26](last accessed April 16, 2025).

---

[25] *See* Exhibit 30.

[26] *See* Exhibit 31.



*See* https://www.goldennuggetcasino.com/[27] (last accessed July 14, 2025).



*See* https://www.draftkings.com/dfs[28] (last accessed Oct. 12, 2025).

---

[27] *See* Exhibit 32.

[28] *See* Exhibit 33.



*See* https://pick6.draftkings.com/[29] (last accessed April 16, 2025).



*See* https://www.dkhorse.com/[30] (last accessed July 14, 2025).

### 1.    DraftKings Sportsbook & Casino Application (Sportsbook)

96.    On information and belief, in 2018, DraftKings launched its first online

sportsbook, DraftKings Sportsbook, in the state of New Jersey. According to a press release at

---

[29] *See* Exhibit 34.

[30] *See* Exhibit 35.

the time, DraftKings Sportsbook "offers nearly every available sport and type of wager, including a full suite of props and in-game betting options."[31] The Sportsbook application now also has casino games embedded within the application.[32]

97.    The Sportsbook application allows users to make bets on various sporting events. DraftKings notes that "[m]oneylines, spreads, and parlays are the most common bets to choose from, but there are also prop bets which allow you to have a vested interest in more specific outcomes, like how many points a certain player will score. The world of sports betting is vast, and there's something for just about anyone."[33]

98.    The Sportsbook application is available in approved states, and subject to each state's specific regulations. Today, the Sportsbook application is operable in, among other places, Massachusetts.[34]

99.    The Sportsbook application must implement location tracking for each user device connecting to DraftKings' servers in order to adhere to state-specific regulations and guidelines. The failure to do so could result in penalties and fines from various state actors.

100.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, DraftKings' Mobile Apps, including at least the Sportsbook application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

---

[31] *See* https://www.legalsportsreport.com/22598/draftkings-sportsbook-launch-nj-sports-betting/ at 2 (Exhibit 36).

[32] *See* https://www.draftkings.com/news-2020-06-draftkings-launches-mobile-casino-app-in-new-jersey (Exhibit 37).

[33] *See* https://sportsbook.draftkings.com/help/how-to-bet (Exhibit 38).

[34] *See* https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal (Exhibit 39).

## 2.    DraftKings Casino Application (Casino)

101.    On information and belief, in June 2020, DraftKings launched its standalone Casino application in New Jersey.[35] The company's press release stated that, "[i]n addition to popular slot and table games native to DraftKings Casino, the new app will also offer games from third-party providers including International Gaming Technology, Slingo, Scientific Games and more."[36]

102.    The Casino application allows users to play a variety of casino games using real-world money. Examples of games include slots, table games, live dealers, blackjack, roulette, craps, and poker.[37] DraftKings' website for the Casino application notes that "[y]ou'll find what you're looking for on DraftKings Casino. … With a huge variety of games and an easy-to-use platform, DraftKings is a great online casino for all kinds of player preferences and skill levels."[38]

103.    The Casino application is available in approved states and subject to each state's specific regulations. Today, the Casino application is available in five states.[39]

104.    The Casino application implements location tracking for each user device connecting to DraftKings' servers in order to adhere to state-specific regulations and guidelines. The failure to do so could result in penalties and fines from various state actors.

---

[35] *See* https://www.draftkings.com/news-2020-06-draftkings-launches-mobile-casino-app-in-new-jersey (Exhibit 37).

[36] *See id.*

[37] *See* https://casino.draftkings.com (Exhibit 31).

[38] *See id.*

[39] *See id.*

47

105.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, DraftKings' Mobile Apps, including at least the Casino application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 3.    DraftKings' Golden Nugget Online Casino Application (Golden Nugget)

106.    On information and belief, in May 2022, DraftKings acquired the Golden Nugget application.[40] According to the Apple App Store, the Golden Nugget application allows users to play their "favorite slot, blackjack and table casino games, all from the convenience of your phone or tablet."[41] The Golden Nugget application includes the ability to play games with a live dealer.

107.    Through the Golden Nugget application, users can place bets with real money and win cash prizes. The Golden Nugget application includes games like baccarat, blackjack, craps, roulette, slots, and video poker.[42]

108.    The Golden Nugget application is legal in select states.[43]

---

[40] *See* https://draftkings.gcs-web.com/news-releases/news-release-details/draftkings-completes-acquisition-golden-nugget-online-gaming (Exhibit 40).

[41] *See* https://apps.apple.com/us/app/golden-nugget-online-casino/id1632626653 at 1 (Exhibit 41).

[42] *See* https://www.goldennuggetcasino.com/gn-how-to-play-casino-games (Exhibit 42).

[43] *See* https://www.goldennuggetcasino.com/where-is-gn-online-gambling-legal (Exhibit 43).



109.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, DraftKings' Mobile Apps, including at least the Golden Nugget application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 4.    DraftKings Fantasy Sports Application (Fantasy Sports)

110.    On information and belief, DraftKings operates its fantasy sports operations through its website and the Fantasy Sports application, which are accessible on smartphones, tablets, and computers.

111.    The Fantasy Sports application allows users to create sports line-ups for various leagues and competitions. Through their teams, users can compete in various competitions, including weekly and daily competitions. The Fantasy Sports application covers various leagues, which are listed below.[44]

---

[44] *See* https://www.draftkings.com/dfs (Exhibit 33).



112.    The Fantasy Sports application allows users to enter different contests for each of the listed sports. According to DraftKings' website for the Fantasy Sports application, users "choose from a wide range of contests across all different sports."[45] DraftKings defines a contest as a "specific competition you and your lineup will be competing in against other players for prizes."[46]

113.    On information and belief, the Fantasy Sports application is legal to play in the majority of states, including Massachusetts.

114.    The Fantasy Sports application offers various contest types for users to partake in, including:[47]

---

[45] *See* https://www.draftkings.com/how-to-play at 1 (Exhibit 44).

[46] *See id.*

[47] *See id.* at 2.

(a)     Single State: "Draft any three players to your roster and compete to see who can get the most of a single stat category. No need to worry about fantasy points and salary caps."

(b)     Casual: "Open to players who have over 50 contests under their belt but haven't earned an experience badge."

(c)     Head-to-Head: "Face-off against a single opponent. Score higher and bring home the win."

(d)     In-Game Showdowns: "Fantasy contests for just the second half and overtime (if it happens) of a single game. Pick the players you think will crush it in the clutch."

(e)     Tournament: "Small and large field contests with huge prizes. Mix it up in private or with the public."

(f)     Best Ball: "Season-long fantasy contests where you build your roster in a Snake Draft, then use that same team for the entire season—with no roster management needed."

(g)     Flash Draft: "Compete while watching a live game[,]" and "[d]rafts consist of five rounds. You'll have 15 seconds to pick who you think will score the most fantasy points from three given options, with no salary."[48]

(h)     Single-Game Showdown: "Draft your lineup from just the two teams competing in a single game while staying under the salary cap."

---

[48] *See* https://www.draftkings.com/flash-draft (Exhibit 45).

51

(i)    <u>Leagues</u>: "Create private contests to play with your friends. Compete in any sport at any time and track your results on your league's exclusive leaderboard."

(j)    <u>Tiers</u>: "Draft a team from sets of smaller players. No need to worry about positions or a salary cap. Simply pick one player from each tier."

(k)    <u>Snake Draft</u>: "Teams take turns picking players in a live draft and the order reverses each round. Once it's complete, sit back and watch without having to manage your roster."

(l)    <u>Free-to-Play Pools</u>: "Free contests where you simply make picks for a range of questions or topics. Your payout depends on the number of players, total prize amount, and number of winners."

(m)    <u>50/50s</u>: "All you gotta do is finish in the top half of the field and you win!"

(n)    <u>Satellites and Qualifiers</u>: "Compete for tickets that get you entry into higher-stakes contests."

(o)    <u>Beginner Contests</u>: "A great way for DFS rookies to get in on the action. We recommend starting here or in low-cost private contests."

115.    Through its various competitions and contests, users place bets using real money for the chance to win a monetary prize.

116.    The Fantasy Sports application is available online through https://www.draftkings.com/dfs[49] and is also available as a mobile app for both iOS and Android devices.

---

[49] *See* Exhibit 33.

52

117.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, DraftKings' Mobile Apps, including at least the Fantasy Sports application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 5.    DraftKings Pick6 Fantasy Application (Pick6)

118.    On information and belief, in 2023, DraftKings launched its Pick6 application. According to DraftKings' website, "Pick6 is a peer-to-peer Fantasy Sports (DFS) contest format" where "you can build lineups of 2 or more players (3 or more if you are physically located in Colorado) and compete against others with the same lineup size."[50] Once players make their picks and pay an entry fee, they "[c]ompete in contests against other users' pick sets and win prizes by making the required number of correct picks."[51]

119.    The Pick6 application is available online through https://pick6.draftkings.com[52] and through mobile apps for both iOS and Android devices.

120.    The Pick6 application covers a number of sports, including the NFL, MLB, college football, WNBA, soccer, NASCAR, UFC, PGA Tour, and many other major sports.[53] Moreover, the website explains that "Pick6 contests are $1 entry contests. Each $1 of your

---

[50] *See* https://support.draftkings.com/dk/en-us/what-is-pick6-overview?id=kb_article_view&sysparm_article=KB0010366 (Exhibit 46); *see also* https://support.draftkings.com/dk/en-us/how-it-works-contest-distribution-and-prizing?id=kb_article_view&sysparm_article=KB0010358 (Exhibit 47).

[51] *See* https://pick6.draftkings.com/pick6-rules-and-scoring at 1 (Exhibit 48).

[52] *See* Exhibit 34.

[53] *See* https://pick6.draftkings.com/how-to-play-pick6 (Exhibit 49).

53

Entry Fees represents a single entry into a contest and each entry is competing for a share of the contest's total prizes."[54]

121.    The Pick6 application is available in several states, including Massachusetts.[55]





122.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, DraftKings' Mobile Apps, including at least the Pick6 application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

### 6.    DK Horse Racing & Betting Application (DK Horse)

123.    On information and belief, in 2023, DraftKings launched its DK Horse application. According to the press release, "DK Horse customers will be able to wager on some of the most renowned horse races in the U.S., including Churchill Downs' premier racing

---

[54] *See* https://support.draftkings.com/dk/en-us/how-it-works-contest-distribution-and-prizing?id=kb_article_view&sysparm_article=KB0010358 (Exhibit 47).

[55] *See* https://pick6.draftkings.com/where-is-pick6-available (Exhibit 50).

products like the Oaks and Derby. DK Horse will also give customers the ability to handicap races, wager, and stream video of races all within their DK Horse account. Furthermore, DK Horse will offer a betting guide to inform its customers of upcoming races and the various ways to wager."[56]

124.    The DK Horse application touts that "you'll find easy access to horse racing from the web or our dedicated horse racing app on the go."[57]

125.    The DK Horse application is legal in select states, including Massachusetts.[58]



126.    As explained below and in the accompanying claim charts (Exhibits 6–10), on information and belief, DraftKings' Mobile Apps, including at least the DK Horse application, incorporate Interactive Games' innovative solutions for gambling and practice all asserted claims of the Asserted Patents.

**B.    DraftKings' Location Services and User Verification Requirements**

127.    On information and belief, DraftKings' Mobile Apps include services for detecting the location of users and verifying those users.

---

[56] *See* https://draftkings.gcs-web.com/news-releases/news-release-details/draftkings-launches-dk-horse-app (Exhibit 51).

[57] *See* https://www.dkhorse.com/ (Exhibit 35).

[58] *See id.*

128.   According to DraftKings, "[t]o use DraftKings products, your physical location must be verified at time of use." [59] On information and belief, DraftKings' software in DraftKings' Mobile Apps embeds location-verifying routines provided by third-party GeoComply Solutions Inc. (GeoComply).[60] These routines are included in DraftKings' Mobile Apps that are installed on users' devices and are responsible for determining and verifying that users are permitted to gamble.

129.   On information and belief, DraftKings puts GeoComply's system into service such that DraftKings controls the system and obtains a benefit from it. In particular, DraftKings wrote its software specifically to leverage GeoComply's system, intending and expecting for the system to return users' locations. On information and belief, moreover, DraftKings exerts direction and control over GeoComply and its system such that DraftKings controls the performance of the GeoComply system and directly benefits from such performance. In particular, on information and belief, DraftKings contracts with GeoComply for GeoComply to perform geolocation services for DraftKings' Mobile Apps. DraftKings obtains benefits, including profits, from the use of GeoComply systems since its applications could not legally operate without geolocation services.

---

[59] *See* https://support.draftkings.com/dk/en-us/using-draftkings-with-geocomply-location-services-overview-us?id=kb_article_view&sysparm_article=KB0010726 (Exhibit 52).

[60] *See id.* ("DraftKings utilizes the GeoComply Player Location Check plugin to provide this service, which is required by multiple state regulators for licensed online sportsbooks and casinos."); *see also* https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/ (Exhibit 53).

56

130.    According to GeoComply, its system can "pinpoint[] a customer's location to within meters, to accurately determine if they're in a sanctioned country or a restricted jurisdiction."[61]

131.    In addition, GeoComply can further validate a user's mobile device, including by running "hundreds of location data, device integrity, and identity fraud checks on every geolocation transaction to detect suspicious activity."[62]

132.    On information and belief, GeoComply repeatedly checks the location of users. For example, GeoComply notes that its system "[p]rotects against fraudulent activities associated with users such as location jumping, proxy betting, account sharing and account takeover."[63] Further, GeoComply notes that "[o]ur rules engine runs hundreds of location data, device integrity, and identity fraud checks on every geolocation transaction to detect suspicious activity."[64] Moreover, GeoComply informed state legislatures that users are "rechecked more often as you approach the [state] border."[65]

133.    On information and belief, DraftKings' Mobile Apps and services cease working if the player moves outside a jurisdiction in which gambling is legal. For example, DraftKings' website notes that, "[i]f you leave a jurisdiction where playing is legal to a jurisdiction where

---

[61] *See* https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/ (Exhibit 53).

[62] *See id.*

[63] *See id.*

[64] *See id.*

[65] https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2015_0059T.pdf at 98:23–99:4 (Exhibit 54).

playing isn't legal during your session, you'll no longer be eligible to continue playing and your session will be terminated."[66]

134.    In addition, DraftKings' Mobile Apps require user verification. For example, DraftKings notes that the following information is required while using DraftKings' Mobile Apps: full name, current home address, date of birth, and social security number.[67]

135.    On information and belief, DraftKings' Mobile Apps allow users to partake in various gambling or betting games while "on the go." Further, DraftKings' Mobile Apps determine whether the mobile device is authorized to use DraftKings' Mobile Apps and the location of the user through its use of geolocation detection software, and allow the users to partake in DraftKings' products and services if the requisite criteria are met.

### C.    DraftKings' Harm to Interactive Games

136.    DraftKings places DraftKings' Mobile Apps into the stream of commerce by providing, using, and testing its gaming products and services. On information and belief, DraftKings controls its gaming application platforms and benefits from its sole control, including dictating the use of any third-party software.

137.    DraftKings has substantially profited from the infringing use of Interactive Games' technology. For example, it was reported that DraftKings generated $4.7 billion in

---

[66] *See* https://support.draftkings.com/dk/en-us/what-happens-if-i-leave-a-jurisdiction-in-the-middle-of-a-casino-game?id=kb_article_view&sysparm_article=KB0010511 (Exhibit 55).

[67] *See* https://support.draftkings.com/dk/en-us/why-am-i-being-asked-to-verify-my-identity-us?id=kb_article_view&sysparm_article=KB0010467 (Exhibit 56); *see also* https://support.draftkings.com/dk/en-us/why-am-i-asked-to-provide-my-social-security-number-ssn-to-draftkings-us?id=kb_article_view&sysparm_article=KB0010509 (Exhibit 57).

revenue in 2024, and "almost all of it came through its sportsbook service."[68] Further, as of 2024, it was estimated that DraftKings has 4.8 million active users.[69]

138. DraftKings' infringement causes irreparable harm to Interactive Games such that a permanent injunction is appropriate. *See* Statement of Interest of the United States of America, *Radian Memory Sys. LLC v. Samsung Elec. Co., Ltd.*, No. 2:24-cv-01073 (E.D. Tex. June 24, 2025), ECF No. 52. For example, DraftKings' use of Interactive Games' technology causes Interactive Games harm in the marketplace by infringing its patents and interfering with potential license arrangements, among other harms. Moreover, in the absence of an injunction, other companies would be encouraged to infringe Interactive Games' patents as well.

**D.    DraftKings' Knowledge of Interactive Games' Patent Portfolio**

139. In 2014, Cantor Fitzgerald L.P. sent a letter to DraftKings notifying it of the patent assets owned by Cantor Fitzgerald L.P. and its affiliates (including Interactive Games).[70] In the letter, Cantor Fitzgerald L.P. explained that its patent assets include a portfolio relating to fantasy sports, fantasy sports websites, and fantasy sports-related services, applications, and platforms. The letter also invited DraftKings to license the portfolio. To help facilitate licensing discussions, the letter cited patents that DraftKings was infringing at the time and additionally cited pending patent applications.

140. On information and belief, DraftKings is aware of Interactive Games' innovation in this space, monitors Interactive Games' patent portfolio, and is aware of any new patents that issue.

---

[68] *See* https://www.businessofapps.com/data/draftkings-statistics/ at 2 (Exhibit 58).

[69] *Id.*

[70] *See* Exhibit 59.

141.    Additionally, on April 1, 2026—before filing this lawsuit—Interactive Games sent a notice letter to DraftKings informing it of the Asserted Patents and explaining why and how DraftKings' Mobile Apps infringe each patent in nearly 275 pages of detailed infringement claim charts.[71]

### COUNT I: INFRINGEMENT OF U.S. PATENT NO. 12,409,382

142.    Interactive Games realleges and incorporates by reference paragraphs 1 through 141 as if fully set forth herein.

143.    At all times herein mentioned, the '382 patent has been and is valid and fully enforceable.

144.    By making, using, selling, and offering to sell in the United States, and importing into the United States, DraftKings' Mobile Apps and services, DraftKings directly infringes certain claims of the '382 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, DraftKings tests the Mobile Apps in a manner that directly infringes the '382 patent. As an example, DraftKings has infringed and continues to infringe at least claims 1–26 and 29 of the '382 patent as illustrated in the claim chart attached as **Exhibit 6**.

145.    At no time has Interactive Games granted DraftKings authorization, license, or permission to utilize the inventions claimed in the '382 patent.

---

[71] *See* Exhibit 60.

146.    On information and belief, DraftKings has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to DraftKings' business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

147.    Additionally, on April 1, 2026, Interactive Games sent DraftKings a letter notifying it of the '382 patent and explaining why and how DraftKings' Mobile Apps infringe the '382 patent.[72] Thus, on information and belief, DraftKings was aware of the '382 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

148.    DraftKings, with knowledge of the '382 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of DraftKings' Mobile Apps, to infringe the '382 patent. These actions include:

- encouraging users to download or use DraftKings' Mobile Apps on their mobile devices through marketing.

- providing support for its users to use DraftKings' Mobile Apps through its websites and mobile applications, including through help pages and an online "chatbot." *See, e.g.*, https://support.draftkings.com (Exhibit 61).

- providing instructions to its users on how to use DraftKings' Mobile Apps, including through video guides and its "DraftKings; New Player Getting Started Guide." *See, e.g.*, https://support.draftkings.com/dk/en-us/draftkings-new-player-getting-started-guide?id=kb_article_view&sysparm_article=KB0010391 (Exhibit 62).

- requiring users to activate and use geolocation services prior to using DraftKings' Mobile Apps. *See, e.g.*, https://support.draftkings.com/dk/en-us/using-draftkings-with-geocomply-location-services-overview-us?id=kb_article_view&sysparm_article=KB0010726 (Exhibit 52).

- placing DraftKings' Mobile Apps on both the Apple App Store and Google Play Store for users to download.

---

[72] *See* Exhibit 60.

149.    DraftKings has been aware of the '382 patent and has knowingly continued to infringe the '382 patent, such that the infringement is willful. On information and belief, DraftKings will continue to willfully infringe the '382 patent.

150.    Interactive Games will suffer irreparable harm unless DraftKings is enjoined from infringing the '382 patent.

151.    As a result of DraftKings' infringement of the '382 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for DraftKings' infringing acts as provided by 35 U.S.C. § 284.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,974,302

152.    Interactive Games realleges and incorporates by reference paragraphs 1 through 151 as if fully set forth herein.

153.    At all times herein mentioned, the '302 patent has been and is valid and fully enforceable.

154.    By making, using, selling, and offering to sell in the United States, and importing into the United States, DraftKings' Mobile Apps and services, DraftKings directly infringes certain claims of the '302 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, DraftKings tests the Mobile Apps in a manner that directly infringes the '302 patent. As an example, DraftKings has infringed and continues to infringe at least claims 1–17, 19–24, 26, and 28–40 of the '302 patent as illustrated in the claim chart attached as **Exhibit 7.**

155.    At no time has Interactive Games granted DraftKings authorization, license, or permission to utilize the inventions claimed in the '302 patent.

156.    On information and belief, DraftKings has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to DraftKings' business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

157.    DraftKings has known about the '302 patent since at least June 14, 2019, when Interactive Games filed a previous lawsuit asserting the patent against DraftKings. *See Interactive Games LLC v. DraftKings, Inc.*, No. 1:19-cv-01105-RGA (D. Del.).

158.    Additionally, on April 1, 2026, Interactive Games sent DraftKings a letter notifying it of the '302 patent and explaining why and how DraftKings' Mobile Apps infringe the '302 patent.[73] Thus, on information and belief, DraftKings was aware of the '302 patent at least as of its issuance date or, alternatively, June 14, 2019, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

159.    DraftKings, with knowledge of the '302 patent, has engaged in an extensive pattern of conduct intended to induce others, including users of DraftKings' Mobile Apps, to infringe the '302 patent. These actions include:

- encouraging users to download or use DraftKings' Mobile Apps on their mobile devices through marketing.

- providing support for its users to use DraftKings' Mobile Apps through its websites and mobile applications, including through help pages and an online "chatbot." *See, e.g.*, https://support.draftkings.com (Exhibit 61).

- providing instructions to its users on how to use DraftKings' Mobile Apps, including through video guides and its "DraftKings; New Player Getting Started Guide." *See, e.g.*, https://support.draftkings.com/dk/en-us/draftkings-new-player-getting-started-guide?id=kb_article_view&sysparm_article=KB0010391 (Exhibit 62).

- requiring users to activate and use geolocation services prior to using DraftKings' Mobile Apps. *See, e.g.*, https://support.draftkings.com/dk/en-us/using-draftkings-

---

[73] *See* Exhibit 60.

with-geocomply-location-services-overview-
us?id=kb_article_view&sysparm_article=KB0010726 (Exhibit 52).

- placing DraftKings' Mobile Apps on both the Apple App Store and Google Play Store for users to download.

160.    DraftKings' infringement of the '302 patent has been willful since at least June 14, 2019. On information and belief, DraftKings will continue to willfully infringe the '302 patent.

161.    Interactive Games will suffer irreparable harm unless DraftKings is enjoined from infringing the '302 patent.

162.    As a result of DraftKings' infringement of the '302 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for DraftKings' infringing acts as provided by 35 U.S.C. § 284.

### COUNT III: INFRINGEMENT OF U.S. PATENT NO. 12,548,404

163.    Interactive Games realleges and incorporates by reference paragraphs 1 through 162 as if fully set forth herein.

164.    At all times herein mentioned, the '404 patent has been and is valid and fully enforceable.

165.    By making, using, selling, and offering to sell in the United States, and importing into the United States, DraftKings' Mobile Apps and services, DraftKings directly infringes certain claims of the '404 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, DraftKings tests the Mobile Apps in a manner that directly infringes the '404 patent. As an example, DraftKings has infringed and continues to infringe at

least claims 2, 3, 5–9, 11, 12, 14–18, 20, 21, and 23–27 of the '404 patent as illustrated in the claim chart attached as **Exhibit 8.**

166.    At no time has Interactive Games granted DraftKings authorization, license, or permission to utilize the inventions claimed in the '404 patent.

167.    On information and belief, DraftKings has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to DraftKings' business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

168.    Additionally, on April 1, 2026, Interactive Games sent DraftKings a letter notifying it of the '404 patent and explaining why and how DraftKings' Mobile Apps infringe the '404 patent.[74] Thus, on information and belief, DraftKings was aware of the '404 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

169.    DraftKings, with knowledge of the '404 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of DraftKings' Mobile Apps, to infringe the '404 patent. These actions include:

- encouraging users to download or use DraftKings' Mobile Apps on their mobile devices through marketing.

- providing support for its users to use DraftKings' Mobile Apps through its websites and mobile applications, including through help pages and an online "chatbot." *See, e.g.*, https://support.draftkings.com (Exhibit 61).

- providing instructions to its users on how to use DraftKings' Mobile Apps, including through video guides and its "DraftKings; New Player Getting Started Guide." *See, e.g.*, https://support.draftkings.com/dk/en-us/draftkings-new-player-getting-started-guide?id=kb_article_view&sysparm_article=KB0010391 (Exhibit 62).

---

[74] *See* Exhibit 60.

- requiring users to activate and use geolocation services prior to using DraftKings' Mobile Apps. *See, e.g.*, https://support.draftkings.com/dk/en-us/using-draftkings-with-geocomply-location-services-overview-us?id=kb_article_view&sysparm_article=KB0010726 (Exhibit 52).

- placing DraftKings' Mobile Apps on both the Apple App Store and Google Play Store for users to download.

170.   DraftKings has been aware of the '404 patent and has knowingly continued to infringe the '404 patent, such that the infringement is willful. On information and belief, DraftKings will continue to willfully infringe the '404 patent.

171.   Interactive Games will suffer irreparable harm unless DraftKings is enjoined from infringing the '404 patent.

172.   As a result of DraftKings' infringement of the '404 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for DraftKings' infringing acts as provided by 35 U.S.C. § 284.

### COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 12,400,518

173.   Interactive Games realleges and incorporates by reference paragraphs 1 through 172 as if fully set forth herein.

174.   At all times herein mentioned, the '518 patent has been and is valid and fully enforceable.

175.   By making, using, selling, and offering to sell in the United States, and importing into the United States, DraftKings' Mobile Apps and services, DraftKings directly infringes certain claims of the '518 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, DraftKings tests the Mobile Apps in a manner that directly infringes the '518 patent. As an example, DraftKings has infringed and continues to infringe at

least claims 1–21 and 24 of the '518 patent as illustrated in the claim chart attached as **Exhibit 9.**

176.    At no time has Interactive Games granted DraftKings authorization, license, or permission to utilize the inventions claimed in the '518 patent.

177.    On information and belief, DraftKings has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to DraftKings' business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

178.    Additionally, on April 1, 2026, Interactive Games sent DraftKings a letter notifying it of the '518 patent and explaining why and how DraftKings' Mobile Apps infringe the '518 patent.[75] Thus, on information and belief, DraftKings was aware of the '518 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

179.    DraftKings, with knowledge of the '518 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of DraftKings' Mobile Apps, to infringe the '518 patent. These actions include:

- encouraging users to download or use DraftKings' Mobile Apps on their mobile devices through marketing.

- providing support for its users to use DraftKings' Mobile Apps through its websites and mobile applications, including through help pages and an online "chatbot." *See, e.g.*, https://support.draftkings.com (Exhibit 61).

- providing instructions to its users on how to use DraftKings' Mobile Apps, including through video guides and its "DraftKings; New Player Getting Started Guide." *See, e.g.*, https://support.draftkings.com/dk/en-us/draftkings-new-player-getting-started-guide?id=kb_article_view&sysparm_article=KB0010391 (Exhibit 62).

---

[75] *See* Exhibit 60.

- requiring users to activate and use geolocation services prior to using DraftKings' Mobile Apps. *See, e.g.*, https://support.draftkings.com/dk/en-us/using-draftkings-with-geocomply-location-services-overview-us?id=kb_article_view&sysparm_article=KB0010726 (Exhibit 52).

- placing DraftKings' Mobile Apps on both the Apple App Store and Google Play Store for users to download.

180.    DraftKings has been aware of the '518 patent and has knowingly continued to infringe the '518 patent, such that the infringement is willful. On information and belief, DraftKings will continue to willfully infringe the '518 patent.

181.    Interactive Games will suffer irreparable harm unless DraftKings is enjoined from infringing the '518 patent.

182.    As a result of DraftKings' infringement of the '518 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for DraftKings' infringing acts as provided by 35 U.S.C. § 284.

**COUNT V: INFRINGEMENT OF U.S. PATENT NO. 12,406,284**

183.    Interactive Games realleges and incorporates by reference paragraphs 1 through 182 as if fully set forth herein.

184.    At all times herein mentioned, the '284 patent has been and is valid and fully enforceable.

185.    By making, using, selling, and offering to sell in the United States, and importing into the United States, DraftKings' Mobile Apps and services, DraftKings directly infringes certain claims of the '284 patent—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271. Additionally, on information and belief, to comply with applicable regulatory requirements and to ensure that its location service is operating correctly, DraftKings tests the Mobile Apps in a manner that directly infringes the '284 patent. As an example, DraftKings has infringed and continues to infringe at

least claims 1–4, 8, 10–14, 16–23, and 25–28 of the '284 patent as illustrated in the claim chart attached as **Exhibit 10**.

186.   At no time has Interactive Games granted DraftKings authorization, license, or permission to utilize the inventions claimed in the '284 patent.

187.   On information and belief, DraftKings has knowledge of Cantor Gaming's gaming-related portfolio and its relevance to DraftKings' business, monitors the portfolio, and is aware of Cantor Gaming's gaming-related patents when they issue.

188.   Additionally, on April 1, 2026, Interactive Games sent DraftKings a letter notifying it of the '284 patent and explaining why and how DraftKings' Mobile Apps infringe the '284 patent.[76] Thus, on information and belief, DraftKings was aware of the '284 patent at least as of its issuance date, and, in any event, no later than April 1, 2026, when Interactive Games sent its notice letter.

189.   DraftKings, with knowledge of the '284 patent or willful blindness as to its existence, has engaged in an extensive pattern of conduct intended to induce others, including users of DraftKings' Mobile Apps, to infringe the '284 patent. These actions include:

- encouraging users to download or use DraftKings' Mobile Apps on their mobile devices through marketing.

- providing support for its users to use DraftKings' Mobile Apps through its websites and mobile applications, including through help pages and an online "chatbot." *See, e.g.*, https://support.draftkings.com (Exhibit 61).

- providing instructions to its users on how to use DraftKings' Mobile Apps, including through video guides and its "DraftKings; New Player Getting Started Guide." *See, e.g.*, https://support.draftkings.com/dk/en-us/draftkings-new-player-getting-started-guide?id=kb_article_view&sysparm_article=KB0010391 (Exhibit 62).

---

[76] *See* Exhibit 60.

- requiring users to activate and use geolocation services prior to using DraftKings' Mobile Apps. *See, e.g.*, https://support.draftkings.com/dk/en-us/using-draftkings-with-geocomply-location-services-overview-us?id=kb_article_view&sysparm_article=KB0010726 (Exhibit 52).

- placing DraftKings' Mobile Apps on both the Apple App Store and Google Play Store for users to download.

190.    DraftKings has been aware of the '284 patent and has knowingly continued to infringe the '284 patent, such that the infringement is willful. On information and belief, DraftKings will continue to willfully infringe the '284 patent.

191.    Interactive Games will suffer irreparable harm unless DraftKings is enjoined from infringing the '284 patent.

192.    As a result of DraftKings' infringement of the '284 patent, Interactive Games should be awarded damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for DraftKings' infringing acts as provided by 35 U.S.C. § 284.

**PRAYER FOR RELIEF**

WHEREFORE, Interactive Games respectfully requests that the Court enter judgment in its favor and enter an order:

1.    Finding that DraftKings directly infringes the asserted claims of the Asserted Patents—literally and under the doctrine of equivalents—and induces and contributes to infringement in violation of 35 U.S.C. § 271;

2.    Finding that DraftKings' infringement is willful;

3.    Enjoining DraftKings, its officers, directors, agents, servants, affiliates, employees, subsidiaries, divisions, branches, parents, attorneys, representatives, privies, and all others acting in concert or participation with any of them, from infringing the Asserted Patents directly or indirectly in violation of 35 U.S.C. § 271;

70

4.      Awarding Interactive Games damages adequate to compensate for DraftKings' infringement, but in no event less than a reasonable royalty for DraftKings' infringing acts as provided by 35 U.S.C. § 284;

5.      Awarding Interactive Games increased damages, as appropriate under 35 U.S.C. § 284;

6.      Awarding Interactive Games pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

7.      Declaring this to be an exceptional case pursuant to 35 U.S.C. § 285 and awarding Interactive Games its attorneys' fees;

8.      Awarding Interactive Games its costs; and

9.      Granting Interactive Games such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Interactive Games requests a trial by jury on all issues so triable by right.

Dated: April 2, 2026

Respectfully submitted,

*/s/ Craig R. Smith*
Craig R. Smith (BBO# 636723)
**LANDO & ANASTASI, LLP**
60 State Street, 23rd Floor
Boston, MA 02109
(617) 395-7000
CSmith@LALaw.com

Michael Joffre (BBO# 661399)
Chandrika Vira (DCB# 1018150)
(*pro hac vice* forthcoming)
Daniel Block (DCB# 1009049)
(*pro hac vice* forthcoming)
William H. Milliken (DCB# 1032206)
(*pro hac vice* forthcoming)

71

Richard A. Crudo (DCB# 1015732)
(*pro hac vice* forthcoming)
**STERNE, KESSLER, GOLDSTEIN &**
**FOX P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
mjoffre@sternekessler.com
cvira@sternekessler.com
dblock@sternekessler.com
wmilliken@sternekessler.com
rcrudo@sternekessler.com

*Attorneys for Plaintiff*
*Interactive Games LLC*