**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

INTERACTIVE GAMES LLC,

Plaintiff,

v.

DRAFTKINGS INC.,

Defendant.

REDACTED

Civil Action No. 26-11544-WGY

**DEMAND FOR JURY TRIAL**

# DEFENDANT DRAFTKINGS INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Defendant DraftKings Inc. ("DraftKings") hereby submits its Answer, Affirmative Defenses, and Counterclaims to Plaintiff Interactive Games LLC's ("IG or Plaintiff") Complaint filed April 2, 2026 (Dkt. 1) (the "Complaint"). DraftKings reserves the right to raise additional defenses and counterclaims based on discovery and further factual investigation in this case.

## GENERAL DENIAL

DraftKings denies each and every allegation in the Complaint, whether express or implied, except those specifically and expressly admitted below. To the extent the headings or any other non-numbered statement in the Complaint contain any allegations, DraftKings denies each and every allegation therein. Any factual allegation admitted below is admitted only as to the specific facts expressly admitted, and not as to any characterization, conclusion, or implication that Plaintiff draws from, or that might follow from, the admitted facts. To the extent the Complaint's footnotes, figures, images, or exhibits (including the claim charts attached as Exhibits 6–10) contain allegations not expressly admitted below, DraftKings denies them. DraftKings' use of terms defined in the Complaint (including "DraftKings' Mobile Apps" and "smartphone") is for

convenience only and is not an admission that any such definition is accurate or appropriate. DraftKings denies that IG is entitled to the requested relief or any other relief.

DraftKings responds to the numbered paragraphs in the Complaint and the prayer for relief as follows:

1. DraftKings admits that IG brings this action but denies the remaining allegations, including IG's characterization that its assertions involve novel innovations related to mobile gambling, sports betting, and fantasy sports betting, and IG's allegations of DraftKings' infringement of the same. DraftKings denies IG's assertion that IG's predecessor, Cantor Gaming, was the first to develop systems that allowed users to gamble, place sports wagers, and play casino games on mobile devices, and that Cantor Gaming pioneered systems that allowed users to gamble on newly emerging smartphones of the time. DraftKings denies the allegations of footnote 1 to the extent they define "smartphone" to include "tablets" or "other mobile devices," or to the extent this definition applies to any allegations of the Complaint. DraftKings denies IG's characterization that the problems described in Paragraph 1 were technological problems. To the extent that the remaining allegations in Paragraph 1 require a response, DraftKings lacks knowledge or information sufficient to form a belief as to their truth or falsity and therefore denies them.

2. DraftKings admits that it is a digital sports entertainment and gaming company offering online and retail sports betting, online casino, daily fantasy sports, and other offerings. DraftKings admits that the DraftKings business was founded in 2012, but denies that Defendant DraftKings Inc., the entity named in the Complaint, was formed in 2012. DraftKings admits that it offers certain services through certain mobile applications publicly available on the Apple App Store and the Google Play Store, including iOS and Android versions of the DraftKings Sportsbook & Casino ("Sportsbook"), DraftKings Casino ("Casino"), Golden Nugget Online Casino ("Golden

Nugget”), DraftKings Fantasy Sports (“Fantasy Sports”), DraftKings Pick6 (“Pick6”), and DK Horse Racing & Betting (“DK Horse”) mobile applications (collectively, “DraftKings’ Mobile Apps”). DraftKings denies that any of the listed DraftKings’ Mobile Apps has infringed or infringes any valid and enforceable claim of the Asserted Patents. DraftKings admits that services of Sportsbook, Casino, Fantasy Sports, Pick6, and DK Horse are accessible online through https://www.draftkings.com. DraftKings denies that services of Golden Nugget are accessible through https://www.draftkings.com or its sub-domains. DraftKings admits that IG alleges that Exhibit 11 in footnote 2 is a printed portion of https://www.draftkings.com. To the extent that the remaining allegations in Paragraph 2 require a response, DraftKings denies them.

3. DraftKings denies the allegations of Paragraph 3.

## NATURE OF THE ACTION

4. Paragraph 4 states legal conclusions to which no response is required. To the extent a response is required, DraftKings admits that this Complaint purports to assert an action for patent infringement under the patent laws of the United States. DraftKings admits that IG alleges infringement of U.S. Patent Nos. 12,409,382 (the “’382 Patent”), 8,974,302 (the “’302 Patent”), 12,548,404 (the “’404 Patent”), 12,400,518 (the “’518 Patent”), and 12,406,284 (the “’284 Patent”) (collectively, the “Asserted Patents”). DraftKings denies that it has infringed or infringes any valid and enforceable claim of the Asserted Patents.

## PARTIES

5. DraftKings lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 5 of the Complaint, and therefore denies them.

6. DraftKings admits that it is a corporation organized and existing under the laws of the State of Nevada. DraftKings admits that its principal place of business is located at 222 Berkeley Street, Boston, Massachusetts 02116, and denies that the zip code of that address is

02110. DraftKings admits that it is a publicly traded company. DraftKings admits that DraftKings Holdings, Inc., DK Crown Holdings Inc., Crown Gaming Inc., and Crown MA Gaming LLC are subsidiaries and that certain of such subsidiaries operate in the Commonwealth of Massachusetts. DraftKings admits that IG alleges that Exhibit 12 in footnote 3 is a printed copy of https://massgaming.com/wp-content/uploads/DraftKings-redacted.pdf. DraftKings denies any remaining allegations in Paragraph 6.

**JURISDICTION AND VENUE**

7. Paragraph 7 states legal conclusions to which no response is required. To the extent a response is required, DraftKings does not contest, for purposes of this action only, that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

8. Paragraph 8 states legal conclusions to which no response is required. To the extent a response is required, DraftKings does not contest, for purposes of this action only, whether personal jurisdiction properly lies in this District.

9. For the purposes of this action only, DraftKings does not contest whether personal jurisdiction properly lies in this District. DraftKings denies that it has committed acts of patent infringement in this District or elsewhere. DraftKings denies that it has contributed to acts of patent infringement by others in this District or elsewhere. DraftKings denies that it has induced acts of patent infringement by others in this District or elsewhere. DraftKings admits that it conducts or solicits business in this District. DraftKings denies that it offers infringing products and services in this District or elsewhere. DraftKings admits that its subsidiary, Crown MA Gaming LLC d/b/a DraftKings, holds an untethered Category 3 Sports Wagering Operator License issued by the Massachusetts Gaming Commission. DraftKings admits that IG alleges that Exhibit 13 in footnote 4 is a printed copy of https://massgaming.com/about/sports-wagering-in-massachusetts/sports-wagering-licensees/draftkings/. The remaining allegations in Paragraph 9 contain legal

conclusions to which no response is required. To the extent a response is required, DraftKings denies the remaining allegations of Paragraph 9.

10. DraftKings admits that it operates a website and certain mobile applications that are accessible to residents of Massachusetts. DraftKings denies any remaining allegations in Paragraph 10.

11. DraftKings admits that it identifies Massachusetts on its website as a state where certain offerings are available. DraftKings denies that any of its offerings infringe any valid and enforceable claim of the Asserted Patents. DraftKings admits that IG alleges that Exhibit 14 in footnote 6 is an annotated printed portion of https://sportsbook.draftkings.com/sportsbook. DraftKings denies any remaining allegations in Paragraph 11.

12. DraftKings admits that it is subject to certain Massachusetts rules and regulations with respect to its operation of gaming within the Commonwealth. DraftKings admits that Mass. Gen. Laws ch. 23K, § 4(10) & (11) (Jan. 10, 2025) states "(10) require an applicant for a position which requires a license under this chapter to apply for such license and approve or disapprove any such application or other transactions, events and processes as provided in this chapter;" and "(11) require a person who has a business association of any kind with a gaming licensee or applicant to be qualified for licensure under this chapter." The remaining allegations in Paragraph 12 contain legal conclusions, to which no response is required, or characterize Massachusetts rules and regulations, which speak for themselves. To the extent a response is required, DraftKings denies the remaining allegations of Paragraph 12.

13. DraftKings admits it advertises in Massachusetts. DraftKings admits that it solicits business in Massachusetts. DraftKings admits that it obtains revenue from its operations in Massachusetts. DraftKings denies any remaining allegations in Paragraph 13.

14. For the purposes of this action only, DraftKings does not contest whether personal jurisdiction properly lies in this District. DraftKings admits that it markets and sells offerings to citizens in Massachusetts. DraftKings denies that any of its products or services infringe any valid and enforceable claim of the Asserted Patents. The remaining allegations in Paragraph 14 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the remaining allegations of Paragraph 14.

15. DraftKings admits that certain DraftKings employees located in Boston, Massachusetts have performed development work on certain of DraftKings' Mobile Apps. DraftKings denies that each of DraftKings' Mobile Apps is developed, at least in part, in this District by a team of engineers located in DraftKings' Boston headquarters. DraftKings denies that DraftKings' Mobile Apps are distributed and offered for sale from this District. DraftKings states that DraftKings' Mobile Apps are distributed primarily through third-party application marketplaces, including the Apple App Store and the Google Play Store. DraftKings denies any remaining allegations in Paragraph 15.

16. For the purposes of this action only, DraftKings does not contest whether venue is proper in this District. DraftKings admits that it has a place of business in this District. DraftKings denies that it has committed any acts of infringement in this District or elsewhere. The remaining allegations in Paragraph 16 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the remaining allegations of Paragraph 16.

## INTERACTIVE GAMES' HISTORY OF [ALLEGED][1] INNOVATION

### A. The [Alleged] Problem of Online Gambling in the Era of Mobile Devices

17. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 17 of the Complaint, and therefore denies them.

18. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 18 of the Complaint, and therefore denies them. The allegations in this Paragraph are also vague and ambiguous, such as assertions of "confusing and complicated" regulations "[a]t the time," which are undefined and untethered to any time period relevant to the Asserted Patents, rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations. DraftKings admits that IG alleges that Exhibit 15 in footnote 7 is a copy of Government Accountability Office (GAO), Internet Gambling: An Overview of the Issues, GAO-03-89 at 1 (Dec. 2002), located at: https://www.gao.gov/assets/gao-03-89.pdf. DraftKings denies any remaining allegations of Paragraph 18.

19. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 19 of the Complaint, and therefore denies them. To the extent that Paragraph 19 characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent a response is required, DraftKings denies the remaining allegations of Paragraph 19.

20. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 20 of the Complaint, and therefore denies them.

[1] Headings here and throughout DraftKings' Answer are reproduced from IG's Complaint for convenience only and are denied to the extent they contain allegations.

DraftKings admits that IG alleges that Exhibit 16 in footnote 8 is a printed copy of https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html.

21. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 21 of the Complaint, and therefore denies them. To the extent that Paragraph 21 characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that Paragraph 21 implicitly alleges that the claims of the Asserted Patents are directed to a technological solution, DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings denies any remaining allegations of Paragraph 21.

22. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22 of the Complaint, and therefore denies them. To the extent that Paragraph 22 characterizes the Asserted Patents, such as the ’518 Patent, those documents speak for themselves such that no response is required. To the extent that Paragraph 22 implicitly alleges that the claims of the Asserted Patents are directed to a technological solution, DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 17 in footnote 9 is a printed copy of https://d3.harvard.edu/platform-digit/submission/the-rise-and-fall-and-rise-again-of-blackberry/. DraftKings admits that IG alleges that Exhibit 18 in footnote 10 is a printed copy of https://www.makeuseof.com/the-reasons-blackberry-failed-spectacularlyand-why-they-might-rise-again/. DraftKings admits that IG alleges that Exhibit 19 in footnote 11 is a printed copy of https://www.fastcompany.com/90903224/15-years-ago-apple-launched-the-app-store-last-year-it-brought-in-1-1-trillion-for-developers/. DraftKings admits that IG alleges that Exhibit 20 in

footnote 12 is a printed copy of https://www.cnet.com/tech/mobile/a-brief-history-of-android-phones/. DraftKings denies any remaining allegations of Paragraph 22.

23. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 23 of the Complaint, and therefore denies them. To the extent that Paragraph 23 characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that Paragraph 23 implicitly alleges that the claims of the Asserted Patents are directed to a technological solution, DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 21 in footnote 13 is a printed copy of https://www.govinfo.gov/content/pkg/CHRG-110hhrg37553/pdf/CHRG-110hhrg37553.pdf. DraftKings admits that IG alleges that Exhibit 22 in footnote 13 is a printed copy of https://www.globe.gov/documents/2631933/6965868/42534991.pdf. DraftKings denies any remaining allegations of Paragraph 23.

**B. Interactive Games' [Alleged] Technological Solutions**

24. DraftKings denies that the claims of the Asserted Patents allegedly developed by Cantor Gaming and/or its inventors are novel and/or are novel inventions. DraftKings denies that the claims of the Asserted Patents allegedly developed by Cantor Gaming are technological solutions to technological problems. To the extent that Paragraph 24 characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that Paragraph 24 implicitly alleges that the claims of the Asserted Patents are directed to a technological solution, DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 24 of the Complaint, and therefore denies them.

25. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 25 of the Complaint, and therefore denies them. To the extent that Paragraph 25 implicitly alleges that the claims of the Asserted Patents are directed to a technological solution, DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 23 in footnote 14 is a printed copy of https://www.prnewswire.com/news-releases/cantor-gaming-launches-android-compatible-mobile-sports-wagering-application-132609713.html. DraftKings admits that IG alleges that Exhibit 23 states "Cantor Gaming's primary goal and focus is to constantly enhance our customers' experience through innovative, superior technology. Our team has developed an application that is real-time, convenient and enjoyable, while incorporating the most advanced and reliable security." DraftKings denies any remaining allegations of Paragraph 25.

26. To the extent that Paragraph 26 implicitly alleges that the claims of the Asserted Patents are directed to a technological solution, DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 26 of the Complaint, and therefore denies them.

**1. Detecting Rooted Smartphones Among Different Devices**

27. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 27 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents

claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

28. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 28 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 24 in footnote 16 is a printed copy of https://us.norton.com/blog/emerging-threats/gps-spoofing. DraftKings denies any remaining allegations in this Paragraph.

29. The allegations in Paragraph 29 are vague and ambiguous, such as alleging that "[t]hese issues are specific to gambling on smartphones," without specificity as to which issues are referenced or support for why those issues are specific to gambling on smartphones as opposed to other devices, rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 29 of the Complaint, and therefore denies them.

30. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 30 of the Complaint, and therefore denies them. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 25 in footnote 18 is a printed copy of

https://www.nytimes.com/2011/03/14/science/14poker.html?_r=0. DraftKings denies any remaining allegations in this Paragraph.

31. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 31 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

32. DraftKings denies that the claims of the Asserted Patents, including those reciting a "wrapper" allegedly developed by the inventors, are novel. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 32 of the Complaint, and therefore denies them.

**2. Hierarchical Location Determination**

33. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 33 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes Nevada Gaming Control Board regulations, those documents speak for themselves such that no response is required. To the extent that the allegations misquote those regulations, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

34. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 34 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible technological solutions under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 26 in footnote 19 is a printed copy of https://www.bettingusa.com/geolocation/. DraftKings denies any remaining allegations in this Paragraph.

35. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 35 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

36. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 27 in footnote 20 is a printed copy of

http://spcomnav.uab.cat/docs/journals/Seco_Challenges_Indoor_GNSS_IEEE_SPMAG_2012.pdf. DraftKings denies any remaining allegations in this Paragraph.

37. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 37 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

38. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 38 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings admits that IG alleges that Exhibit 28 in footnote 21 is a printed copy of https://arxiv.org/pdf/1303.5943. DraftKings denies any remaining allegations in this Paragraph.

39. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 39 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

40. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 40 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

**3. Peer-to-Peer Connections for Gambling**

41. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 41 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

42. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 42 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

43. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 43 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim

patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

44. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 44 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

**4. Smartphone Screen Reformatting**

45. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 45 of the Complaint, and therefore denies them.

46. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 46 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

47. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 47 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. DraftKings denies that the Asserted Patents claim

patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

48. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 48 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

49. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 49 of the Complaint, and therefore denies them. To the extent that this Paragraph characterizes the Asserted Patents, those documents speak for themselves such that no response is required. To the extent that the allegations misquote the Asserted Patents, DraftKings denies them on that basis. DraftKings denies that the Asserted Patents claim patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies any remaining allegations in this Paragraph.

## THE ASSERTED PATENTS

50. DraftKings denies that any preceding paragraph describes a patent-eligible invention captured by the claims of the Asserted Patents. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 50 of the Complaint, and therefore denies them.

### A. U.S. Patent No. 12,409,382

51. DraftKings admits that the ’382 Patent shows an issue date of September 9, 2025, and is entitled “Smart Phone With Wrapper Application That Checks Whether the Smart Phone

May Use a Gambling Application." DraftKings admits that IG alleges that Exhibit 1 to the Complaint is a copy of the '382 Patent. DraftKings admits that the '382 Patent attached as Exhibit 1 identifies IG as the applicant and assignee. The remaining allegations in Paragraph 51 contain legal conclusions to which no response is required. To the extent that a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 51 of the Complaint, and therefore denies them.

52. Paragraph 52 states legal conclusions to which no response is required. To the extent that a response is required, the '382 Patent speaks for itself, and DraftKings admits that the face of the '382 Patent shows its alleged priority chain. To the extent that the allegations in this Paragraph misrepresent the alleged priority chain shown on the face of the '382 Patent, DraftKings denies them on that basis. DraftKings denies that the alleged priority claim shown on the face of the '382 Patent is proper. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 52 of the Complaint, and therefore denies them.

53. To the extent that this Paragraph characterizes the '382 Patent, the '382 Patent speaks for itself such that no response is required. DraftKings denies that the '382 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 53.

54. To the extent that this Paragraph characterizes the '382 Patent, the '382 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the '382 Patent, DraftKings denies them on that basis. DraftKings denies that the '382 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 54.

55. To the extent that this Paragraph characterizes the ’382 Patent, the ’382 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’382 Patent, DraftKings denies them on that basis. DraftKings denies that the ’382 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 55.

56. To the extent that this Paragraph characterizes the ’382 Patent, the ’382 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’382 Patent, DraftKings denies them on that basis. DraftKings denies that the ’382 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 56.

57. To the extent that this Paragraph characterizes the ’382 Patent, the ’382 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’382 Patent, DraftKings denies them on that basis. DraftKings denies that the ’382 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 57.

58. To the extent that this Paragraph characterizes the ’382 Patent, the ’382 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’382 Patent, DraftKings denies them on that basis. DraftKings denies that the ’382 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies that the claims of the ’382 Patent recite subject matter that was unconventional at the time of the ’382 Patent. DraftKings denies the remaining allegations in Paragraph 58.

**B. U.S. Patent No. 8,974,302**

59. DraftKings admits that the '302 Patent shows an issue date of March 10, 2015, and is entitled "Multi-Process Communication Regarding Gaming Information." DraftKings admits that IG alleges that Exhibit 2 to the Complaint is a copy of the '302 Patent, including a reexamination certificate issued on April 12, 2024. DraftKings admits that the reexamination certificate of the '302 Patent attached as Exhibit 2 identifies IG as the assignee. The remaining allegations in Paragraph 59 contain legal conclusions to which no response is required. To the extent that a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 59 of the Complaint, and therefore denies them.

60. Paragraph 60 states legal conclusions to which no response is required. To the extent that a response is required, the '302 Patent speaks for itself, and DraftKings admits that the face of the '302 Patent shows its alleged priority chain. To the extent that the allegations in this Paragraph misrepresent the alleged priority chain shown on the face of the '302 Patent, DraftKings denies them on that basis. DraftKings denies that the alleged priority claim shown on the face of the '302 Patent is proper. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 60 of the Complaint, and therefore denies them.

61. To the extent that this Paragraph characterizes the '302 Patent, the '302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the '302 Patent, DraftKings denies them on that basis. DraftKings denies that the '302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 61.

62. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 62.

63. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 63.

64. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 64.

65. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 65.

66. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. DraftKings denies that the ’302 Patent claims

patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 66.

67. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 67.

68. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 68.

69. To the extent that this Paragraph characterizes the ’302 Patent, the ’302 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’302 Patent, DraftKings denies them on that basis. DraftKings denies that the ’302 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies that the claims of the ’302 Patent recite subject matter that was unconventional at the time of the ’302 Patent. DraftKings denies the remaining allegations in Paragraph 69.

70. DraftKings denies that the validity of the ’302 Patent has been extensively litigated and upheld. DraftKings admits that the Patent Trial and Appeal Board (“PTAB”) denied institution of a petition for *inter partes* review of the ’302 Patent in IPR2020-01108. To the extent that Paragraph 70 characterizes the PTAB’s institution decision in IPR2020-01108, that document speaks for itself such that no response is required. To the extent that the allegations misquote the

PTAB's institution decision in IPR2020-01108, DraftKings denies them on that basis. DraftKings admits that the reexamination certificate of the '302 Patent attached as Exhibit 2 identifies the reexamination request date as November 4, 2022, and the certificate issue date as April 12, 2024. DraftKings denies that the claims of the '302 Patent are valid and enforceable, whether considered before or after the *ex parte* reexamination. The remaining allegations in Paragraph 70 state legal conclusions to which no response is required. To the extent that a response is required, DraftKings denies the remaining allegations in this Paragraph.

**C. U.S. Patent No. 12,548,404**

71. DraftKings admits that the '404 Patent shows an issue date of February 10, 2026, and is entitled "Multi-Level Device Verification For Mobile Gambling Applications." DraftKings admits that IG alleges that Exhibit 3 to the Complaint is a copy of the '404 Patent, including a certificate of correction issued on March 24, 2026. DraftKings admits that the '404 Patent attached as Exhibit 3 identifies IG as the applicant and assignee. The remaining allegations in Paragraph 71 contain legal conclusions to which no response is required. To the extent that a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 71 of the Complaint, and therefore denies them.

72. Paragraph 72 states legal conclusions to which no response is required. To the extent that a response is required, the '404 Patent speaks for itself, and DraftKings admits that the face of the '404 Patent shows its alleged priority chain. To the extent that the allegations in this Paragraph misrepresent the alleged priority chain shown on the face of the '404 Patent, DraftKings denies them on that basis. DraftKings denies that the alleged priority claim shown on the face of the '404 Patent is proper. DraftKings lacks knowledge or information sufficient to form a belief as

to the truth or falsity of the remaining allegations in Paragraph 72 of the Complaint, and therefore denies them.

73. To the extent that this Paragraph characterizes the ’404 Patent, the ’404 Patent speaks for itself such that no response is required. DraftKings denies that the ’404 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 73.

74. To the extent that this Paragraph characterizes the ’404 Patent, the ’404 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’404 Patent, DraftKings denies them on that basis. DraftKings denies that the ’404 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 74.

75. To the extent that this Paragraph characterizes the ’404 Patent, the ’404 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’404 Patent, DraftKings denies them on that basis. DraftKings denies that the ’404 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 75.

76. To the extent that this Paragraph characterizes the ’404 Patent, the ’404 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’404 Patent, DraftKings denies them on that basis. DraftKings denies that the ’404 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 76.

77. To the extent that this Paragraph characterizes the ’404 Patent, the ’404 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the

’404 Patent, DraftKings denies them on that basis. DraftKings denies that the ’404 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies that the claims of the ’404 Patent recite subject matter that was unconventional at the time of the ’404 Patent. DraftKings denies the remaining allegations in Paragraph 77.

**D. U.S. Patent No. 12,400,518**

78. DraftKings admits that the ’518 Patent shows an issue date of August 26, 2025, and is entitled “System For Facilitating Online Wagering With Nearby Mobile Phones.” DraftKings admits that IG alleges that Exhibit 4 to the Complaint is a copy of the ’518 Patent. DraftKings admits that the ’518 Patent attached as Exhibit 4 identifies IG as the applicant and assignee. The remaining allegations of Paragraph 78 contain legal conclusions to which no response is required. To the extent that a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 78 of the Complaint, and therefore denies them.

79. Paragraph 79 states legal conclusions to which no response is required. To the extent that a response is required, the ’518 Patent speaks for itself, and DraftKings admits that the face of the ’518 Patent shows its alleged priority chain. To the extent that the allegations in this Paragraph misrepresent the alleged priority chain shown on the face of the ’518 Patent, DraftKings denies them on that basis. DraftKings denies that the alleged priority claim shown on the face of the ’518 Patent is proper. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 79 of the Complaint, and therefore denies them.

80. To the extent that this Paragraph characterizes the ’518 Patent, the ’518 Patent speaks for itself such that no response is required. DraftKings denies that the ’518 Patent claims

patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 80.

81. To the extent that this Paragraph characterizes the ’518 Patent, the ’518 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’518 Patent, DraftKings denies them on that basis. DraftKings denies that the ’518 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 81.

82. To the extent that this Paragraph characterizes the ’518 Patent, the ’518 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’518 Patent, DraftKings denies them on that basis. DraftKings denies that the ’518 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 82.

83. To the extent that this Paragraph characterizes the ’518 Patent, the ’518 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’518 Patent, DraftKings denies them on that basis. DraftKings denies that the ’518 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 83.

84. To the extent that this Paragraph characterizes the ’518 Patent, the ’518 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’518 Patent, DraftKings denies them on that basis. DraftKings denies that the ’518 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies that the claims of the ’518 Patent recite subject matter that was unconventional at the time of the ’518 Patent. DraftKings denies the remaining allegations in Paragraph 84.

**E. U.S. Patent No. 12,406,284**

85. DraftKings admits that the ’284 Patent shows an issue date of September 2, 2025, and is entitled “Mobile Device Proximity Tracking For Selective Content Delivery and Formatting.” DraftKings admits that IG alleges that Exhibit 5 to the Complaint is a copy of the ’284 Patent. DraftKings admits that the ’284 Patent that is attached as Exhibit 5 identifies IG as the applicant and assignee. The remaining allegations in Paragraph 85 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 85 of the Complaint, and therefore denies them.

86. Paragraph 86 states legal conclusions to which no response is required. To the extent that a response is required, the ’284 Patent speaks for itself, and DraftKings admits that the face of the ’284 Patent shows its alleged priority chain. To the extent that the allegations in this Paragraph misrepresent the alleged priority chain shown on the face of the ’284 Patent, DraftKings denies them on that basis. DraftKings denies that the alleged priority claim shown on the face of the ’284 Patent is proper. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 86 of the Complaint, and therefore denies them.

87. To the extent that this Paragraph characterizes the ’284 Patent, the ’284 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’284 Patent, DraftKings denies them on that basis. DraftKings denies that the ’284 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 87.

88. To the extent that this Paragraph characterizes the ’284 Patent, the ’284 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’284 Patent, DraftKings denies them on that basis. DraftKings denies that the ’284 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 88.

89. To the extent that this Paragraph characterizes the ’284 Patent, the ’284 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’284 Patent, DraftKings denies them on that basis. DraftKings denies that the ’284 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 89.

90. To the extent that this Paragraph characterizes the ’284 Patent, the ’284 Patent speaks for itself such that no response is required. DraftKings denies that the ’284 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies the remaining allegations in Paragraph 90.

91. To the extent that this Paragraph characterizes the ’284 Patent, the ’284 Patent speaks for itself such that no response is required. To the extent that the allegations misquote the ’284 Patent, DraftKings denies them on that basis. DraftKings denies that the ’284 Patent claims patent-eligible subject matter under 35 U.S.C. § 101. DraftKings denies that the claims of the ’284 Patent recite subject matter that was unconventional at the time of the ’284 Patent. DraftKings denies the remaining allegations in Paragraph 91.

## DRAFTKINGS [ALLEGED] INFRINGING TECHNOLOGY AND CONDUCT

### A. DraftKings’ Mobile Apps

92. DraftKings admits that it is a digital sports entertainment and gaming company. *See supra* at ¶2.

93. DraftKings admits that the DraftKings business was founded in 2012, but denies that Defendant DraftKings Inc. was formed in 2012. *See supra* at ¶2. DraftKings admits that it offers fantasy sports services. DraftKings admits that some fantasy sports contests allow users to create and develop fantasy teams utilizing real-world athletes. DraftKings denies the remaining allegations in Paragraph 93.

94. DraftKings admits that it operates certain mobile applications and certain web-based interfaces offering sports betting, casino games, and/or fantasy sports. DraftKings admits that it offers the mobile applications of Sportsbook, Casino, Golden Nugget, Fantasy Sports, Pick6, and DK Horse. DraftKings admits that these mobile applications can be downloaded and used on certain iOS devices. DraftKings admits that these mobile applications can be downloaded and used on certain Android devices. DraftKings admits that it offers the services of Sportsbook, Casino, Fantasy Sports, Pick6, and DK Horse through its web-based interface at https://www.draftkings.com. DraftKings denies that it offers the services of Golden Nugget through its web-based interface at https://www.draftkings.com. DraftKings admits that IG alleges that Exhibit 29 in footnote 22 is a printed portion of https://www.draftkings.com/mobileapps. DraftKings admits that IG alleges in footnote 23 that the six images included in this Paragraph are screenshots of DraftKings' Mobile Apps as they appear on an iOS device. DraftKings denies the remaining allegations in Paragraph 94.

95. DraftKings denies that DraftKings' Mobile Apps can be used through a web browser from a desktop, laptop, or other computer. DraftKings admits that IG alleges that Exhibit 11 in footnote 24 is a printed portion of https://www.draftkings.com/. DraftKings admits that IG alleges that Exhibit 30 in footnote 25 is a printed portion of https://sportsbook.draftkings.com/. DraftKings admits that IG alleges that Exhibit 31 in footnote 26 is a printed portion of

https://casino.draftkings.com/. DraftKings admits that IG alleges that Exhibit 32 in footnote 27 is a printed portion of https://www.goldennuggetcasino.com/. DraftKings admits that IG alleges that Exhibit 33 in footnote 28 is a printed portion of https://www.draftkings.com/dfs. DraftKings admits that IG alleges that Exhibit 34 in footnote 29 is a printed portion of https://pick6.draftkings.com/. DraftKings admits that IG alleges that Exhibit 35 in footnote 30 is a printed portion of https://www.dkhorse.com/. DraftKings denies the remaining allegations in Paragraph 95.

**1. DraftKings Sportsbook & Casino Application ("Sportsbook")**

96. DraftKings admits that it launched DraftKings Sportsbook in the state of New Jersey in 2018. DraftKings admits that IG alleges that Exhibit 36 in footnote 31 is a printed copy of https://www.legalsportsreport.com/22598/draftkings-sportsbook-launch-nj-sports-betting/. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 36 and/or its underlying website, DraftKings denies them on that basis. DraftKings admits that IG alleges that Exhibit 37 in footnote 32 is a printed copy of https://www.draftkings.com/news-2020-06-draftkings-launches-mobile-casino-app-in-new-jersey. This document speaks for itself. To the extent that the allegations in this Paragraph mischaracterize the document attached as Exhibit 37 and/or its underlying website, DraftKings denies them on that basis. DraftKings admits that for certain customers the DraftKings Sports and Casino mobile app offers casino games. DraftKings denies the remaining allegations in Paragraph 96.

97. DraftKings admits that the Sportsbook application allows some users to make certain bets on certain sporting events. DraftKings admits that IG alleges that Exhibit 38 in footnote 33 is a printed copy of https://sportsbook.draftkings.com/help/how-to-bet. This document speaks for itself. To the extent that the allegations in this Paragraph misquote the document attached as

Exhibit 38 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 97.

98. DraftKings admits that the Sportsbook application is available in certain states. DraftKings admits the Sportsbook application is operable in Massachusetts. DraftKings admits that IG alleges that Exhibit 39 in footnote 34 is a printed copy of https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal. This document speaks for itself. To the extent that the allegations in this Paragraph mischaracterize the document attached as Exhibit 39 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 98.

99. DraftKings admits that the Sportsbook application is subject to state-specific regulations and guidelines. The remaining allegations in Paragraph 99 are vague and ambiguous, such as alleging that "[t]he Sportsbook application must implement location tracking for each user device connecting to DraftKings' servers," without definition of what constitutes "must," "implement," or "location tracking," rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations. DraftKings denies any remaining allegations in Paragraph 99.

100. DraftKings denies the allegations in Paragraph 100.

**2. DraftKings Casino Application ("Casino")**

101. DraftKings admits that it launched a Casino application in New Jersey in June of 2020. DraftKings admits that IG alleges that Exhibit 37 in footnotes 35 and 36 is a printed copy of https://www.draftkings.com/news-2020-06-draftkings-launches-mobile-casino-app-in-new-jersey. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 37 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 101.

102. DraftKings admits that the Casino application allows some users to play certain casino games using real-world money. DraftKings admits that the Casino application includes games such as slots, table games, live dealers, blackjack, roulette, craps, and poker. DraftKings admits IG alleges that Exhibit 31 in footnotes 37 and 38 is a printed copy of https://casino.draftkings.com. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 31 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 102.

103. DraftKings admits that the Casino application is available in certain states. DraftKings admits that the Casino application is available in five states. DraftKings admits that IG alleges that Exhibit 31 in footnote 39 is a printed copy of https://casino.draftkings.com. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 31 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 103.

104. DraftKings admits that the Casino application is subject to state-specific regulations. The remaining allegations in Paragraph 104 are vague and ambiguous, such as alleging that "[t]he Casino application implements location tracking for each user device connecting to DraftKings' servers," without definition of what constitutes "implements" or "location tracking," rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations.

105. DraftKings denies the allegations in Paragraph 105.

### 3. DraftKings' Golden Nugget Online Casino Application ("Golden Nugget")

106. DraftKings admits that it completed its acquisition of Golden Nugget Online Gaming in May 2022. DraftKings admits that IG alleges that Exhibit 40 in footnote 40 is a printed copy of https://draftkings.gcs-web.com/news-releases/news-release-details/draftkings-completes-acquisition-golden-nugget-online-gaming, and admits that Exhibit 40 appears to be a copy of a DraftKings press release dated May 5, 2022. DraftKings states that the URL cited in footnote 40 is no longer active. DraftKings admits that IG alleges that Exhibit 41 in footnote 41 is a printed copy of https://apps.apple.com/us/app/golden-nugget-online-casino/id1632626653. This document speaks for itself. To the extent that the allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 41 and/or its underlying website, DraftKings denies them on that basis. DraftKings admits that the Golden Nugget application includes the ability for some users to play certain games with a live dealer.

107. DraftKings admits that the Golden Nugget application allows some users to place certain bets with real-world money and win certain cash prizes. DraftKings admits that the Golden Nugget application includes games such as baccarat, blackjack, craps, roulette, slots, and video poker. DraftKings admits that IG alleges that Exhibit 42 in footnote 42 is a printed copy of https://www.goldennuggetcasino.com/gn-how-to-play-casino-games. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 42 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 107.

108. DraftKings admits that the Golden Nugget application is available in certain states. DraftKings admits that IG alleges that Exhibit 43 in footnote 43 is a printed copy of https://www.goldennuggetcasino.com/where-is-gn-online-gambling-legal. To the extent that

allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 43 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 108.

109. DraftKings denies the allegations in Paragraph 109.

**4. DraftKings Fantasy Sports Application ("Fantasy Sports")**

110. DraftKings admits that it operates certain fantasy sports services on its website at https://www.draftkings.com, which DraftKings admits are accessible on certain computers. DraftKings denies IG's characterization that the fantasy sports services accessible on certain computers are also accessible on smartphones and tablets. DraftKings admits that it operates the fantasy sports services of the Fantasy Sports application, which DraftKings admits are accessible on certain smartphones and/or certain tablets. DraftKings denies IG's characterization that a Fantasy Sports application accessible on certain smartphones and/or certain tablets is also accessible on computers.

111. DraftKings admits that the Fantasy Sports application allows some users to create certain sports line-ups for certain leagues and/or competitions. DraftKings admits that the Fantasy Sports application includes weekly and daily competitions. DraftKings admits that the Fantasy Sports application covers certain leagues. DraftKings admits that IG alleges that Exhibit 33 in footnote 44 is a printed portion of https://www.draftkings.com/dfs. This document speaks for itself. To the extent that the allegations in this Paragraph misrepresent the document attached as Exhibit 33 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 111.

112. DraftKings admits that the Fantasy Sports application allows some users to enter certain contests for certain sports. DraftKings admits that IG alleges that Exhibit 44 in footnotes 45 and 46 is a printed copy of https://www.draftkings.com/how-to-play. This document speaks for

itself. To the extent the allegations in this Paragraph misquote the document attached as Exhibit 44 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 112.

113. DraftKings admits that the Fantasy Sports application is available in certain states. DraftKings admits that the Fantasy Sports application is available in Massachusetts. DraftKings denies any additional characterizations or allegations in Paragraph 113.

114. DraftKings admits that the Fantasy Sports application offers certain contest types for some users to partake in. DraftKings admits that IG alleges that Exhibit 44 in footnote 47 is a printed copy of https://www.draftkings.com/how-to-play. DraftKings admits that IG alleges that Exhibit 45 in footnote 48 is a printed copy of https://www.draftkings.com/flash-draft. These documents speak for themselves. To the extent that the allegations in this Paragraph misquote or mischaracterize the documents attached as Exhibits 44 and 45, respectively, and/or their underlying websites, DraftKings denies them on that basis.

115. DraftKings admits that the Fantasy Sports application allows some users to enter contests using real-world money. DraftKings denies the remaining allegations in Paragraph 115.

116. DraftKings denies IG's characterization that the Fantasy Sports application is available online through https://www.draftkings.com/dfs. DraftKings admits that the Fantasy Sports application is available as a mobile app for certain iOS devices. DraftKings admits that the Fantasy Sports application is available as a mobile app for certain Android devices. DraftKings admits that IG alleges that Exhibit 33 in footnote 49 is a printed portion of https://www.draftkings.com/dfs. DraftKings denies any remaining allegations in Paragraph 116.

117. DraftKings denies the allegations of Paragraph 117.

**5. DraftKings Pick6 Fantasy Application ("Pick6")**

118. DraftKings admits it launched the Pick6 application in 2023. DraftKings admits that IG alleges that Exhibit 46 in footnote 50 is a printed copy of https://support.draftkings.com/dk/en-us/what-is-pick6-overview?id=kb_article_view&sysparm_article=KB0010366. DraftKings admits that IG alleges that Exhibit 47 in footnote 50 is a printed copy of https://support.draftkings.com/dk/en-us/how-it-works-contest-distribution-and-prizing?id=kb_article_view&sysparm_article=KB0010358. DraftKings admits that IG alleges that Exhibit 48 in footnote 51 is a printed copy of https://pick6.draftkings.com/pick6-rules-and-scoring. These documents speak for themselves. To the extent that the allegations in this Paragraph misquote or mischaracterize the documents attached as Exhibits 46, 47, and 48, respectively, and/or their underlying websites, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 118.

119. DraftKings denies IG's characterization that the Pick6 application is available online through https://pick6.draftkings.com. DraftKings admits that the Pick6 application is available as a mobile app for certain iOS devices. DraftKings admits that the Pick6 application is available as a mobile app for certain Android devices. DraftKings admits that IG alleges that Exhibit 34 in footnote 52 is a printed portion of https://pick6.draftkings.com. DraftKings denies any remaining allegations in Paragraph 119.

120. DraftKings admits that the Pick6 application includes contests for certain sports. DraftKings admits that the Pick6 application includes contests for sports such as NFL, MLB, college football, WNBA, soccer, NASCAR, UFC, and PGA Tour. DraftKings admits that IG alleges that Exhibit 49 in footnote 53 is a printed copy of https://pick6.draftkings.com/how-to-play-pick6. DraftKings admits that IG alleges that Exhibit 47 in footnote 54 is a printed copy of https://support.draftkings.com/dk/en-us/how-it-works-contest-distribution-and-

prizing?id=kb_article_view&sysparm_article=KB0010358. These documents speak for themselves. To the extent that the allegations in this Paragraph misquote or mischaracterize the documents attached as Exhibits 49 and 47, respectively, and/or their underlying websites, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 120.

121. DraftKings admits that the Pick6 application is available in certain states. DraftKings admits that the Pick6 application is available in Massachusetts. DraftKings admits that IG alleges that Exhibit 50 in footnote 55 is a printed copy of https://pick6.draftkings.com/where-is-pick6-available. This document speaks for itself. To the extent that the allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 50 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 121.

122. DraftKings denies the allegations in Paragraph 122.

**6. DK Horse Racing & Betting Application ("DK Horse")**

123. DraftKings admits that it launched a DK Horse application in 2023. DraftKings admits that IG alleges that Exhibit 51 in footnote 56 is a printed copy of https://draftkings.gcs-web.com/news-releases/news-release-details/draftkings-launches-dk-horse-app. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 51 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 123.

124. DraftKings admits that IG alleges that Exhibit 35 in footnote 57 is a printed portion of https://www.dkhorse.com/. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 35 and/or its underlying website, DraftKings denies them on that basis.

125. DraftKings admits that the DK Horse application is available in certain states. DraftKings admits that the DK Horse application is available in Massachusetts. DraftKings admits that IG alleges that Exhibit 35 in footnote 58 is a printed portion of https://www.dkhorse.com/. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 35 and/or its underlying website, DraftKings denies them on that basis.

126. DraftKings denies the allegations in Paragraph 126.

**B. DraftKings' Location Services and User Verification Requirements**

127. DraftKings admits that DraftKings' Mobile Apps use geolocation and identity verification services, including services provided by third parties, as required by applicable laws and regulations. DraftKings denies the remaining allegations in Paragraph 127.

128. DraftKings admits that IG alleges that Exhibit 52 in footnotes 59 and 60 is a printed copy of https://support.draftkings.com/dk/en-us/using-draftkings-with-geocomply-location-services-overview-us?id=kb_article_view&sysparm_article=KB0010726. DraftKings admits that IG alleges that Exhibit 53 in footnote 60 is a printed copy of https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/. These documents speak for themselves. To the extent that allegations in this Paragraph misquote or mischaracterize the documents attached as Exhibits 52 and 53, respectively, and/or their underlying websites, DraftKings denies them on that basis. DraftKings denies the remaining allegations in Paragraph 128.

129. DraftKings admits that it has contracted with GeoComply for certain geolocation services used with certain of DraftKings' Mobile Apps. DraftKings denies that it directs or controls GeoComply's performance of any step of any asserted claim. The remaining allegations in

Paragraph 129 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the remaining allegations in Paragraph 129.

130. DraftKings admits that IG alleges that Exhibit 53 in footnote 61 is a printed copy of https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 53 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies the remaining allegations in Paragraph 130.

131. DraftKings admits that IG alleges that Exhibit 53 in footnote 62 is a printed copy of https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 53 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies the remaining allegations in Paragraph 131.

132. DraftKings admits that IG alleges that Exhibit 53 in footnote 63 is a printed copy of https://www.geocomply.com/anti-fraud-and-geolocation-solutions/geocomply-core/. DraftKings admits that IG alleges that Exhibit 54 in footnote 65 is a printed copy of https://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2015_0059T.pdf. These documents speak for themselves. To the extent that allegations in this Paragraph misquote or mischaracterize the documents attached as Exhibits 53 and 54, respectively, and/or their underlying websites, DraftKings denies them on that basis. DraftKings denies the remaining allegations in Paragraph 132.

133. The allegations in this Paragraph are vague and ambiguous, such as alleging that "DraftKings' Mobile Apps and services cease working if the player moves outside a jurisdiction in which gambling is legal," without specificity as to which of DraftKings' mobile applications

and/or services are referenced or definition of what constitutes "cease working," rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations. DraftKings admits that IG alleges that Exhibit 55 in footnote 66 is a printed copy of https://support.draftkings.com/dk/en-us/what-happens-if-i-leave-a-jurisdiction-in-the-middle-of-a-casino-game?id=kb_article_view&sysparm_article=KB0010511. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 55 and/or its underlying website, DraftKings denies them on that basis. DraftKings denies the remaining allegations in Paragraph 133.

134. The allegations in this Paragraph are vague and ambiguous, such as alleging that "DraftKings' Mobile Apps require user verification," without specificity as to which of DraftKings' mobile applications are referenced or definition of what constitutes "require" or "user verification," rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations. DraftKings admits that IG alleges that Exhibit 56 in footnote 67 is a printed copy of https://support.draftkings.com/dk/en-us/why-am-i-being-asked-to-verify-my-identity-us?id=kb_article_view&sysparm_article=KB0010467. DraftKings admits that IG alleges that Exhibit 57 in footnote 67 is a printed copy of https://support.draftkings.com/dk/en-us/why-am-i-asked-to-provide-my-social-security-number-ssn-to-draftkings-us?id=kb_article_view&sysparm_article=KB0010509. These documents speak for themselves. To the extent that allegations in this Paragraph misquote or mischaracterize the documents attached as Exhibits 56 and 57, respectively, and/or their underlying websites, DraftKings denies them on that basis. DraftKings denies any remaining allegations in Paragraph 134.

135. DraftKings admits that it has described certain offerings with the phrase: "Mobile users can enjoy the convenience of on-the-go play." Otherwise, the allegations in this Paragraph are vague and ambiguous, such as the phrases "mobile device is authorized" and "requisite criteria are met," which are without definition of what constitutes each term, rendering DraftKings unable to form a belief as to the truth or falsity of the allegations, and therefore DraftKings denies these allegations. DraftKings denies the remaining allegations in Paragraph 135.

**C. DraftKings' [Alleged] Harm to Interactive Games**

136. DraftKings admits that it uses and tests its offerings in the ordinary course of its business. DraftKings denies that any such use or testing infringes any valid and enforceable claim of the Asserted Patents. The remaining allegations in Paragraph 136 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies them.

137. The allegations in this Paragraph contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies that it has infringed or infringes any valid and enforceable claim of the Asserted Patents. DraftKings admits that it reported revenue of $4,767.7 million for fiscal year 2024. DraftKings admits that it reported 4.8 million average monthly unique paying customers in the fourth quarter of 2024. DraftKings admits that IG alleges that Exhibit 58 in footnotes 68 and 69 is a printed copy of a third-party website located at https://www.businessofapps.com/data/draftkings-statistics/. This document speaks for itself. To the extent that allegations in this Paragraph misquote or mischaracterize the document attached as Exhibit 58 and/or its underlying website, DraftKings denies them on that basis.

138. DraftKings denies infringing any valid and enforceable claim of the Asserted Patents. DraftKings denies that it causes irreparable harm to IG. DraftKings denies that a permanent injunction is appropriate in this case. The remaining allegations in Paragraph 138

contain legal conclusions to which no response is required. To the extent a response is required, DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 138 of the Complaint, and therefore denies them.

**D. DraftKings' [Alleged] Knowledge of Interactive Games' Patent Portfolio**

139. DraftKings admits that IG alleges that Exhibit 59 in footnote 70 is a copy of a letter from Cantor Fitzgerald L.P. to DraftKings. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 59, DraftKings denies them on that basis. DraftKings denies infringing any valid and enforceable claim of the Asserted Patents, whether considered at the time of Exhibit 59 or thereafter. DraftKings denies that Exhibit 59 identifies any of the Asserted Patents, none of which had issued as of the date of Exhibit 59. DraftKings denies that it infringed any patent identified in Exhibit 59. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 139 of the Complaint, and therefore denies them.

140. DraftKings denies the allegations of Paragraph 140.

141. DraftKings admits that IG alleges that Exhibit 60 in footnote 71 is a copy of a letter addressed to DraftKings. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 60, DraftKings denies them on that basis. For example, DraftKings states that Exhibit 60 is a letter from IG's outside counsel, dated April 1, 2026, that was delivered to DraftKings' registered agent in Delaware on April 1, 2026, the day before IG filed this action. DraftKings denies infringing any valid and enforceable claim of the Asserted Patents, whether considered before or after the time of Exhibit 60. DraftKings lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 141 of the Complaint, and therefore denies them.

## COUNT I: [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 12,409,382

142. DraftKings incorporates by reference its answers to Paragraphs 1–141, as if fully set forth herein.

143. The allegations in Paragraph 143 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies that the ’382 Patent has been or is valid or enforceable.

144. DraftKings denies that any claim of the ’382 Patent is valid and enforceable. DraftKings denies that it directly infringes any valid and enforceable claim of the ’382 Patent. DraftKings denies that it induces infringement of any valid and enforceable claim of the ’382 Patent. DraftKings denies that it contributes to infringement of any valid and enforceable claim of the ’382 Patent. DraftKings denies that it has infringed or continues to infringe any valid and enforceable claim of the ’382 Patent. DraftKings admits that IG alleges that Exhibit 6 to the Complaint is a claim chart of certain claims of the ’382 Patent. DraftKings denies the allegations in Exhibit 6. The remaining allegations of Paragraph 144 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 144.

145. DraftKings admits that IG has not granted DraftKings a license to the ’382 Patent. DraftKings denies that the ’382 Patent claims inventions. DraftKings denies that any claim of the ’382 Patent is valid and enforceable. The remaining allegations in Paragraph 145 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 145.

146. DraftKings denies the allegations in Paragraph 146.

147. DraftKings admits that IG alleges that Exhibit 60 in footnote 72 is a copy of a letter addressed to DraftKings. DraftKings admits that Exhibit 60 was delivered to DraftKings’

registered agent on April 1, 2026. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 60, DraftKings denies them on that basis. DraftKings denies that it has infringed or infringes any valid and enforceable claim of the ’382 Patent. DraftKings denies that it was aware of the ’382 Patent as of its issuance date. The remaining allegations in Paragraph 147 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 147.

148. The allegations in Paragraph 148 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies engaging in conduct intended to induce infringement of any valid and enforceable claim of the ’382 Patent. DraftKings denies being willfully blind to the ’382 Patent. DraftKings denies any remaining allegations in this Paragraph.

149. DraftKings denies the allegations in Paragraph 149.

150. The allegations in Paragraph 150 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies infringing any valid and enforceable claim of the ’382 Patent. DraftKings denies any remaining allegations in this Paragraph.

151. DraftKings denies the allegations in Paragraph 151.

**COUNT II: [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 8,974,302**

152. DraftKings incorporates by reference its answers to Paragraphs 1–151, as if fully set forth herein.

153. The allegations in Paragraph 153 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies that the ’302 Patent has been or is valid or enforceable.

154. DraftKings denies that any claim of the ’302 Patent is valid and enforceable. DraftKings denies that it directly infringes any valid and enforceable claim of the ’302 Patent.

DraftKings denies that it induces infringement of any valid and enforceable claim of the ’302 Patent. DraftKings denies that it contributes to infringement of any valid and enforceable claim of the ’302 Patent. DraftKings denies that it has infringed or continues to infringe any valid and enforceable claim of the ’302 Patent. DraftKings admits that IG alleges that Exhibit 7 to the Complaint is a claim chart of certain claims of the ’302 Patent. DraftKings denies the allegations in Exhibit 7. The remaining allegations of Paragraph 154 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 154.

155. DraftKings admits that IG has not granted DraftKings a license to the ’302 Patent. DraftKings denies that the ’302 Patent claims inventions. DraftKings denies that any claim of the ’302 Patent is valid and enforceable. The remaining allegations in Paragraph 155 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 155.

156. DraftKings denies the allegations in Paragraph 156.

157. DraftKings admits that IG asserted the ’302 Patent against DraftKings in a lawsuit captioned *Interactive Games LLC v. DraftKings, Inc.*, No. 1:19-cv-01105-RGA (D. Del.), filed on June 14, 2019, and admits that DraftKings has been aware of the ’302 Patent since it received notice of that lawsuit. DraftKings further states that IG voluntarily dismissed that lawsuit after the Patent Trial and Appeal Board found certain asserted claims of other asserted patents in that lawsuit unpatentable. DraftKings denies that any claim of the ’302 Patent is valid and enforceable. DraftKings denies that it infringes any valid and enforceable claim of the ’302 Patent. The remaining allegations in Paragraph 157 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 157.

158. DraftKings admits that IG alleges that Exhibit 60 in footnote 73 is a copy of a letter addressed to DraftKings. DraftKings admits that Exhibit 60 was delivered to DraftKings' registered agent on April 1, 2026. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 60, DraftKings denies them on that basis. DraftKings denies that it has infringed or infringes any valid and enforceable claim of the '302 Patent. DraftKings denies that it was aware of the '302 Patent as of its issuance date. DraftKings admits that it was aware of the '302 Patent as of the date it received notice of the lawsuit identified in Paragraph 157. The remaining allegations in Paragraph 158 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 158.

159. The allegations in Paragraph 159 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies engaging in conduct intended to induce infringement of any valid and enforceable claim of the '302 Patent. DraftKings denies any remaining allegations in this Paragraph.

160. DraftKings denies the allegations in Paragraph 160.

161. The allegations in Paragraph 161 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies infringing any valid and enforceable claim of the '302 Patent. DraftKings denies any remaining allegations in this Paragraph.

162. DraftKings denies the allegations in Paragraph 162.

**COUNT III: [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 12,548,404**

163. DraftKings incorporates by reference its answers to Paragraphs 1–162, as if fully set forth herein.

164. The allegations in Paragraph 164 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies that the ’404 Patent has been or is valid or enforceable.

165. DraftKings denies that any claim of the ’404 Patent is valid and enforceable. DraftKings denies that it directly infringes any valid and enforceable claim of the ’404 Patent. DraftKings denies that it induces infringement of any valid and enforceable claim of the ’404 Patent. DraftKings denies that it contributes to infringement of any valid and enforceable claim of the ’404 Patent. DraftKings denies that it has infringed or continues to infringe any valid and enforceable claim of the ’404 Patent. DraftKings admits that IG alleges that Exhibit 8 to the Complaint is a claim chart of certain claims of the ’404 Patent. DraftKings denies the allegations in Exhibit 8. The remaining allegations of Paragraph 165 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 165.

166. DraftKings admits that IG has not granted DraftKings a license to the ’404 Patent. DraftKings denies that the ’404 Patent claims inventions. DraftKings denies that any claim of the ’404 Patent is valid and enforceable. The remaining allegations in Paragraph 166 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 166.

167. DraftKings denies the allegations in Paragraph 167.

168. DraftKings admits that IG alleges that Exhibit 60 in footnote 74 is a copy of a letter addressed to DraftKings. DraftKings admits that Exhibit 60 was delivered to DraftKings’ registered agent on April 1, 2026. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 60, DraftKings denies them on

that basis. DraftKings denies that it has infringed or infringes any valid and enforceable claim of the ’404 Patent. DraftKings denies that it was aware of the ’404 Patent as of its issuance date. The remaining allegations in Paragraph 168 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 168.

169. The allegations in Paragraph 169 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies engaging in conduct intended to induce infringement of any valid and enforceable claim of the ’404 Patent. DraftKings denies being willfully blind to the ’404 Patent. DraftKings denies any remaining allegations in this Paragraph.

170. DraftKings denies the allegations in Paragraph 170.

171. The allegations in Paragraph 171 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies infringing any valid and enforceable claim of the ’404 Patent. DraftKings denies any remaining allegations in this Paragraph.

172. DraftKings denies the allegations in Paragraph 172.

**<u>COUNT IV: [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 12,400,518</u>**

173. DraftKings incorporates by reference its answers to Paragraphs 1–172, as if fully set forth herein.

174. The allegations in Paragraph 174 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies that the ’518 Patent has been or is valid or enforceable.

175. DraftKings denies that any claim of the ’518 Patent is valid and enforceable. DraftKings denies that it directly infringes any valid and enforceable claim of the ’518 Patent. DraftKings denies that it induces infringement of any valid and enforceable claim of the ’518 Patent. DraftKings denies that it contributes to infringement of any valid and enforceable claim of

the ’518 Patent. DraftKings denies that it has infringed or continues to infringe any valid and enforceable claim of the ’518 Patent. DraftKings admits that IG alleges that Exhibit 9 to the Complaint is a claim chart of certain claims of the ’518 Patent. DraftKings denies the allegations in Exhibit 9. The remaining allegations of Paragraph 175 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 175.

176. DraftKings admits that IG has not granted DraftKings a license to the ’518 Patent. DraftKings denies that the ’518 Patent claims inventions. DraftKings denies that any claim of the ’518 Patent is valid and enforceable. The remaining allegations in Paragraph 176 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 176.

177. DraftKings denies the allegations in Paragraph 177.

178. DraftKings admits that IG alleges that Exhibit 60 in footnote 75 is a copy of a letter addressed to DraftKings. DraftKings admits that Exhibit 60 was delivered to DraftKings’ registered agent on April 1, 2026. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 60, DraftKings denies them on that basis. DraftKings denies that it has infringed or infringes any valid and enforceable claim of the ’518 Patent. DraftKings denies that it was aware of the ’518 Patent as of its issuance date. The remaining allegations in Paragraph 178 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 178.

179. The allegations in Paragraph 179 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies engaging in conduct intended to

induce infringement of any valid and enforceable claim of the '518 Patent. DraftKings denies being willfully blind to the '518 Patent. DraftKings denies any remaining allegations in this Paragraph.

180. DraftKings denies the allegations in Paragraph 180.

181. The allegations in Paragraph 181 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies infringing any valid and enforceable claim of the '518 Patent. DraftKings denies any remaining allegations in this Paragraph.

182. DraftKings denies the allegations in Paragraph 182.

**COUNT V: [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 12,406,284**

183. DraftKings incorporates by reference its answers to Paragraphs 1–182, as if fully set forth herein.

184. The allegations in Paragraph 184 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies that the '284 Patent has been or is valid or enforceable.

185. DraftKings denies that any claim of the '284 Patent is valid and enforceable. DraftKings denies that it directly infringes any valid and enforceable claim of the '284 Patent. DraftKings denies that it induces infringement of any valid and enforceable claim of the '284 Patent. DraftKings denies that it contributes to infringement of any valid and enforceable claim of the '284 Patent. DraftKings denies that it has infringed or continues to infringe any valid and enforceable claim of the '284 Patent. DraftKings admits that IG alleges that Exhibit 10 to the Complaint is a claim chart of certain claims of the '284 Patent. DraftKings denies the allegations in Exhibit 10. The remaining allegations of Paragraph 185 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 185.

186. DraftKings admits that IG has not granted DraftKings a license to the ’284 Patent. DraftKings denies that the ’284 Patent claims inventions. DraftKings denies that any claim of the ’284 Patent is valid and enforceable. The remaining allegations in Paragraph 186 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 186.

187. DraftKings denies the allegations in Paragraph 187.

188. DraftKings admits that IG alleges that Exhibit 60 in footnote 76 is a copy of a letter addressed to DraftKings. DraftKings admits that Exhibit 60 was delivered to DraftKings’ registered agent on April 1, 2026. This document speaks for itself. To the extent that allegations in this Paragraph mischaracterize the document attached as Exhibit 60, DraftKings denies them on that basis. DraftKings denies that it has infringed or infringes any valid and enforceable claim of the ’284 Patent. DraftKings denies that it was aware of the ’284 Patent as of its issuance date. The remaining allegations in Paragraph 188 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies the allegations in Paragraph 188.

189. The allegations in Paragraph 189 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies engaging in conduct intended to induce infringement of any valid and enforceable claim of the ’284 Patent. DraftKings denies being willfully blind to the ’284 Patent. DraftKings denies any remaining allegations in this Paragraph.

190. DraftKings denies the allegations in Paragraph 190.

191. The allegations in Paragraph 191 contain legal conclusions to which no response is required. To the extent a response is required, DraftKings denies infringing any valid and enforceable claim of the ’284 Patent. DraftKings denies any remaining allegations in this Paragraph.

192. DraftKings denies the allegations in Paragraph 192.

## RESPONSE TO PRAYER FOR RELIEF

This section of the Complaint sets forth IG's requested relief, to which no response is required. To the extent a response is required, DraftKings denies the underlying allegations of IG's Prayer for Relief against DraftKings, denies that IG is entitled to any relief whatsoever, and requests that the Court deny all relief to IG, enter judgment in favor of DraftKings, and award DraftKings its attorneys' fees and costs as the prevailing party in the action and as permitted by law.

## RESPONSE TO JURY DEMAND

DraftKings admits that IG sets forth a demand for a trial by jury. DraftKings likewise demands a trial by jury on all issues so triable raised by IG's Complaint or by DraftKings' Answer, Affirmative Defenses, and Counterclaims.

***

To the extent any allegations of the Complaint have not been previously specifically admitted or denied, DraftKings denies them.

## AFFIRMATIVE DEFENSES

DraftKings asserts the following defenses, without assuming the burden of proof on issues as to which Plaintiff bears such burden. DraftKings reserves the right to assert any additional defenses or counterclaims which are permitted under the Federal Rules of Civil Procedure, the Patent Laws of the United States, and/or at law or equity, and which may now exist or in the future be available based on discovery and further investigation in this case.

## FIRST DEFENSE: FAILURE TO STATE A CLAIM

Plaintiff's Complaint fails to state a claim upon which relief may be granted.

**SECOND DEFENSE: NON-INFRINGEMENT**

DraftKings does not infringe and has not directly, indirectly, jointly, willfully, or otherwise infringed (literally or under the doctrine of equivalents) any valid and enforceable claim of the Asserted Patents as properly construed. To the extent that the claims at issue are interpreted so broadly as to read on any accused product, DraftKings has not infringed any such claim of the Asserted Patents under the reverse doctrine of equivalents.

**THIRD DEFENSE: INVALIDITY**

Each asserted claim of the Asserted Patents is invalid and/or unpatentable for failure to comply with one or more of the conditions and requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, 119, 120, 132, and/or 256 and/or judicially created doctrines of invalidity because, for example, the alleged invention thereof lacks utility; is not eligible for patenting; is taught by, suggested by, and/or obvious in view of, the prior art; is not adequately supported or enabled by the written description of that patented invention; and/or the claims are indefinite and/or directed to an abstract idea or other non-statutory subject matter. By way of example only, (a) the asserted claims of the Asserted Patents are directed to patent-ineligible abstract ideas and lack an inventive concept, including for the reasons set forth in DraftKings' Partial Motion to Dismiss (Dkt. 36), which DraftKings maintains and preserves notwithstanding the Court's October 27, 2026 Order (Dkt. 79); (b) asserted claims reciting "means for" limitations are indefinite under 35 U.S.C. § 112(b) because the specifications do not disclose corresponding structure, including any algorithm, for the claimed functions; (c) the asserted claims are not entitled to the priority dates IG claims; and (d) the asserted claims are anticipated by and/or obvious over the prior art identified in DraftKings' invalidity contentions served in this action.

**FOURTH DEFENSE: LACK OF STANDING**

Plaintiff's claims of patent infringement are precluded in whole or in part to the extent that Plaintiff lacks standing to assert any of the Asserted Patents.

**FIFTH DEFENSE: ESTOPPEL AND DISCLAIMER**

Plaintiff's claims of patent infringement are barred, in whole or in part, by estoppel, including collateral estoppel and prosecution history estoppel. Plaintiff is estopped from asserting that DraftKings has infringed, directly or indirectly, any valid and enforceable claim of the Asserted Patents based on prior district court orders and/or statements, representations, prosecution history disclaimers, and admissions made during prosecution before the USPTO of the patent applications resulting in the Asserted Patents, as well as during prosecution of related patent applications and in proceedings concerning the Asserted Patents and related patents, including IPR2020-01108 and Ex Parte Reexamination Control No. 90/015,151.

**SIXTH DEFENSE: ENSNAREMENT**

To the extent Plaintiff claims infringement of one or more claims of the Asserted Patents under the doctrine of equivalents, Plaintiff's claims are barred under the ensnarement doctrine, which prohibits Plaintiff from asserting an infringement theory under the doctrine of equivalents that encompasses, or "ensnares," the prior art.

**SEVENTH DEFENSE: LACK OF NOTICE**

Plaintiff's claims for damages are limited and/or barred, in part or in whole, because DraftKings is not liable for damages for acts alleged to have been performed before DraftKings received adequate notice of the Asserted Patents.

**EIGHTH DEFENSE: LICENSE AND EXHAUSTION**

Plaintiff's claims of patent infringement are barred, in whole or in part, to the extent that the alleged infringement is licensed or otherwise authorized. Plaintiff's claims of patent

infringement are also barred to the extent Plaintiff has exhausted its rights and remedies as to the alleged infringement.

**NINTH DEFENSE: DAMAGES AND COST LIMITATIONS**

Plaintiff's claims for relief are limited or barred, in whole or in part, by 35 U.S.C. §§ 286, 287, and/or 288. By way of non-limiting example, Plaintiff is barred in whole or in part from recovering damages to the extent there is a failure by the owner and/or licensee of the Asserted Patents to mark relevant products as required by 35 U.S.C. § 287.

**TENTH DEFENSE: ACTIONS OF OTHERS; DIVIDED INFRINGEMENT**

Plaintiff's claims of patent infringement are barred, in whole or in part, because DraftKings is not liable for acts of others over whom it has no control. To the extent any asserted claim requires steps or functions performed by third parties, including GeoComply, Radar, Apple, Google, or end users, DraftKings does not direct or control the performance of those steps or functions, and no single entity performs every limitation of any asserted claim. Any alleged performance of claimed steps by third parties cannot be attributed to DraftKings.

**ELEVENTH DEFENSE: NO CAUSATION**

Plaintiff's claims against DraftKings are barred because Plaintiff's damages, if any, were not caused by DraftKings.

**TWELFTH DEFENSE: NO EXCEPTIONAL CASE**

Plaintiff is not entitled to a finding that this is an exceptional case justifying an award of attorneys' fees associated with this action pursuant to 35 U.S.C. § 285 or any other ground, or costs associated with this action pursuant to 35 U.S.C. § 288 or any other ground. Plaintiff's prayer for attorneys' fees and costs for its claims of patent infringement is barred because Plaintiff does not satisfy the requirements of 35 U.S.C. §§ 284, 285, or 288.

**THIRTEENTH DEFENSE: NO WILLFUL INFRINGEMENT**

Plaintiff is not entitled to a finding of willful infringement because Plaintiff cannot demonstrate that infringement occurred. Even if Plaintiff were able to demonstrate that infringement has occurred, DraftKings has not willfully infringed any valid and enforceable claim of the Asserted Patents. As a nonlimiting example, Plaintiff served DraftKings with a 275-page letter identifying the Asserted Patents one day before filing the Complaint in this lawsuit, Plaintiff's letter delivered to DraftKings' registered agent on July 15, 2014 did not identify any of the Asserted Patents, and the Patent Trial and Appeal Board denied institution of the '302 Patent claims without reaching a decision on the substantive merits of patentability. These circumstances further undermine Plaintiff's allegations that DraftKings deliberately or intentionally infringed any valid and enforceable claim of the Asserted Patents.

**FOURTEENTH DEFENSE: PRINCIPLES OF EQUITY**

Plaintiff's claims are limited and/or barred, in whole or in part, under principles of equity including, but not limited to, the doctrines of laches (to the extent available), prosecution laches, unclean hands, waiver, implied waiver, equitable estoppel and/or acquiescence due to its inaction in timely prosecuting and asserting the Asserted Patents.

**FIFTEENTH DEFENSE: INCORRECT INVENTORSHIP**

At least the '302 and '382 Patents are invalid under 35 U.S.C. §§ 102(f) and 256(b) for uncorrectable nonjoinder of inventor Anoop Gopinatha.

Title 35, Section 112(f) of the United States Code states that "[a] person shall be entitled to a patent ***unless*** . . . he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (emphasis added). In other words, a patent is invalid if one or more inventors did not invent the subject matter claimed.

Similarly, 35 U.S.C. § 256(b) states that "[t]he error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected." The necessary and opposite implication is that a patent is invalid for the error of omitting inventors when that error cannot be corrected. At least the '302 and '382 Patents are invalid under 35 U.S.C. §§ 102(f) and 256 for nonjoinder of inventor Anoop Gopinatha.

Mr. Gopinatha is named as the sole inventor on U.S. Provisional Application Nos. 61/413,089 (the "'089 Application," attached as Exhibit BG) and 61/413,098 (the "'098 Application," attached as Exhibit BH), both filed November 12, 2010. Mr. Anoop Gopinatha is named as a joint inventor on U.S. Provisional Application No. 61/373,435 (the "'435 Application," attached as Exhibit BI), filed August 13, 2010, and U.S. Provisional Application No. 61/405,439 (the "'439 Application," attached as Exhibit BJ), filed October 21, 2010. The '435 Application also lists Sunny Tara as a named inventor. And the '439 Application also lists Lee Amaitis as an inventor. The '302 and '382 Patents claim priority to all four of these provisional applications and claim subject matter disclosed therein.

By naming Mr. Gopinatha as an inventor on each of these '089, '098, '435, and '439 Applications, CFPH LLC—the Cantor Fitzgerald entity responsible for prosecuting the applications—represented to the USPTO that Mr. Gopinatha contributed to the conception of the subject matter they disclose. And by naming him as the sole inventor of the '089 and '098 Applications, CFPH LLC represented to the USPTO that Mr. Gopinatha alone conceived the subject matter disclosed in those applications.

On March 24, 2011, CFPH LLC filed U.S. Application No. 13/070,893 (the "'893 Application") under pre-AIA 37 C.F.R. § 1.47, claiming priority to each of the '089, '098. '435, and '439 Applications. That non-provisional application omitted Mr. Gopinatha as an inventor.

Every later application in the family, and every patent issuing from them, likewise omits Mr. Gopinatha. This includes both the ’302 and ’382 Patents, which only list Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette as inventors.

Upon information and belief, Mr. Gopinatha is an inventor of and contributed to claimed subject matter in the ’302 and ’382 Patents. Both patents claim priority to ’089 and ’098 Applications. And Mr. Gopinatha is the sole named inventor of the subject matter of the ’098 and ’089 Applications. There would be no need to claim priority to the ’098 and ’089 Applications if they did not disclose subject matter claimed in the ’302 and ’382 Patents. And pursuant to pre-AIA 35 U.S.C. § 119(e)(1), at least the ’302 Patent—which was filed pre-AIA—should have named Mr. Gopinatha as an inventor to enjoy the benefit of those priority claims.

The ’098 and ’089 Applications disclose subject matter claimed in the ’302 and ’382 Patents. For example, independent claims 1 and 22 of the ’302 Patent recite a distance-based recheck interval, which is described as part of the “Continuous Security Validation Protocol” at pages 19–20 of the ’089 Application. And independent claims 1, 14, 26 and 27 of the ’382 Patent are directed to a smart phone running a wrapper application alongside a gambling application, which are described as an Android Wrapper Application (AWA) running alongside an AIR Mobile gaming Client (ABC) in the “Actors” at page 15 and “Client and User Validation” at page 18 of the ’089 Application. Mr. Gopinatha’s contributions to the claimed subject matter are not insignificant in quality when measured against the full scope of that subject matter.

CFPH LLC knew of Mr. Gopinatha’s inventive contributions, having identified him as an inventor in four separate filings with the USPTO within the nine months preceding the filing of the ’893 Application—the first non-provisional in the ’302 and ’382 Patent family. Upon

information and belief, CFPH LLC nonetheless omitted him deliberately, and has never sought correction under 35 U.S.C. § 256.

Upon information and belief, the omission followed Mr. Gopinatha's departure from Cantor Gaming—a CFPH LLC affiliate—on or about November 2010. Upon information and belief, Mr. Gopinatha only worked for Cantor Gaming from February 2010 to November 2010 and, by the time of his departure, had not executed an assignment of his rights in the claimed inventions; nor had he executed an employment agreement requiring him to do so.

The application for the '302 Patent was filed by CFPH LLC on April 5, 2011. Upon information and belief, CFPH LLC did not name Mr. Gopinatha as an inventor in that application with the specific intent of deceiving the USPTO (and the public) into believing Mr. Gopinatha did not contribute to the claimed subject matter. Upon information and belief, CFPH LLC did not want the USPTO or the public to know that Mr. Gopinatha contributed to the claimed subject matter in that application because CFPH LLC did not want the USPTO or the public to know that Mr. Gopinatha has an undivided interest in the patent that ultimately issued from that application. In addition, or alternatively, CFPH LLC did not want the USPTO or the public to know that Mr. Gopinatha contributed to the claimed subject matter in the '302 Patent because it did not want to be burdened with the additional paperwork associated with recording Mr. Gopinatha's assignment, if any, of his interests in the '302 Patent or correcting inventorship, including the requirement under pre-AIA 37 C.F.R. 1.47 that supporting facts be provided when an inventor refused to sign a declaration or could not be reached after diligent effort. In either event, CFPH LLC's intent was to deceive the USPTO to its own advantage. The '302 Patent is therefore invalid for incorrect inventorship under 35 U.S.C. §§ 102(f) and 256.

Plaintiff here also knew of Mr. Gopinatha's inventive contributions when prosecuting the '382 Patent. They claimed priority to the '089 and '098 Applications and claimed subject matter disclosed in those applications. Upon information and belief, Plaintiffs also omitted him deliberately and never sought correction under 35 U.S.C. § 256.

Plaintiff omitted Mr. Gopinatha as an inventor on the '382 Patent and never sought correction because, like CFPH LLC, Plaintiff did not want the USPTO or the public to know that Mr. Gopinatha contributed to the claimed subject matter in those applications because Plaintiff did not want the USPTO or the public to know that Mr. Gopinatha has an undivided interest in the '382 Patent. In addition, or alternatively, Plaintiff did not want the USPTO or the public to know that Mr. Gopinatha contributed to the claimed subject matter in '382 Patent because it did not want to be burdened with the additional paperwork associated with recording Mr. Gopinatha's assignment, if any, of his interests in the '382 Patent and correcting inventorship. In other words, Plaintiff sought to obtain the benefit of Mr. Gopinatha's contributions to the claimed subject matter of the '382 Patent through a priority claim while, at the same time, deliberately omitting him as an inventor to avoid acknowledging that Mr. Gopinatha has a joint and undivided interest in the '382 Patent and/or to avoid the logistical burdens required to add Mr. Gopinatha as an inventor. In either event, Plaintiff's intent was to deceive the USPTO to its own advantage. The '382 Patent is therefore invalid for incorrect inventorship under 35 U.S.C. §§ 102(f) and 256.

An affirmative misrepresentation of inventorship to the USPTO also can support a finding of inequitable conduct. *See Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 829–30 (Fed. Cir. 2010) (affirming unenforceability where the applicant misrepresented inventorship to the USPTO); *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000) (affirming inequitable conduct based on misrepresentations bearing

on inventorship). "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc).

Each inventor declaration in the '302 and '382 Patents was a sworn statement that the four named individuals were the original and first inventors of the claimed subject matter. And each such inventor declaration was false because it omitted Mr. Gopinatha.

At the pleading stage, DraftKings need only to allege facts from which the Court may reasonably infer that a specific individual knew of the falsity of a material misrepresentation and made it with a specific intent to deceive the USPTO. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328–29 (Fed. Cir. 2009).

Those facts are pleaded here. *Who*: Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette—the four named inventors of the '302 and '382 Patents. *What*: the inventor declarations stating that the four named individuals were the original and first inventors, and the failure to identify Mr. Gopinatha. *When*: on or about November 15, 2011, and continuing through issuance of the '302 Patent and '382 Patent. *Where*: in the '893 Application and each subsequent application in the '302 and '382 Patent family. *How*: the USPTO would have rejected the claims under pre-AIA 35 U.S.C. § 102(f) and/or invalidated the patents under 35 U.S.C. § 256, and could not have accepted an oath or declaration lacking Mr. Gopinatha, had it known he was a joint inventor.

Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette knew that Mr. Gopinatha contributed to the claimed subject matter of the '302 and '382 Patents and, therefore, that Mr. Gopinatha should have been named as an inventor. Those individuals necessarily knew what they did and did not invent. This is particularly true of Mr. Amaitis and Mr. Tara, who

necessarily had personal knowledge of Mr. Gopinatha's contributions because each was named as a co-inventor with Mr. Gopinatha on a provisional application. And they knew of Mr. Gopinatha's contributions when each of them executed an oath and declaration in which each represented to the USPTO that "I believe the inventor(s) named below to be the original and first inventor(s) or the subject matter which is claimed and for which a patent is sought." That misrepresentation was but-for material. Had the USPTO known that Mr. Gopinatha was a joint inventor, it would not have allowed the claims without naming him.

The motive to omit Mr. Gopinatha—his departure from Cantor Gaming months before the non-provisional filing without having assigned his rights—further supports an inference of specific intent to deceive. Thus, each of Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette individually deceived the USPTO when executing this oath and declaration with the intent of obtaining allowance of claims without naming Mr. Gopinatha. The '302 and '382 Patents are therefore also unenforceable for inequitable conduct.

**SIXTEENTH DEFENSE: INTERVENING RIGHTS**

Plaintiff's claims for relief concerning the '302 Patent are barred or limited, in whole or in part, by absolute and equitable intervening rights under 35 U.S.C. §§ 252 and 307(b), to the extent the asserted claims were added or substantively amended during reexamination and are not substantially identical to the original claims. DraftKings is entitled to protection for qualifying activities undertaken, and substantial preparations made, before issuance of the reexamination certificate, including continued activities to the extent permitted by equity.

**SEVENTEENTH DEFENSE: INEQUITABLE CONDUCT**

The claims of the Asserted Patents are unenforceable as a result of inequitable conduct during prosecution before the USPTO, including failure to disclose known prior art to the

Examiner, as particularly explained and alleged in DraftKings' Count XI Counterclaim, which DraftKings incorporates by reference.

**EIGHTEENTH DEFENSE: NO INJUNCTIVE RELIEF**

IG is not entitled to injunctive relief because any alleged injury to IG is not irreparable, IG has an adequate remedy at law, IG does not practice the Asserted Patents or compete with DraftKings in any relevant market, the balance of hardships and the public interest weigh against an injunction, and the '518 Patent expired on May 5, 2026.

**NINTEENTH DEFENSE: PROSECUTION LACHES**

The Asserted Patents are unenforceable, in whole or in part, under the doctrine of prosecution laches. By way of example, IG and its predecessors filed the applications that issued as the '518 and '284 Patents on May 1, 2024, and the applications that issued as the '382 and '404 Patents on June 27, 2024, each claiming priority through chains of continuation and continuation-in-part applications to applications filed as early as 2006, 2009, 2010, and 2012, respectively. IG and its predecessors delayed presenting the asserted claims for between approximately 12 and 18 years without adequate explanation, while DraftKings and others developed, launched, and invested in the offerings IG now accuses, to DraftKings' prejudice.

**RESERVATION OF ADDITIONAL DEFENSES**

DraftKings reserves the right to amend, supplement, and/or assert additional affirmative defenses which may be developed through discovery in this action.

**PRAYER FOR RELIEF**

WHEREFORE, DraftKings respectfully requests the following relief:

A. A judgment dismissing with prejudice Plaintiff's Complaint against DraftKings;

B. A judgement declaring that each of the claims of the Asserted Patents is not infringed, either literally or under the doctrine of equivalents, whether directly, by inducement, or

contributorily, by any actions of DraftKings or its customers, suppliers, users, licensees, vendors or vendees, or others using their offerings either alone or in combination with any other offerings;

C. A judgement declaring that each of the claims of the Asserted Patents is invalid and/or unenforceable;

D. A judgement declaring all of Plaintiff's requests for injunctive relief;

E. A judgment denying any and all relief requested by Plaintiff;

F. A declaration that this case is exceptional within the meaning of 35 U.S.C. § 285 and awarding DraftKings its costs and attorneys' fees in connection with this action; and

G. An award of any such further relief that this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

DraftKings demands a jury trial on all matters so triable.

## COUNTERCLAIMS

Without admitting any of the allegations of the Complaint other than those expressly admitted herein, and without prejudice to the rights of Defendant DraftKings Inc. ("DraftKings") to plead additional counterclaims as information becomes available, DraftKings brings these Counterclaims against Plaintiff and Counterclaim-Defendant Interactive Games LLC ("IG").

## BACKGROUND

1. On April 2, 2026, IG filed its Complaint against DraftKings (Dkt. 1), alleging infringement of U.S. Patent Nos. 12,409,382 ("the '382 Patent"), 8,974,302 ("the '302 Patent"), 12,548,404 ("the '404 Patent"), 12,400,518 ("the '518 Patent"), and 12,406,284 ("the '284 Patent") (collectively, "the Asserted Patents").

2. DraftKings denies that any of its products or services infringe any valid or enforceable claim of the Asserted Patents.

3. In its Complaint, IG alleges that it is the assignee of each of the Asserted Patents and possesses the exclusive right to enforce them. Dkt. 1, ¶¶ 51, 59, 71, 78, 85.

4. In view of IG's Complaint, an actual, substantial, and continuing justiciable controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between IG and DraftKings concerning the alleged validity, enforceability, and infringement of the Asserted Patents. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

## THE PARTIES

5. Counterclaim-Plaintiff DraftKings is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business at 222 Berkeley Street, Boston, Massachusetts 02116.

6. Upon information and belief, Plaintiff and Counterclaim-Defendant IG is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business at 110 East 59th Street, New York, New York 10022. IG is a successor of Cantor Gaming.

## JURISDICTION AND VENUE

7. DraftKings' Counterclaims arise under the patent laws of the United States, 35 U.S.C. § 101, *et seq.*, and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

8. This Court has subject matter jurisdiction over DraftKings' Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

9. An actual controversy exists under the Declaratory Judgment Act, at least because IG has asserted, and is asserting, infringement of the Asserted Patents by DraftKings, and DraftKings denies those allegations.

10. This Court has personal jurisdiction over IG because IG has consented to the personal jurisdiction of this Court by filing its Complaint against DraftKings in this Court.

11. For purposes of the Counterclaims set forth herein, venue is proper in this Judicial District under 28 U.S.C. §§ 1391 and 1400 for at least the reason that IG filed its lawsuit in this venue, and thereby has submitted to personal jurisdiction in this Court and has consented to venue.

## COUNT I:
## DECLARATION OF NON-INFRINGEMENT OF THE '302 PATENT

12. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

13. This is an action for declaratory judgment of non-infringement of any and all asserted claims of the '302 Patent.

14. IG alleges that DraftKings infringes certain claims of the ’302 Patent, either directly, indirectly, or under the doctrine of equivalents, by importing, manufacturing, using, offering for sale, and selling certain products.

15. DraftKings denies IG’s claims of infringement. DraftKings’ accused products do not satisfy each limitation of any asserted claim.

16. An actual, continuing, and justiciable controversy exists between DraftKings and IG as to DraftKings’ non-infringement of all claims of the ’302 Patent, as evidenced by the allegations in IG’s Complaint.

17. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

18. Absent a declaration of non-infringement, IG will continue to wrongfully assert the ’302 Patent against DraftKings, and will continue to cause DraftKings injury and damage.

19. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that DraftKings does not infringe, and has not infringed, contributed to the infringement of, or induced infringement of, any claim of the ’302 Patent either literally or under the doctrine of equivalents, indirectly, willfully, or in any other manner.

**COUNT II:**
**DECLARATION OF NON-INFRINGEMENT OF THE ’382 PATENT**

20. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

21. This is an action for declaratory judgment of non-infringement of any and all asserted claims of the ’382 Patent.

22. IG alleges that DraftKings infringes certain claims of the ’382 Patent, either directly, indirectly, or under the doctrine of equivalents, by importing, manufacturing, using, offering for sale, and selling certain products.

23. DraftKings denies IG’s claims of infringement. DraftKings’ accused products do not satisfy each limitation of any asserted claim.

24. An actual, continuing, and justiciable controversy exists between DraftKings and IG as to DraftKings’ non-infringement of all claims of the ’382 Patent, as evidenced by the allegations in IG’s Complaint.

25. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

26. Absent a declaration of non-infringement, IG will continue to wrongfully assert the ’382 Patent against DraftKings, and will continue to cause DraftKings injury and damage.

27. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that DraftKings does not infringe, and has not infringed, contributed to the infringement of, or induced infringement of, any claim of the ’382 Patent either literally or under the doctrine of equivalents, indirectly, willfully, or in any other manner.

**COUNT III:**
**DECLARATION OF NON-INFRINGEMENT OF THE ’404 PATENT**

28. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

29. This is an action for declaratory judgment of non-infringement of any and all asserted claims of the ’404 Patent.

30. IG alleges that DraftKings infringes certain claims of the ’404 Patent, either directly, indirectly, or under the doctrine of equivalents, by importing, manufacturing, using, offering for sale, and selling certain products.

31. DraftKings denies IG’s claims of infringement. DraftKings’ accused products do not satisfy each limitation of any asserted claim.

32. An actual, continuing, and justiciable controversy exists between DraftKings and IG as to DraftKings’ non-infringement of all claims of the ’404 Patent, as evidenced by the allegations in IG’s Complaint.

33. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

34. Absent a declaration of non-infringement, IG will continue to wrongfully assert the ’404 Patent against DraftKings, and will continue to cause DraftKings injury and damage.

35. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that DraftKings does not infringe, and has not infringed, contributed to the infringement of, or induced infringement of, any claim of the ’404 Patent either literally or under the doctrine of equivalents, indirectly, willfully, or in any other manner.

## COUNT IV: DECLARATION OF NON-INFRINGEMENT OF THE ’518 PATENT

36. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

37. This is an action for declaratory judgment of non-infringement of any and all asserted claims of the ’518 Patent.

38. IG alleges that DraftKings infringes certain claims of the ’518 Patent, either directly, indirectly, or under the doctrine of equivalents, by importing, manufacturing, using, offering for sale, and selling certain products.

39. DraftKings denies IG’s claims of infringement. DraftKings’ accused products do not satisfy each limitation of any asserted claim.

40. An actual, continuing, and justiciable controversy exists between DraftKings and IG as to DraftKings’ non-infringement of all claims of the ’518 Patent, as evidenced by the allegations in IG’s Complaint.

41. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

42. Absent a declaration of non-infringement, IG will continue to wrongfully assert the ’518 Patent against DraftKings, and will continue to cause DraftKings injury and damage.

43. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that DraftKings does not infringe, and has not infringed, contributed to the infringement of, or induced infringement of, any claim of the ’518 Patent either literally or under the doctrine of equivalents, indirectly, willfully, or in any other manner.

## COUNT V: DECLARATION OF NON-INFRINGEMENT OF THE ’284 PATENT

44. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

45. This is an action for declaratory judgment of non-infringement of any and all asserted claims of the ’284 Patent.

46. IG alleges that DraftKings infringes certain claims of the ’284 Patent, either directly, indirectly, or under the doctrine of equivalents, by importing, manufacturing, using, offering for sale, and selling certain products.

47. DraftKings denies IG’s claims of infringement. DraftKings’ accused products do not satisfy each limitation of any asserted claim.

48. An actual, continuing, and justiciable controversy exists between DraftKings and IG as to DraftKings’ non-infringement of all claims of the ’284 Patent, as evidenced by the allegations in IG’s Complaint.

49. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

50. Absent a declaration of non-infringement, IG will continue to wrongfully assert the ’284 Patent against DraftKings, and will continue to cause DraftKings injury and damage.

51. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that DraftKings does not infringe, and has not infringed, contributed to the infringement of, or induced infringement of, any claim of the ’284 Patent either literally or under the doctrine of equivalents, indirectly, willfully, or in any other manner.

## COUNT VI: DECLARATION OF INVALIDITY OF THE ’302 PATENT

52. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

53. This is an action for declaratory judgment of invalidity of all ’302 Patent claims.

54. The claims of the ’302 Patent are invalid, in whole or in part, for failure to meet one or more requirements of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 112, 116, 119 and/or 120, and/or any judicially created doctrine of invalidity.

55. By way of non-limiting example, one or more claims of the ’302 Patent are invalid as anticipated under pre-AIA or AIA 35 U.S.C. § 102 and/or obvious under pre-AIA or AIA 35 U.S.C. § 103 in view of prior art to the ’302 Patent. Non-limiting examples of such art include at least Nguyen ’707 (US 2006/0035707), Verteuil (US 2004/0219932), Raith (US 2005/0101333), Nguyen ’790 (US 2006/0095790), Cockerille ’874 (US 2006/0036874), Rive (US 7,627,902), Morrison ’252 (US 2011/0034252), Winneg (US 7,069,586), Miltenberger (US 2007/0202941), Nguyen ’541 (US 2006/0281541), the Cantor Mobile Device, and Cantor Gaming’s eDeck system, alone or in combination, in addition to the knowledge of a person of ordinary skill in the art and the state of the art.

56. By way of another non-limiting example, the ’302 Patent is invalid under 35 U.S.C. §§ 101, 115, 116, and 256(b) for failure to name the correct inventors. On information and belief, Anoop Gopinatha contributed to the conception and/or reduction to practice of at least one claim of the ’302 Patent but was not named as an inventor on the ’302 Patent. *See infra* at Count XI, § G. Proper attribution of inventorship is highly material to patentability. *See* 35 U.S.C. § 101 (“Whoever invents or discovers . . . .”); *PerSeptive Biosystems*, 225 F.3d at 1321. A patent is invalid if it names persons other than the true inventor or if it fails to name all true inventors. 35 U.S.C. § 256(b).

57. An actual controversy exists between DraftKings and IG as to the validity of the ’302 Patent based on IG’s allegations in its Complaint that DraftKings has infringed and continues to infringe one or more claims of the ’302 Patent.

58. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

59. Absent a declaration of invalidity, IG will continue to wrongfully assert the ’302 Patent against DraftKings and will continue to cause DraftKings injury and damage.

60. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that the claims of the ’302 Patent are invalid.

**COUNT VII:**
**DECLARATION OF INVALIDITY OF THE ’382 PATENT**

61. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

62. This is an action for declaratory judgment of invalidity of all ’382 Patent claims.

63. The claims of the ’382 Patent are invalid, in whole or in part, for failure to meet one or more requirements of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 112, 116, 119 and/or 120, and/or any judicially created doctrine of invalidity.

64. By way of non-limiting example, one or more claims of the ’382 Patent are invalid as anticipated under pre-AIA or AIA 35 U.S.C. § 102 and/or obvious under pre-AIA or AIA 35 U.S.C. § 103 in view of prior art to the ’382 Patent. Non-limiting examples of such art include at least Nguyen (US 2006/0281541), Rive (US 7,627,902), Juniper Networks Secure Access Administration Guide, Rel. 6.0 (2007), Morrison (US 2011/0034252), Hunt (US 2006/0123412), Pearson (US 2004/0078572), Cockerille (US 6,685,567), and Cantor Gaming’s eDeck system, alone or in combination, in addition to the knowledge of a person of ordinary skill in the art and the state of the art.

65. By way of another non-limiting example, the ’382 Patent is invalid under 35 U.S.C. §§ 101, 115, 116, and 256(b) for failure to name the correct inventors. On information and belief,

Anoop Gopinatha contributed to the conception and/or reduction to practice of at least one claim of the ’382 Patent but was not named as an inventor on the ’382 Patent. *See infra* at Count XI, §G. Proper attribution of inventorship is highly material to patentability. *See* 35 U.S.C. § 101 (“Whoever invents or discovers . . . .”); *PerSeptive Biosystems*, 225 F.3d at 1321. A patent is invalid if it names persons other than the true inventor or if it fails to name all true inventors. 35 U.S.C. § 256(b).

66. An actual controversy exists between DraftKings and IG as to the validity of the ’382 Patent based on IG’s allegations in its Complaint that DraftKings has infringed and continues to infringe one or more claims of the ’382 Patent.

67. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

68. Absent a declaration of invalidity, IG will continue to wrongfully assert the ’382 Patent against DraftKings and will continue to cause DraftKings injury and damage.

69. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that the claims of the ’382 Patent are invalid.

## COUNT VIII: DECLARATION OF INVALIDITY OF THE ’404 PATENT

70. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

71. This is an action for declaratory judgment of invalidity of all ’404 Patent claims.

72. The claims of the ’404 Patent are invalid, in whole or in part, for failure to meet one or more requirements of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 112, 116, 119 and/or 120, and/or any judicially created doctrine of invalidity.

73. By way of non-limiting example, one or more claims of the ’404 Patent are invalid as anticipated under pre-AIA or AIA 35 U.S.C. § 102 and/or obvious under pre-AIA or AIA 35 U.S.C. § 103 in view of prior art to the ’404 Patent. Non-limiting examples of such art include at least Porco (WO 2010/045716), Shaw (US 2009/0058720), Horon (US 9,563,576), Morrison (US 2012/0046096), Brachet (US 2008/0176583), Krzyzanowski (US 2012/0174237), the Cantor Mobile Device, and Cantor Gaming’s eDeck system, alone or in combination, in addition to the knowledge of a person of ordinary skill in the art and the state of the art.

74. An actual controversy exists between DraftKings and IG as to the validity of the ’404 Patent based on IG’s allegations in its Complaint that DraftKings has infringed and continues to infringe one or more claims of the ’404 Patent.

75. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

76. Absent a declaration of invalidity, IG will continue to wrongfully assert the ’404 Patent against DraftKings and will continue to cause DraftKings injury and damage.

77. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that the claims of the ’404 Patent are invalid.

## COUNT IX:
## DECLARATION OF INVALIDITY OF THE ’518 PATENT

78. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

79. This is an action for declaratory judgment of invalidity of all ’518 Patent claims.

80. The claims of the ’518 Patent are invalid, in whole or in part, for failure to meet one or more requirements of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 112, 116, 119 and/or 120, and/or any judicially created doctrine of invalidity.

81. By way of non-limiting example, one or more claims of the ’518 Patent are invalid as anticipated under pre-AIA or AIA 35 U.S.C. § 102 and/or obvious under pre-AIA or AIA 35 U.S.C. § 103 in view of prior art to the ’518 Patent. Non-limiting examples of such art include at least Beckley (US 2007/0155489), Eagle (US 2005/0250552), Carter (US 2002/0147049), Amaitis ’601 (WO 2007/008601), Amaitis ’020 (US 2005/0187020), Dunko (US 2002/0183068), Kammer (US 7,356,347), the Cantor Mobile Device, Cantor Gaming’s eDeck, and the Bluetooth Specification, alone or in combination, in addition to the knowledge of a person of ordinary skill in the art and the state of the art.

82. An actual controversy exists between DraftKings and IG as to the validity of the ’518 Patent based on IG’s allegations in its Complaint that DraftKings has infringed and continues to infringe one or more claims of the ’518 Patent.

83. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

84. Absent a declaration of invalidity, IG will continue to wrongfully assert the ’518 Patent against DraftKings and will continue to cause DraftKings injury and damage.

85. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that the claims of the ’518 Patent are invalid.

## COUNT X:
## DECLARATION OF INVALIDITY OF THE ’284 PATENT

86. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

87. This is an action for declaratory judgment of invalidity of all ’284 Patent claims.

88. The claims of the ’284 Patent are invalid, in whole or in part, for failure to meet one or more requirements of Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, 112, 116, 119 and/or 120, and/or any judicially created doctrine of invalidity.

89. By way of non-limiting example, one or more claims of the ’284 Patent are invalid as anticipated under pre-AIA or AIA 35 U.S.C. § 102 and/or obvious under pre-AIA or AIA 35 U.S.C. § 103 in view of prior art to the ’284 Patent. Non-limiting examples of such art include at least Gagner (WO 2009/061651), Liu (US 2008/0311893), Mitchell (US 6,983,331), Haney (US 2006/0223518), McNutt (US 2001/0037211), Nguyen ’707 (US 2006/0035707), LeMay (US 2007/0243925), Pacey (US 2010/0105482), Mizrachi US 2008/0320396 the Cantor Mobile Device, Cantor Gaming’s eDeck system, and Black / Apple iPhone (mobile-phone disclosure), alone or in combination, in addition to the knowledge of a person of ordinary skill in the art and the state of the art.

90. An actual controversy exists between DraftKings and IG as to the validity of the ’284 Patent based on IG’s allegations in its Complaint that DraftKings has infringed and continues to infringe one or more claims of the ’284 Patent.

91. The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

92. Absent a declaration of invalidity, IG will continue to wrongfully assert the ’284 Patent against DraftKings and will continue to cause DraftKings injury and damage.

93. Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DraftKings requests a judicial determination and declaration that the claims of the ’284 Patent are invalid.

**COUNT XI:**
**DECLARATION OF UNENFORCEABILITY OF THE ASSERTED PATENTS DUE TO INEQUITABLE CONDUCT**

94. DraftKings realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

95. Under the rules of the United States Patent and Trademark Office ("USPTO"), "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a). "[I]nformation is material to patentability when it is not cumulative to information already of record" and (1) "establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim," or (2) "refutes, or is inconsistent with, a position the applicant takes in . . . [a]sserting an argument of patentability." 37 C.F.R. § 1.56(b). To avoid violating the duty of disclosure, which renders the patent unenforceable, the Office "encourages applicants to carefully examine: . . . [t]he closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office." 37 C.F.R. § 1.56(a)(2). The "individuals associated with the filing or prosecution of a patent application" with a duty of candor to the Office includes "[e]ach inventor named in the application" and "[e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c). Any individuals other than "the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor." 37 C.F.R. § 1.56(d).

96. Here, each of the Asserted Patents is unenforceable due to material omissions to the USPTO during prosecution. Specifically, certain named inventors of the Asserted Patents and/or individuals substantively involved with the filing and prosecution of the Asserted Patents at the USPTO failed to disclose known prior products—including at least the eDeck and Cantor Mobile Devices—that were on sale, made publicly available, and disclosed by IG prior to the filing of each of the Asserted Patents.

97. The eDeck and Cantor Mobile Devices were handheld gaming and wagering devices. The Cantor Mobile Device offered the ability to trade wager positions on the outcome of sports events similar to how stocks are traded. The eDeck allowed users to gamble on casino games, and later included wagering on live sports.

98. On information and belief, these prior products contain features and/or perform functions that render the recited limitations of at least one claim of each of the Asserted Patents unpatentable. But for the failure of those with a duty of candor to disclose these known prior products to the Examiner, the claims of the Asserted Patents would not have been allowed.

**A. Knowledge of eDeck and Cantor Prior Products**

99. Cantor Gaming[2] was formed on November 12, 2004 for Cantor Fitzgerald, L.P. to enter the Nevada sportsbook and mobile device wagering market. The hurdle was the ban on mobile wagering in the United States. Cantor Fitzgerald, L.P., whose executives include some of the alleged inventors, launched Cantor Gaming after Lee Amaitis presented a potentially legal mobile wagering device to Nevada regulators. However, Mr. Amaitis' presentation occurred in 2003–years before the Asserted Patents–and relied on designs and products already known to the

[2] CG Technology (Nevada) L.P. (d/b/a Cantor G&W (Nevada) L.P.) (f/k/a Cantor Gaming) ("Cantor Gaming") is the predecessor to Plaintiff and subsidiary of Cantor Fitzgerald L.P. in Las Vegas, Nevada.

public as the Cantor Mobile Device in the United Kingdom. Mr. Amaitis and others set about changing Nevada law to create a market for these products.

100. From its inception in 2004 through March of 2006, Cantor Gaming and its employees successfully lobbied the Nevada Assembly and Governor to legalize mobile wagering and the NGC and NGCB to implement mobile wagering. Lee Amaitis, Joe Asher, Howard Lutnick, and others associated with Cantor Gaming worked to draft the laws and regulations in Nevada to encompass products and technologies already commercialized by Cantor Index in the United Kingdom.

101. After drafting the laws and regulations, Cantor Gaming applied for licensure of the eDeck, known initially and developed as the Wireless Gaming System.

102. Cantor Gaming submitted detailed technical documents and plans to the NGC and NGCB for testing and regulatory compliance as early as 2006.

103. Starting in 2006, Cantor Gaming struck deals with casinos in Las Vegas, including the Las Vegas Sands, which owned and operated the Venetian, to bring mobile wagering to Nevada.

104. In November 2007, Lee Amaitis and other Cantor Executives demonstrated the eDeck to patrons of the Venetian.

105. In April of 2008, the eDeck was approved for a public field trial, and over the course of May to October 2008, thousands of Venetian patrons used the eDeck.

106. The eDeck was launched at The M Casino on March 20, 2009.

107. Employees at Cantor Gaming, including many of the alleged inventors, knew of the eDeck and the Cantor Mobile Device through their work on the products and through their employment at Cantor Gaming and/or Cantor Fitzgerald.

108. Despite this knowledge, neither the eDeck, the Cantor Mobile Device, or their features, functionality, or documentation was disclosed to the USPTO during prosecution of the Asserted Patents.

109. Their omission was inequitable.

**B. The ’302 Patent**

110. The ’302 Patent is unenforceable due to material omissions to the USPTO during prosecution of the ’302 Patent.

111. On April 5, 2011, CFPH, LLC (“CFPH”)—the corporate parent of IG—filed U.S. Patent Application No. 13/080,098 that issued as the ’302 Patent on March 10, 2015. A Reexamination Request No. 90/015,151 was filed for the ’302 Patent on November 4, 2022. On April 12, 2024, a Reexamination Certificate was issued for the ’302 Patent, which confirmed existing claims 1-14 and 16-25, amended Claim 15, and added new claims 26-40. The reexamined ’302 Patent names Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette as inventors and is assigned to IG.

112. Here, the individuals who owe duties of candor and disclosure include at least named inventors Mr. Amaitis and Mr. Tara (collectively, “Applicants”), both of whom, on information and belief, were substantively involved in the preparation and prosecution of the ’302 Patent.

113. On information and belief, in light of their role in the preparation and prosecution of the ’302 Patent, Applicants were aware of the rules and procedures of the USPTO, including the duty of candor.

114. The Cantor Mobile Device was described in at least one printed publication available to the public at least by September 2003. *See, e.g.*, Exhibit BO (DK_IG_0042383); Exhibit O (DK_IG_0031024).

115. The Cantor Mobile Device was available and publicly demonstrated in the US throughout 2005 and the subject of a commercial offer for sale in 2006. Exhibit AE (DK_IG_0036182); Exhibit BD (DK_IG_0030578); Exhibit BB (DK_IG_0030568); Exhibit AM (DK_IG_0042537); Exhibit A (DK_IG_0029518); Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455).

116. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the Cantor Mobile Device in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); EXHIBIT B (DK_IG_0029660).

117. The Cantor Mobile Device is therefore prior art to the ’302 Patent under pre-AIA §§102(a)-(b).

118. The eDeck was described in at least one printed publication available to the public in the United States at least by March 2007. *See, e.g.*, Exhibit BL (DK_IG_0042731).

119. The eDeck device was the subject of a commercial offer for sale in 2006, Exhibit BK (DK_IG_0042438); Exhibit BL (DK_IG_0042731) at 13-14, was publicly demonstrated in 2007, Exhibit BM (DK_IG_0030489) at 2, was field tested at the Venetian in 2008, Exhibit BN (DK_IG_0042797) at 14-15; Exhibit J (DK_IG_0030517) at 185:10–186:8, and commercially offered at the M Resort in March 2009, Exhibit BD (DK_IG_0030578); Exhibit B (DK_IG_0029660) at 21.

120. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the eDeck in a multi-year effort to amend laws and regulations in Nevada beginning in the early 2000s. Exhibit BB (DK_IG_0030568); EXHIBIT B (DK_IG_0029660).

121. The eDeck device is therefore prior art to the ’302 Patent under pre-AIA §§102(a)-(b).

### 1. Individuals With Knowledge of Cantor Mobile Device and eDeck Features

#### a. Mr. Lee Amaitis

122. Mr. Amaitis was not just a named inventor on the ’302 Patent. From approximately 2001 to 2010, Mr. Amaitis was the President and Chief Executive Officer of Cantor Index during the Cantor Mobile Device’s development and commercialization. From approximately 2004 to 2013, Mr. Amaitis was the President and Chief Executive Officer of Cantor Gaming during the eDeck’s development, regulatory approval, and commercialization.

123. On information and belief, Mr. Amaitis knew of the Cantor Mobile Device during prosecution of the ’302 Patent.

124. On information and belief, Mr. Amaitis knew of the eDeck Device during prosecution of the ’302 Patent.

125. On information and belief, Mr. Amaitis knew that the Cantor Mobile Device is prior art to the ’302 Patent during its prosecution and reexamination proceedings at the USPTO. Mr. Amaitis presented the Cantor Mobile Device to the Nevada legislature in 2003 and the Nevada Gaming Control Board in 2006. Exhibit B (DK_IG_0029660). Thus, Mr. Amaitis knew that the Cantor Mobile Device was publicly disclosed prior to the earliest claimed priority date of the ’302 Patent.

126. The eDeck device was publicly demonstrated in 2007, field tested at the Venetian in 2008, and commercially offered at the M Resort in March 2009. The eDeck device is prior art to the ’302 Patent under pre-AIA §§102(a)-(b).

127. On information and belief, Mr. Amaitis knew that the eDeck Device is prior art to the ’302 Patent during its prosecution and reexamination proceedings at the USPTO.

128. On November 20, 2008, Mr. Amaitis stated to the Nevada Gaming Commission that “approximately 2,000 patrons trialed the [eDeck] system and shared their opinions through survey responses” during the field trial at the Venetian in 2008. Exhibit J (DK_IG_0030517).

129. In September 2009, Mr. Amaitis further confirmed that the eDeck Device “launched in March of this year at the M Casino.” Exhibit BD (DK_IG_0030578) at 0:29–2:48.

130. Thus, Mr. Amaitis knew that the eDeck Device was publicly used and offered for sale prior to the earliest claimed priority date of the ’302 Patent.

131. On information and belief, Mr. Amaitis knew that the eDeck Device incorporated hardware and software from earlier financial trading products (*e.g.*, eSpeed) that included encryption and authorization features. On information and belief, Mr. Amaitis knew that the same or similar encryption and authorization features were also implemented in the eDeck Device. On information and belief, Mr. Amaitis knew that these eDeck features secure wagering transactions and restrict wagering to authorized users and locations.

132. In a February 23, 2011 podcast published by the University of Nevada Las Vegas Center for Gaming Research, Mr. Amaitis explained that the eDeck Device “was based on the technology … in wireless delivery of financial services info[rmation]” through “an application on a BlackBerry” that allowed users to “trade a U.S. Treasury bond.” Exhibit BB (DK_IG_0030568) at 12:45–14:20.

133. Mr. Amaitis further emphasized that the technology for this prior financial trading product "ha[d] to be flawless, and the encryption ha[d] to be flawless because you have to know that device, where it is, who's got it, ya know, are they authorized to trade it." *Id.*

134. His statement indicates that the prior financial trading product had encryption and authorization features to identify the device requesting to place a financial trade, determine the device's location, determine the user of the device, and verify whether that user was authorized to trade.

135. Given Mr. Amaitis's knowledge of the prior financial trading product's encryption and authorization features and his involvement in adapting that prior technology for the eDeck, on information and belief, Mr. Amaitis knew that the eDeck likewise had encryption and authorization features to secure wagering transactions and restrict use to authorized users and locations. These features and functionalities were material to the patentability of at least Claim 1 of the '302 Patent, as explained in further detail below. Despite his knowledge of these preexisting functionalities and their materiality to the '302 Patent claims, Mr. Amaitis declined to disclose them to the USPTO during prosecution of the '302 Patent. On information and belief, Mr. Amaitis did so with the specific intent of improving the likelihood of the issuance of the claims of the '302 Patent. The single most reasonable inference that can be drawn from Mr. Amaitis's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

136. On information and belief, Mr. Amaitis knew that the eDeck performed repeated user authorization and discontinued the user's access to gaming if multiple credentials are not presented to authorize the device "every so often." On November 6, 2008, Mr. Amaitis personally appeared before the Nevada Gaming Control Board to obtain regulatory approval for the eDeck

and explained the operation of its hardware, software, and supporting systems. *See, e.g.*, Exhibit K (DK_IG_0030537) at 54:24–55:6, 60:10-63:3.

137. During that hearing, Mr. Amaitis explained that the eDeck implemented "a two-key entry" requiring a user to present a bracelet or player card for authorization before wagering. *Id.* at 60:10–61:2, 61:19–24.

138. Moreover, Ron Rushin—Cantor Gaming's Chief Technology Officer—explained in Mr. Amaitis's presence at the same hearing that users were required to provide "a user ID, the PIN and the bracelet," which a Nevada regulator characterized as "three levels of data" required "[b]efore they could get in." *Id*. at 61:25–62:11.

139. Mr. Amaitis also explained that the required user authorization was repeated and periodic, stating that "we set the system to shut down every so often to get the swipe back on to the bracelet" for additional user protection. *Id*. at 62:12–20.

140. Mr. Amaitis stated that users learned to remain near the bracelet "to keep the machine going" and authorized for continued gaming. *Id*.

141. Thus, Mr. Amaitis knew that the eDeck performed repeated user authorization to authorize continued gaming. These features and functionalities were material to the patentability of at least Claim 1 of the '302 Patent, which claims, among other things, "repeatedly…allow or disallow the user's gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized," as discussed *infra* at § B.3. Despite his knowledge of these preexisting functionalities and their materiality to the patentability of at least Claim 1 of the '302 Patent, Mr. Amaitis declined to disclose them to the USPTO during prosecution of the '302 Patent. On information and belief, Mr. Amaitis did so with the specific intent of improving the likelihood of the issuance of the claims of the '302 Patent. The

single most reasonable inference that can be drawn from Mr. Amaitis's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

142. On information and belief, Mr. Amaitis knew that the eDeck performed repeated geolocation verification at various times during gaming to determine whether the device is authorized for continued gaming.

143. During the November 6, 2008 hearing before the Nevada Gaming Control Board, Mr. Amaitis confirmed that the eDeck was capable of determining when the device "migrat[ed] outside of the defined area" allowed for gaming and "shut[ting] off" to prevent gaming outside the gaming-allowed area:

> MEMBER SAYRE: In our material, Mr. Amaitis, we have got the device area, it is outlined, it is a map outlined. Were there any -- did you experience any breaches of that in terms of the device, ***migrating outside of the defined area and continuing to function***?
>
> MR. AMAITIS: Well, we tested the bleed, if that is what you mean, in terms of it and ***it did shut off***. Now the new devices, the future devices that will come in, obviously, this is a piece of hardware that went into the lab that had to go in as it was, and the new design of ***the device*** coming out ***will have a band around it that indicates red or green***. ***So it will actually indicate if it is in a good zone or a bad zone*** by just looking at the device. You won't have to see that it logs out. It will actually stop. And that is a feature we put into the new hardware that's about to come out.

Exhibit K (DK_IG_0030537) at 63:23–64:13 (emphasis added).

144. Mr. Amaitis also confirmed that the eDeck was capable of determining when the device re-entered the gaming-allowed area and resuming game play:

> MEMBER SAYRE: Does it give you a little warning so if you are enamored with your game, you can go around and turn back in another direction?
>
> MR. AMAITIS: Remember, it doesn't lose the game. So you can come back in. It can't lose the game because the data is served on the server.

Exhibit K (DK_IG_0030537) at 64:14–19.

145. At a subsequent hearing before the Nevada Gaming Commission on November 20, 2008, Mr. Amaitis personally appeared and further explained that "one of the things that was heavily tested [in the eDeck Device] is sort of location verification and where we have red and green zones." Exhibit J (DK_IG_0030517) at 190:17–19.

146. For example, Mr. Amaitis explained that if a user "got dealt a hand of blackjack that you didn't like," the user "couldn't take it into the red zone and then bring it back in" to erase the game result because the system would "remember what you did." *Id*. at 190:19–23.

147. These statements demonstrate that the eDeck's geolocation verification involved repeated determinations of whether the device was inside or outside an authorized gaming area to disable and enable gaming accordingly at various times during an ongoing game. On information and belief, Mr. Amaitis knew that the eDeck repeatedly performed such geolocation determinations at various times during gaming to verify the device's continued authorization to wager.

148. Thus, on information and belief, Mr. Amaitis knew that the eDeck performed repeated location verification at various times to authorize the device for continued gaming. These features and functionalities were material to the patentability of at least Claim 1 of the '302 Patent, which claims, among other things, "repeatedly… determine a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming-allowed geographical area," as discussed *infra* at § B.3. Despite his knowledge of these preexisting functionalities and their materiality to the patentability of at least Claim 1 of the '302 Patent, Mr. Amaitis declined to disclose them to the USPTO during prosecution of the '302 Patent. On information and belief, Mr. Amaitis did so with the specific intent of improving the likelihood of the issuance of the claims of the '302 Patent. The single most

reasonable inference that can be drawn from Mr. Amaitis's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**b. Mr. Sunny Tara**

149. Mr. Tara was not just a named inventor on the '302 Patent. From approximately 2008 to 2010, Mr. Tara was the Chief Technology Officer of Cantor Gaming during the eDeck's regulatory approval and commercialization. *See, e.g.*, Exhibit I (DK_IG_0030470).

150. On information and belief, Mr. Tara knew of the eDeck Device during prosecution of the '302 Patent.

151. The eDeck device was publicly demonstrated in 2007, field tested at the Venetian in 2008, and commercially offered at the M Resort in March 2009. The eDeck device is prior art to the '302 Patent under pre-AIA §§102(a)-(b).

152. On information and belief, Mr. Tara knew that the eDeck Device had security and authorization features. On May 1, 2009, a letter addressed to Mr. Tara was sent from the Nevada Gaming Control Board containing a list of approved "software and hardware component versions" that authorized the eDeck device for an administrative field trial at the M Resort, including specific approved versions of the "Handheld Device," "Mobile Client," "Gateway," "Authentication CD," and "Server." *See* Exhibit I (DK_IG_0030470). On information and belief, Mr. Tara knew of the eDeck's various software and hardware features, at least including its authorization mechanisms for a mobile device.

153. Given Mr. Tara's technical responsibilities, his position as CTO, his involvement in the eDeck's regulatory approval process, and his knowledge of the eDeck's approved software and authorization components, on information and belief, Mr. Tara knew that the eDeck's authorization

mechanisms included repeated user authorization and repeated geolocation verification for continued gaming.

154. On information and belief, Mr. Tara knew that the eDeck Device performed repeated user authorization that discontinued the user's access to gaming if authorization failed at any time during gaming.

155. A December 28, 2009 New York Times article by Matt Villano, entitled "In Las Vegas, Sports Book in a Pocket," reported that "Sunny Tara, Cantor Gaming's chief technology officer, says that as soon as the [eDeck] device can no longer read the RFID chip, it prohibits any further betting before being reset." Exhibit N (DK_IG_0030977) at 3. The article further explains that the RFID chip is embedded in a user's player card or bracelet used for user authorization. *Id.* ("The company requires all eDeck users to obtain a plastic card embedded with a Radio Frequency Identification chip. When bettors check out a device, ticket writers program it to work only within a few feet of that chip, so no other people can pick up the device and wager on the original user's account."); *see also* Exhibit K (DK_IG_0030537) at 60:10–61:2, 61:19–24, 62:12–20. Thus, Mr. Tara's statement shows that he knew the eDeck Device repeatedly checked for user authorization via the associated RFID signal during an ongoing game to allow or disallow continued gaming.

156. These features and functionalities were material to the patentability of at least Claim 1 of the '302 Patent, which claims, among other things, "repeatedly…allow or disallow the user's gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized," as discussed *infra* at § B.3. Despite his knowledge of these preexisting functionalities and their materiality to the patentability of at least Claim 1 of the '302 Patent, Mr. Tara declined to disclose them to the USPTO during prosecution of the '302 Patent. On information and belief, Mr. Tara did so with the specific intent

of improving the likelihood of the issuance of the claims of the ’302 Patent. The single most reasonable inference that can be drawn from Mr. Tara’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

157. On information and belief, Mr. Tara knew that the eDeck Device performed repeated geolocation verification that discontinued the user’s access to gaming if authorization failed at any time during gaming.

158. In this regard, the 2009 New York Times article explained that users could “check out location-aware wireless hand-helds, called eDecks” “[a]t the M Resort.” Exhibit N (DK_IG_0030977) at 2.

159. Mr. Tara was responsible for obtaining regulatory approval of the eDeck device that was offered to users during a field trial at the M Resort in 2009. *See* Exhibit I (DK_IG_0030470).

160. Thus, on information and belief, Mr. Tara knew that the eDeck Device offered for use at the M Resort in 2009 was “location-aware.” On information and belief, Mr. Tara also knew that the eDeck Device’s location awareness involved repeated geolocation verification during an ongoing game to determine whether the device was within a gaming-allowed area in order to comply with regulatory requirements. These features and functionalities were material to the patentability of at least Claim 1 of the ’302 Patent, which claims, among other things, “repeatedly… determine a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming-allowed geographical area,” as discussed *infra* at § B.3. Despite his knowledge of these preexisting functionalities and their materiality to the patentability of at least Claim 1 of the ’302 Patent, Mr. Tara declined to disclose them to the USPTO during prosecution of the ’302 Patent.

On information and belief, Mr. Tara did so with the specific intent of improving the likelihood of the issuance of the claims of the ’302 Patent. The single most reasonable inference that can be drawn from Mr. Tara’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

***

161. On information and belief, Applicants—specifically Mr. Amaitis and Mr. Tara—violated 37 C.F.R. § 1.56 by deliberately withholding material features of the Cantor Mobile Device and eDeck Device from the USPTO during prosecution of the ’302 Patent with the specific intent to deceive the Examiner into allowing claims that would not have issued but for the nondisclosure.

**2. Prosecution of the ’302 Patent**

162. The claims of the ’302 Patent are directed toward a mobile device that determines device and user authorization for gaming. For example, independent Claim 1 generally recites determining gaming authorization by repeatedly determining whether the device is within a gaming-allowed geographical area, determining whether the user of the device is authorized, and determining a period of time before the next geolocation verification based on the device’s distance from the boundary of that area. *See* ’302 Patent, Claim 1. The claim also recites that access to gaming is allowed or disallowed based on the determined authorizations. *Id.*

163. During prosecution of the ’302 Patent, Applicants argued that the prior art of record did not address Claim 1’s limitation of “determin[ing] that a device is authorized to use a gaming service.” *See* ’302 Patent File History, Response to OA dated November 26, 2012, at 6. Applicants further specified that this device authorization “discusses the device itself and not the location of the device.” *Id.* at 6-7. Applicants argued that since the Examiner failed to cite prior art “regarding authorization of a device itself,” Claim 1 was patentable. *Id.* at 6-7.

> Second, Claim 1 recites:
>
> determine that a device is authorized to use a gaming service.
>
> The Office Action cites no portion of any reference in discussing this limitation and therefore cannot possibly have made a prima facie showing of unpatentability of this limitation. Moreover, The Office Action makes a statement regarding location of the device to discuss this limitation. This limitation does not discuss location and therefore the reference to location seems irrelevant. Another limitation of this claim discusses location of the device. However, the cited limitation discusses the device itself and not a location of the device. Nothing is cited regarding authorization of a device itself in discussing this claim. Accordingly, the Office Action has failed to make a prima facie showing of unpatentabililty of claim 1.

164. To secure allowance of independent Claim 1, Applicants also amended the claim to recite, among other things, repeatedly "determin[ing] a period of time <u>to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area</u>, the period of time <u>to be</u> based <u>at least in part</u> on a distance of the <u>mobile device</u> from a boundary of <u>the gaming-allowed geographical area</u>." *See* '302 Patent File History, Response to OA dated January 22, 2014, at 2 (underlining language added by amendment). Applicants further argued that the prior art lacked the recited limitation of determining a period of "time" for repeating the geolocation verification in Claim 1. *See* '302 Patent File History, Response to OA dated January 22, 2014, at 9-10.

165. On December 9, 2014, the Examiner issued a Notice of Allowance for the '302 Patent. In the Notice of Allowability, the Examiner stated that "the best available prior art . . . fail to disclose either singularly, in combination with one another, or in combination with other prior art, the entirety of the invention, and specifically determining a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile

device from a boundary of the gaming-allowed geographical area." '302 Patent File History, NOA dated Dec. 9, 2014, at 6. Thus, according to the Examiner, these features were material to patentability of independent Claim 1 of the '302 Patent.

***Allowability Notice***

1. The following is an examiner's statement of reasons for allowance:

2. Regarding claims 1 and 19, the best available prior art of Carter (U.S. PGPUB 2002/0147049) and Alderucci (U.S. PGPUB 2008/0113808), fail to disclose either singularly, in combination with one another, or in combination with other prior art, the entirety of the invention, and specifically determining a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming- allowed geographical area. Thus, the dependents of the claims are also allowed.

166. On November 4, 2022, a request for *ex parte* reexamination of the originally issued claims of the '302 Patent was filed. On April 12, 2024, a Reexamination Certificate was issued for the '302 Patent, which confirmed existing claims 1-14 and 16-25, amended Claim 15, and added new claims 26-40.

167. During the reexamination proceeding for the '302 Patent, Applicants argued that the prior art of record did not address Claim 1's limitation of "'repeatedly … allow[ing] or disallow[ing] the user's gaming activity based at least in part on the determination that [1] the mobile device is authorized, [and 2] the determination that the user is authorized,' as required by independent claims 1 and 22." *See* '302 Patent Reexamination Proceeding, Patent Owner's Reply to Office Action dated September 12, 2023, at 2, 20-31 (omitted emphasis in original) (reproduced

in part below). Applicants specifically argued that the Nguyen, Lewin, and Garskof references cited during prior proceedings, including IPR2020-01108 that was denied institution and the present third party reexamination proceeding, failed to disclose *repeated* authorization "while the user is engaged in activity" of an ongoing game. *Id.*

> The '302 patent was previously challenged in a petition for *inter partes* review (IPR) in proceeding IPR2020-01108. The Board denied institution on the merits because the prior art presented in the petition (Nguyen and Lewin) did not teach "**repeatedly** . . . allow[ing] or disallow[ing] the user's gaming activity based at least in part on the determination that [1] **the mobile device is authorized**, [and 2] the determination that **the user is authorized**," as required by independent claims 1 and 22. *DraftKings, Inc. v. Interactive Games LLC*, IPR2020-01108, Inst. Dec., 18, 21–23 (P.T.A.B. January 6, 2021) (emphasis added). DraftKings, Inc.—who petitioned for the previous IPR and is requester in this reexamination proceeding—seeks to remedy the failings of its previous IPR petition by introducing a new reference in this reexamination: Garskof. But Garskof fails for the same reasons as Nguyen and Lewin—namely, Garskof performs authentication only when initiating activity, never repeatedly while the user is engaged in activity. None of the art teaches this key claim feature, and thus the claims should be confirmed.

168. On March 15, 2024, the Examiner issued a Notice of Intent to Issue a Reexam Certificate, stating that "[t]here is no teaching or suggestion in the cited art to have provided the entire scope of claim 1," especially the repeated determination of device and user authorization. *See* '302 Patent Reexamination Proceeding, Notice of Intent to Issue a Reexam Certificate dated March 15, 2024, at 2 (reproduced below).

> The following is an examiner's statement of reasons for patentability and/or confimation of the claims found patentable in this reexamination proceeding. As stated in the 10/31/2023 Final:
>
> There is no teaching or suggestion in the cited art to have provided the entire scope of claim 1, especially in combination with the following limitations:
>
> ". . . repeatedly: . . . allow or disallow the user's gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized . . .".

### 3. Inequitable Conduct Based on the eDeck Device

#### a. The eDeck Device Was Material to Patentability of the '302 Patent

169. On information and belief, Applicants knew during prosecution of the '302 Patent that the eDeck device had the features material to the patentability of at least Claim 1 of the '302 Patent.

170. On information and belief, Applicants knew during prosecution of the '302 Patent that the eDeck device was a mobile device.

171. On information and belief, Applicants knew during prosecution of the '302 Patent that the eDeck device contained a machine readable medium storing instructions for executing various authorization checks.

172. On information and belief, Applicants knew during prosecution of the '302 Patent that the eDeck device communicated gaming requests to a gaming service.

173. On information and belief, Applicants knew during prosecution of the '302 Patent that the eDeck determined whether the mobile device was authorized to use a gaming service.

174. On information and belief, Applicants knew during prosecution of the ’302 Patent that the eDeck determined whether a user of the mobile device was authorized to use a gaming service.

175. On information and belief, Applicants knew during prosecution of the ’302 Patent that the eDeck performed repeated geolocation verification during an ongoing game.

176. On information and belief, Applicants knew during prosecution of the ’302 Patent that the eDeck performed repeated user authorization during an ongoing game.

177. On information and belief, Applicants knew during prosecution of the ’302 Patent that the eDeck allowed or disallowed the user’s continued access to gaming based on successful authorization.

178. Applicants’ knowledge of the eDeck device’s relevant features is evidenced, for example, by [redacted] The [redacted] describes features and functionality of the eDeck device that is prior art to the ’302 Patent under pre-AIA §§102(a)-(b).

179. Applicants’ knowledge of the eDeck device’s relevant features is also evidenced, as another example, by a presentation titled [redacted] is prior art to the ’302 Patent under pre-AIA §§102(a)-(b).

180. On information and belief, Applicants knew that the Examiner found the claims of the ’302 Patent patentable based on the Examiner’s belief that the prior art failed to disclose at least “determining a period of time to elapse until the next repetition of determination whether the

mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming-allowed geographical area." *See* '302 Patent File History, NOA dated Dec. 9, 2014, at 6.

181. On information and belief, Applicants knew during prosecution of the '302 Patent that the eDeck device had the features purportedly missing from the prior art.

182. Specifically, the [redacted] The claimed location authorization feature that the Examiner found missing from the prior art encompasses the eDeck's repeated geolocation verification for continued gaming.

183. In this regard, the [redacted]

184. The [redacted]

[redacted].

185. Moreover, the eDeck's location verification was not limited to the beginning of a session. [redacted]

186. The eDeck's location verification may also be repeated at configurable intervals. [redacted]

187. A person of ordinary skill in the art ("POSITA") would have understood from these disclosures that the eDeck's configurable intervals for repeating geolocation verification could be determined by the device, rather than requiring a user or developer to manually configure the intervals. It was well known before the earliest priority date of the '302 Patent that mobile devices could determine time intervals for performing repeated operations. A POSITA would have recognized that the eDeck device determining the interval between successive geolocation verifications would eliminate the need to manually change the configured interval whenever a different verification frequency was desired. Moreover, given the eDeck's use of defined green zone and red zone boundaries to allow or restrict gaming, a POSITA would have been motivated to determine the verification interval based in part on the device's distance from a gaming-allowed area boundary, such that geolocation verification would occur more frequently when the device approached the boundary and less frequently when the device was farther from the boundary. This would have improved the eDeck's ability to detect when a device exited a gaming-allowed area while reducing unnecessary location-verification operations when the device remained farther from the boundary. Implementing such functionality would have involved combining known software-based timing and location-determination techniques with the eDeck's existing geolocation-verification system to achieve predictable results without undue experimentation.

Thus, it would have been obvious to a POSITA to modify the eDeck to "determine a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming-allowed geographical area," as recited in Claim 1 of the '302 Patent.

188. On information and belief, Applicants knew that the eDeck's preexisting geolocation verification performed at configurable or determinable intervals rendered Claim 1 of the '302 Patent obvious. On information and belief, Applicants intentionally withheld this material information from the Examiner during prosecution of the '302 Patent.

189. That the eDeck performed repeated geolocation verification and conditioned continued gaming on successful device authorization within a gaming-allowed area was material to Claim 1's limitation of "determining a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming-allowed geographical area" during prosecution of the '302 Patent.

190. The Examiner considered Claim 1's limitation of "determining a period of time to elapse until the next repetition of determination whether the mobile device is within or without the gaming-allowed geographical area, the period of time to be based at least in part on a distance of the mobile device from a boundary of the gaming-allowed geographical area" to be an allegedly patentably distinct feature that led to allowance of the '302 Patent.

191. Had the Examiner been aware of the eDeck, at least Claim 1 of the '302 Patent would not have been allowed in its issued form.

192. As another example, Claim 1 of the ’302 Patent specifically recites “repeatedly…allow or disallow the user’s gaming activity based at least in part on … the determination that the user is authorized.”

193. On information and belief, Applicants knew during prosecution of the ’302 Patent that the eDeck performed repeated user authorization that discontinued the user’s access to gaming if authorization failed at any time during gaming.

194. In this regard, [redacted] Thus, the system authorized the eDeck’s connection and separately conditioned access to gaming on successful user authorization.

195. The [redacted]

[redacted] Thus, allowing or disallowing continued gaming depended on renewed authorization confirming that the user is still authorized.

196. Moreover, the eDeck's operation during the Venetian field trial confirms that repeated user authorization governed continued wagering. Mr. Amaitis explained that "we set the system to shut down every so often to get the swipe back on to the bracelet," and subsequently explained that users needed to "rekey in every 25, 30 minutes." Exhibit K (DK_IG_0030537) at 60:10–62:24; Exhibit J (DK_IG_0030517) at 189:17–190:14. If the user was not reauthorized, the device restricted further gaming.

197. That the eDeck performed repeated user authorization and conditioned continued gaming on successful user authorization was material to Claim 1's limitation of "repeatedly . . . allow[ing] or disallow[ing] the user's gaming activity based at least in part on … the determination that the user is authorized."

198. But for the failure of Applicants to disclose material eDeck features, the USPTO would not have allowed Claim 1 of the '302 Patent.

199. But for the failure of Applicants to disclose material teachings of [redacted], the USPTO would not have allowed Claim 1 of the '302 Patent.

200. But for the failure of Applicants to disclose material teachings of [redacted], the USPTO would not have allowed Claim 1 of the '302 Patent.

201. The eDeck features for repeatedly determining user authorization and geolocation verification for continued gambling are not cumulative to any prior art before the USPTO during prosecution of the '302 Patent.

202. On information and belief, Mr. Amaitis specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

203. On information and belief, Mr. Tara specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

204. On information and belief, Mr. Amaitis was motivated to deceive the USPTO to secure allowance of the ’302 Patent claims.

205. On information and belief, Mr. Tara was motivated to deceive the USPTO to secure allowance of the ’302 Patent claims.

206. On information and belief, Mr. Amaitis knew that the ’302 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’302 Patent from issuing.

207. On information and belief, Mr. Tara knew that the ’302 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’302 Patent from issuing.

**b. The eDeck Device Had Features That Contradicted Applicants’ Arguments for Patentability**

208. On information and belief, Applicants knew during prosecution of the ’302 Patent that the eDeck “determine[d] that a device is authorized to use a gaming service.” But Applicants argued during prosecution of the ’302 Patent that the Examiner failed to cite prior art discussing this limitation. *See* ’302 Patent File History, Response to OA dated November 26, 2012, at 6.

209. In this regard, the Nevada Technical Standards and Policies for Mobile Gaming and [redacted] both indicate that the eDeck rendered obvious determining that the mobile device was authorized to use the gaming service. The eDeck’s features for device authorization for

access to the gaming service contradict Applicants' argument that the claimed device authorization to use a gaming service was missing from the prior art.

210. Specifically, the Nevada Technical Standards and Policies for Mobile Gaming states: (1) "Communications between the server(s) and the mobile client must use appropriate authentication and cryptographic protocols to provide mutual authentication of the mobile unit and the server . . . ."; (2) "All mobile devices must be successfully authenticated prior to accessing any resources of the mobile gaming system"; and (3) "The system must maintain an authorized list of devices which it may communicate with, which must include the device name, a unique device ID and the device's hardware identifier." NGCB Mobile Gaming System Policies 4.020(1), Parts (1)-(2), (4) (Exhibit P (DK_IG_0031077) at 3). Further, Nevada's Technical Standard 4 for Mobile Gaming Systems provided that "Communications between a mobile communications device and a mobile gaming system must be conducted using a method that securely links the mobile communications device to the mobile gaming system and authenticates both the mobile communications device and mobile gaming system as authorized to communicate over that link." NGCB Technical Standard 4.020(1) (DK_IG_0031197). And Nevada's Technical Standard 1 required that "Software transferred between server and client or conventional gaming device portions of a system based or system supported game must be conducted using a method that securely links the client or clients to the server such that the software may only be used by authorized clients. In general, if certificates, keys or seeds are used they must not be hard coded, and must change automatically, over time, as a function of the communication." NGCB Technical Standard 1.062(1) (Exhibit Q (DK_IG_0031160) at 4).

211. Moreover, [redacted]

[redacted]

212. The Nevada Gaming Commission approved the eDeck as compliant with its policies and regulations, including the Technical Standards for mobile wagering systems.

213. Therefore, the eDeck determined whether the mobile device was authorized to use the gaming service by securely linking and authorizing both the eDeck device and the mobile gaming system prior to allowing access to resources of the mobile gaming system.

214. That the eDeck performed device authorization and conditioned access to the gaming on successful device authorization was material to Claim 1's limitation of "determin[ing] whether a mobile device is authorized to use a gaming service," which Applicants argued was missing from the prior art during prosecution of the '302 Patent.

215. Furthermore, Applicants argued during the reexamination proceeding of the '302 Patent that none of the prior art of record discloses "'repeatedly … allow[ing] or disallow[ing] the user's gaming activity based at least in part on … the determination **that the user is authorized**,'

as required by independent claims 1 and 22." *See* '302 Patent Reexamination Proceeding, Patent Owner's Reply to Office Action dated September 12, 2023, at 2 (emphasis in original). Specifically, Applicant argued that the prior art cited by the examiner "perform[ed] authentication only when initiating activity, never repeatedly while the user is engaged in activity." *Id.* As explained above in Sections B.1 and B.3.a, on information and belief, Applicants knew that the eDeck device performed repeated user authentication and geolocation verification during an ongoing game. *See supra* §§ B.1, B.3.a.

216. Applicants argued during the reexamination proceeding of the '302 Patent that "in the 2010-2011 timeframe" wager-based gaming on mobile devices was limited by "regulatory concerns" and "technical limitations." *See* '302 Patent Reexamination Proceeding, Patent Owner's Reply to Office Action dated September 12, 2023, at 4-5. The concerns and limitations Applicants described included "device security, player identity, and player location," as well as limits on location determination and networking technology. *See* '302 Patent Reexamination Proceeding, Patent Owner's Reply to Office Action dated September 12, 2023, at 4-5. As explained above in Sections B.1 and B.3.a, on information and belief, Applicants knew that the eDeck device had device security, player identity, and player location features, including two-factor authentication, operation with a password or PIN, and ensuring player and device location in a jurisdiction that allows wagering. *See supra* §§ B.1, B.3.a. And as explained above in Section B.1, on information and belief, Applicants further knew that regulatory approval of the eDeck in Nevada and its commercial deployment (*see supra* § B.1) was inconsistent with and contradicted these statements.

217. Applicants argued during the reexamination proceeding that "the '302 patent's novel solution" included "repeated authorization determinations 'throughout a gaming session, and or at points during a gaming session,'" to "prevent fraudulent activity … that may occur after

a gaming activity commences." *See* '302 Patent Reexamination Proceeding, Patent Owner's Reply to Office Action dated September 12, 2023, at 5-6; *id.* at 20-31. As explained above in Sections B.1 and B.3.a, on information and belief, Applicants knew that the eDeck device performed repeated authorization determinations throughout a gaming session and prevented fraudulent activity. *See supra* §§ B.1, B.3.a.

218. Thus, Applicants' arguments in opposition to the Office's arguments of unpatentability, and Applicant's arguments for the patentability, of at least independent Claim 1 during prosecution of the '302 Patent is inconsistent with and contradicts Applicants' knowledge of preexisting eDeck functionality that is material to the patentability of the '302 Patent claims, which render the '302 Patent unenforceable. *See* 37 C.F.R. §§ 1.56, 1.555(b)(2).

219. But for the failure of Applicants to disclose material eDeck features, the USPTO would not have allowed Claim 1 of the '302 Patent.

220. But for the failure of Applicants to disclose material teachings of Nevada's Technical Standards and Policies for Mobile Gaming, the USPTO would not have allowed Claim 1 of the '302 Patent.

221. But for the failure of Applicants to disclose material teachings of [redacted] the USPTO would not have allowed Claim 1 of the '302 Patent.

222. The eDeck features for performing device authorization before allowing access to gaming services are not cumulative to any prior art before the USPTO during prosecution of the '302 Patent.

223. On information and belief, Mr. Amaitis specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

224. On information and belief, Mr. Tara specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

225. On information and belief, Mr. Amaitis was motivated to deceive the USPTO to secure allowance of the ’302 Patent claims.

226. On information and belief, Mr. Tara was motivated to deceive the USPTO to secure allowance of the ’302 Patent claims.

227. On information and belief, Mr. Amaitis knew that the ’302 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’302 Patent from issuing.

228. On information and belief, Mr. Tara knew that the ’302 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’302 Patent from issuing.

***

229. The inequitable conduct in procuring the ’302 Patent has an immediate and necessary relation to the enforcement of the ’302 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the ’302 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’302 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’302 Patent against DraftKings.

#### 4. Inequitable Conduct Based on the Cantor Mobile Device

##### a. The Cantor Mobile Device Was Material to Patentability of the ’302 Patent

230. On information and belief, Applicants knew that the Examiner found the claims of the ’302 Patent patentable based on the Examiner’s belief that the prior art failed to disclose at least “repeatedly: … allow or disallow the user’s gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized ….” *See* ’302 Patent File History, NOA dated Dec. 9, 2014, at 6 and Notice of Intent to Issue Reexam Certificate dated Mar. 15, 2024, at 2-4.

231. On information and belief, Applicants knew during prosecution of the ’302 Patent that the Cantor Mobile Device had the features purportedly missing from the prior art.

232. On information and belief, Applicants knew during prosecution of the ’302 Patent that the Cantor Mobile Device was a mobile device.

233. On information and belief, Applicants knew during prosecution of the ’302 Patent that the Cantor Mobile Device communicated gaming requests to a gaming service.

234. On information and belief, Applicants knew during prosecution of the ’302 Patent that the Cantor Mobile Device (including mobile device and gaming service) determined whether the mobile device is authorized to use the gaming service.

235. On information and belief, Applicants knew during prosecution of the ’302 Patent that the Cantor Mobile Device performed repeated user authorization that discontinued the user’s access to gaming if authorization failed at any time during gaming.

236. On information and belief, Applicants knew during the prosecution of the ’302 Patent that the Cantor Mobile Device had the features that the Examiner believed were missing from the prior art.

237. In this regard, the Cantor Mobile Device repeatedly allows or disallows the user's gaming activity based at least in part on the determination that the mobile device is authorized. Cantor Index's terms of service require a subscription before a Cantor Mobile Device is authorized to access the gambling service. Another requirement was that O2 must be the service provider for the device. Exhibit F (DK_IG_0030408) at 1.




Exhibit O (DK_IG_0031024) at 4.

238. Additionally, the Cantor Mobile Device is supplied with a "Wireless Login," which the user activates when they activate the phone. The Wireless Login "consists of a username and a password." Exhibit D (DK_IG_0030358) at 4.

239. The Wireless Login credentials supplied by Cantor Index were used to authorize the mobile device. The Cantor Mobile Device allowed gaming activity at least in part based on the determination that the mobile device was authorized, and it would disallow gaming activity if the mobile device was not authorized. Exhibit D (DK_IG_0030358).

240. That the Cantor Mobile Device authorized the mobile device was material to Claim 1's limitation of "determine whether a mobile device is authorized to use a gaming service" and "repeatedly . . . allow[ing] or disallow[ing] the user's gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized" during prosecution of the '302 Patent.

241. The Cantor Mobile Device also repeatedly allows or disallows the user's gaming activity based at least in part on the determination that the user is authorized. The Cantor Mobile Device required users to enter their account username and password to access gaming features.

242. The Cantor Mobile Device was advertised as "highly secure" and having "a two-stage login process, . . . and a time-out feature so [users] can be confident that their sensitive data is protected." Exhibit AN (DK_IG_0042816) at 3. Each time the Cantor Mobile Device would time-out, the user would have to re-enter their login credentials before re-gaining access to gaming features. Exhibit D (DK_IG_0030358) at 6, 13.

243. That the Cantor Mobile Device conditioned continued gaming on successful user authorization was material to Claim 1's limitation of "repeatedly . . . allow[ing] or disallow[ing] the user's gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized" during prosecution of the '302 Patent.

244. The Examiner considered Claim 1's limitation of "repeatedly . . . allow[ing] or disallow[ing] the user's gaming activity based at least in part on the determination that the mobile device is authorized [and] the determination that the user is authorized" to be an allegedly patentably distinct feature that led to allowance of the '302 Patent.

245. But for the failure of Applicants to disclose material features of the Cantor Mobile Device, the USPTO would not have allowed Claim 1 of the ’302 Patent.

246. The Cantor Mobile Device features for determining user authorization for continued gambling are not cumulative to any prior art before the USPTO because they disclose the very limitations that the Examiner found to be missing from the art of record during prosecution.

247. On information and belief, Applicants—specifically Mr. Amaitis—intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

248. On information and belief, Applicants—specifically Mr. Amaitis—were motivated to deceive the USPTO to secure allowance of the ’302 Patent claims.

249. On information and belief, Applicants—specifically Mr. Amaitis—knew that the ’302 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’302 Patent from issuing.

250. The inequitable conduct in procuring the ’302 Patent has an immediate and necessary relation to the enforcement of the ’302 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the ’302 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’302 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’302 Patent against DraftKings.

**5. Inequitable Conduct Based on Incorrect Inventorship**

251. An affirmative misrepresentation of inventorship to the USPTO also can support a finding of inequitable conduct. *See Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,

607 F.3d 817, 829–30 (Fed. Cir. 2010) (affirming unenforceability where the applicant misrepresented inventorship to the USPTO); *PerSeptive Biosystems*, 225 F.3d at 1321–22 (affirming inequitable conduct based on misrepresentations bearing on inventorship). “When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.” *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc) (citations omitted).

252. Mr. Anoop Gopinatha is named as the sole inventor on U.S. Provisional Application Nos. 61/413,089 (the “’089 Application,” attached as Exhibit BG) and 61/413,098 (the “’098 Application,” attached as Exhibit BH), both filed November 12, 2010. Mr. Gopinatha is named as a joint inventor on U.S. Provisional Application No. 61/373,435 (the “’435 Application,” attached as Exhibit BI), filed August 13, 2010, and U.S. Provisional Application No. 61/405,439 (the “’439 Application,” attached as Exhibit BJ), filed October 21, 2010. The ’435 Application also lists Sunny Tara as a named inventor. And the ’439 Application also lists Lee Amaitis as an inventor. The ’302 and ’382 Patents claim priority to all four of these provisional applications and claim subject matter disclosed therein.

253. By naming Mr. Gopinatha as an inventor on each of these ’089, ’098, ’435, and ’439 Applications, CFPH—the Cantor Fitzgerald entity responsible for prosecuting the applications—represented to the USPTO that Mr. Gopinatha contributed to the conception of the subject matter they disclose. And by naming him as the sole inventor of the ’089 and ’098 Applications, CFPH represented to the USPTO that Mr. Gopinatha alone conceived the subject matter disclosed in those applications.

254. On March 24, 2011, CFPH filed U.S. Application No. 13/070,893 (the “’893 Application”) under pre-AIA 37 C.F.R. § 1.47, claiming priority to each of the ’089, ’098, ’435,

and ’439 Applications. That non-provisional application omitted Mr. Gopinatha as an inventor. Every later application in the family, and every patent issuing from them, likewise omits Mr. Gopinatha. This includes both the ’302 and ’382 Patents, which only list Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette as inventors.

255. Each inventor declaration in the ’302 and ’382 Patents was a sworn statement that the four named individuals were the original and first inventors of the claimed subject matter. And each such inventor declaration was false because it omitted Mr. Gopinatha.

256. At the pleading stage, DraftKings need only to allege facts from which the Court may reasonably infer that a specific individual knew of the falsity of a material misrepresentation and made it with a specific intent to deceive the USPTO. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328–29 (Fed. Cir. 2009).

257. Those facts are pleaded here. *Who*: Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette—the four named inventors of the ’302 Patent. *What*: the inventor declarations stating that the four named individuals were the original and first inventors, and the failure to identify Mr. Gopinatha. *When*: on or about November 15, 2011, and continuing through issuance of the ’302 Patent. *Where*: in the ’893 Application and each subsequent application in the ’302 and ’382 Patent family. *How*: the USPTO would have rejected the claims under pre-AIA 35 U.S.C. § 102(f) and/or invalidated the patents under 35 U.S.C. § 256(b), and could not have accepted an oath or declaration lacking Mr. Gopinatha, had it known he was a joint inventor.

258. Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette knew that Mr. Gopinatha contributed to the claimed subject matter of the ’302 and ’382 Patents and, therefore, that Mr. Gopinatha should have been named as an inventor. Those individuals necessarily knew what they did and did not invent. This is particularly true of Mr. Amaitis and Mr. Tara, who

necessarily had personal knowledge of Mr. Gopinatha's contributions because each was named as a co-inventor with Mr. Gopinatha on a provisional application. And they knew of Mr. Gopinatha's contributions when each of them executed an oath and declaration in which each represented to the USPTO that "I believe the inventor(s) named below to be the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought." That misrepresentation was but-for material. Had the USPTO known that Mr. Gopinatha was a joint inventor, it would not have allowed the claims without naming him.

259. Upon information and belief, CFPH did not name Mr. Gopinatha as an inventor in the '893 Application with the specific intent of deceiving the USPTO (and the public) into believing Mr. Gopinatha did not contribute to the claimed subject matter. Upon information and belief, CFPH did not want the USPTO or the public to know that Mr. Gopinatha contributed to the claimed subject matter in the '302 and '382 Patents because it did not want to be burdened with the additional paperwork associated with correcting inventorship, including the requirement under pre-AIA 37 C.F.R. § 1.47 that supporting facts be provided. Mr. Gopinatha's departure from Cantor Gaming months before the non-provisional filing further supports an inference of specific intent to deceive. Thus, each of Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette individually deceived the USPTO when executing this oath and declaration with the intent of obtaining allowance of claims without naming Mr. Gopinatha. The '302 and '382 Patents are therefore also unenforceable for inequitable conduct based on inventorship.

**C. The '382 Patent**

260. The '382 Patent is unenforceable due to material omissions to the USPTO during prosecution of the '382 Patent.

261. On June 27, 2024, IG filed U.S. Patent Application No. 18/756,918, which issued as the ’382 Patent on September 9, 2025. The ’382 Patent names Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette as inventors and is assigned to IG. IG’s Chief Technology and IP Counsel—Olga Egorova—was involved in prosecuting the ’382 Patent at the USPTO. *See* ’382 Patent File History, Power of Attorney dated June 27, 2024.

262. Here, the individuals who owe duties of candor and disclosure include at least: Mr. Amaitis and Mr. Tara, two of the named inventors of the ’382 Patent, and prosecution counsel Ms. Egorova (collectively, “Applicants”), all of whom, on information and belief, were substantively involved in the preparation and prosecution of the ’382 Patent.

263. On information and belief, in light of their role in the preparation and prosecution of the ’382 Patent, Applicants were aware of the rules and procedures of the USPTO, including the duty of candor.

264. The eDeck was described in at least one printed publication available to the public in the United States at least by March 2007. *See, e.g.*, Exhibit BQ (DK_IG_0042371).

265. The eDeck device was the subject of a commercial offer for sale in 2006, Exhibit BK (DK_IG_0042438); Exhibit BL (DK_IG_0042731) at 13-14, was publicly demonstrated in 2007, Exhibit BM (DK_IG_0030489) at 2, was field tested at the Venetian in 2008, Exhibit BN (DK_IG_0042797) at 14-15; Exhibit J (DK_IG_0030517) at 185:10–186:8, and commercially offered at the M Resort in March 2009, Exhibit BD (DK_IG_0030578); Exhibit B (DK_IG_0029660) at 21.

266. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the eDeck in a multi-year effort to amend laws and regulations in

Nevada beginning in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660).

267. The eDeck device is therefore prior art to the ’382 Patent under pre-AIA §§102(a)-(b).

268. In 2006, Cantor Gaming—IG’s [redacted] describes features and functionality of the eDeck device that is prior art to the ’382 Patent under pre-AIA §§102(a)-(b).

269. On information and belief, Applicants were aware of the existence of the eDeck device and its software-security and device-authorization functionalities, [redacted] during prosecution of the ’382 Patent.

### 1. Individuals With Knowledge of eDeck Features

#### a. Mr. Lee Amaitis

270. Not only is Mr. Amaitis a named inventor on the ’382 Patent, but he was also the Chief Executive Officer and President of Cantor Gaming during the eDeck’s development, regulatory approval, and commercialization. *See, e.g.*, Exhibit BD (DK_IG_0030578).

271. On November 6, 2008, Mr. Amaitis personally appeared before the Nevada Gaming Control Board to obtain regulatory approval for the eDeck and described its security and authorization features. During that hearing, Nevada regulators confirmed that the eDeck “satisfied all the technical standards” applicable to mobile gaming devices and was “functioning within the bounds of what the Legislature as well as the Nevada Gaming Commission prescribed.” Exhibit K (DK_IG_0030537) at 65:22–66:12. Nevada regulators further explained that “any new software, not just games, but any operating system software, any changes to the approved installation would

all go through the administrative process," and confirmed that the eDeck offered only games that had received regulatory approval. *Id.* at 68:25–69:8.

272. Nevada's Mobile Gaming System Policies in 2008 expressly required that "[a]ll mobile devices must be successfully authenticated prior to accessing any resources of the mobile gaming system." Exhibit P (DK_IG_0031077) at 3. These technical standards imposed specific software-level security requirements, including verifying that control-program components are "authentic copies of the approved components," preventing "execution of any control program component if any component is determined to be invalid," detecting "any alterable media for unintended programs or data," and preventing "further play of the gaming device if an invalid component is detected." *See* Exhibit Q (DK_IG_0031160), at 5-6 (effective Nov. 20, 1997).

273. Given Mr. Amaitis's direct involvement in developing, demonstrating, and obtaining regulatory approval for the eDeck, his knowledge of Nevada's technical standards for regulatory approval, and his knowledge that the eDeck device was required to comply with Nevada's technical standards, on information and belief, Mr. Amaitis knew that the eDeck implemented software-security and device-authorization mechanisms, including mechanisms for verifying approved software components and restricting the execution of unauthorized software before permitting gaming. These preexisting software-security and device-authorization functionalities were material to the patentability of at least Claim 1 of the '382 Patent, which claims, among other things, determining that the smart phone "is not running an unapproved process" and "does not have an unapproved application installed," as discussed *infra* at § C.2. Despite his knowledge of these preexisting functionalities and their materiality to the '382 Patent claims, Mr. Amaitis declined to disclose them to the USPTO during prosecution of the '382 Patent. On information and belief, Mr. Amaitis did so with the specific intent of improving the likelihood

of the issuance of the claims of the ’382 Patent. The single most reasonable inference that can be drawn from Mr. Amaitis’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**b. Mr. Sunny Tara**

274. Not only is Mr. Tara a named inventor of the ’382 Patent, but he was also the Chief Technology Officer of Cantor Gaming during the eDeck’s regulatory approval and commercialization. *See, e.g.*, Exhibit I (DK_IG_0030470).

275. On May 1, 2009, a letter addressed to Mr. Tara was sent from the Nevada Gaming Control Board containing a list of approved “software and hardware component versions” that authorized the eDeck device for an administrative field trial at the M Resort, including specific approved versions of the “Handheld Device,” “Mobile Client,” “Gateway,” “Authentication CD,” and “Server.” *Id.* Thus, Mr. Tara knew of the eDeck’s various software and hardware features, including its security and authorization mechanisms for a mobile device. The letter further referenced compliance with “NGC Regulation[s].” *Id.* at 2. On information and belief, Mr. Tara knew that the eDeck’s software and hardware configuration were subject to Nevada’s regulatory approval requirements.

276. As discussed above, Nevada’s applicable technical standards for regulatory approval required gaming devices to verify that software components were approved, prevent invalid components from executing, and prevent further gaming upon detection of invalid software components. Exhibit Q (DK_IG_0031160), at 5-6.

277. Given Mr. Tara’s technical responsibilities, his position as CTO, his knowledge of the eDeck’s specifically approved software and authorization components, his knowledge of Nevada’s technical standards for regulatory approval, and his involvement in obtaining regulatory

approval for the eDeck, on information and belief, Mr. Tara knew that the eDeck implemented software-security and device-authorization mechanisms, including mechanisms for verifying approved software components and restricting the execution of unauthorized software before permitting gambling. These preexisting software-security and device-authorization functionalities were material to the patentability of at least Claim 1 of the '382 Patent, which claims, among other things, determining that the smart phone "is not running an unapproved process" and "does not have an unapproved application installed," as discussed *infra* at § C.2. Despite his knowledge of these preexisting functionalities and their materiality to the '382 Patent claims, Mr. Tara declined to disclose them to the USPTO during prosecution of the '382 Patent. On information and belief, Mr. Tara did so with the specific intent of improving the likelihood of the issuance of the claims of the '382 Patent. The single most reasonable inference that can be drawn from Mr. Tara's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**c. Ms. Olga Egorova**

278. Not only did Ms. Egorova sign the Power of Attorney on behalf of IG during prosecution of the '382 Patent, but she was also Vice President and Assistant General Counsel of Cantor Gaming during the eDeck's commercialization and was personally involved in filing for trademark protection for the eDeck device. *See, e.g.*, Exhibit R (DK_IG_0031751); Exhibit S (DK_IG_0031789).

279. On June 3, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 77/092,087 for the "EDECK" mark to the USPTO, representing that the mark had been "use[d] ***in commerce***" since at least April 30, 2008 in connection with "mobile and wireless gaming and gambling machines," "computer gaming and gambling hardware," and other "wireless telecommunications devices." Exhibit R (DK_IG_0031751) at 5 (emphasis added);

*see also* Exhibit S (DK_IG_0031789) at 5-6 (U.S. Trademark Application No. 77/593,896); Exhibit T (DK_IG_0031804); Exhibit U (DK_IG_0031811). Ms. Egorova's submission included photographs of the eDeck device (Exhibit R (DK_IG_0031751) at 8-9) and an "eDeck Wireless Gaming" brochure (*id.* at 10-12) expressly representing that Cantor Gaming was "the first company licensed by the Nevada Gaming Commission to manufacture, distribute and operate a mobile gaming system in the state" (*id.* at 10). The eDeck Wireless Gaming brochure also describes the device's use for casino games and sports wagers in authorized areas, as well as its availability at the Venetian, M Resort, and Palazzo. *Id.* at 11. This confirms the public nature of the use of the eDeck product and its qualification as prior art to the '382 Patent under 35 U.S.C. § 102. It also confirms that Ms. Egorova knew that Cantor Gaming had developed and commercialized the eDeck device and that its operation was subject to Nevada's licensing requirements and gaming regulations (*id.* at 10), including Nevada's technical standards for device authorization as discussed above (*see* Exhibit Q (DK_IG_0031160) at 5-6).

280. In addition, the brochure included in Ms. Egorova's 2011 trademark submission further described the eDeck as "a unique mobile device developed by Cantor" that allows patrons to "play casino games" and "place sports wagers" from "a secure account" on the device when in "authorized areas." Exhibit R (DK_IG_0031751) at 11. Therefore, on information and belief, Ms. Egorova knew that the eDeck device had mechanisms for security and authorization.

281. On January 25, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 85/225,931 for the "Cantor" mark to the USPTO, representing that the mark had been "use[d] ***in commerce***" since at least May 1, 2009 in connection with "mobile and wireless gambling machines" and "computer hardware and software for wireless gambling"; and since at least September 29, 2005 in connection with "providing telecommunication channels for

mobile gambling and gaming services[.]" Exhibit BP (DK_IG_0030735) at 1-3, 5-6. Ms. Egorova's submission included a photograph of the eDeck (*id.* at 9), the "eDeck Wireless Gaming" brochure (*id.* at 11-13), and a "Cantor Gaming Proprietary Technology" brochure (*id.* at 14). The "Cantor Gaming Proprietary Technology" brochure states, "Cantor Gaming has developed a proprietary end-to-end mobile gaming solution[,]" the "[t]echnology is based on Cantor Fitzgerald's highly secure financial trading platform[,]" the system uses an 802.11 private wireless network to connect the mobile devices to servers, the network is protected with several layers of encryption, and the "system contains integrated location tracking and fencing capabilities, including a positioning engine to determine player location and a visibility platform server to define and monitor permissible gaming zones[,]" and the system uses "[u]nique access methods and identification procedures" to validate gamblers as required by Nevada regulations. *Id.* at 14. Accordingly, on information and belief, Ms. Egorova knew that the eDeck device had specific authorization protocols and geolocation features.

282. Given Ms. Egorova's position as General Counsel, her direct involvement in the eDeck's trademark filings, and her knowledge that the device was subject to Nevada's regulations, on information and belief, Ms. Egorova knew that the eDeck implemented software-security and device-authorization mechanisms, including mechanisms for verifying approved software components and restricting the execution of unauthorized software before permitting gambling. These preexisting software-security and device-authorization functionalities were material to the patentability of at least Claim 1 of the '382 Patent, which claims, among other things, determining that the smart phone "is not running an unapproved process" and "does not have an unapproved application installed," as discussed *infra* at § C.2. The single most reasonable inference that can

be drawn from Ms. Egorova's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

***

283. On information and belief, Applicants—specifically Mr. Amaitis, Mr. Tara, and Ms. Egorova—violated 37 C.F.R. § 1.56 by deliberately withholding material features of the eDeck device from the USPTO during prosecution of the '382 Patent with the specific intent to deceive the Examiner into allowing claims that would not have issued but for the nondisclosure.

**2. Prosecution of the '382 Patent**

284. The claims of the '382 Patent are directed toward a smart phone executing software that determines whether the phone is authorized to use a gambling service. For example, independent Claim 1 generally recites a gambling application and an associated wrapper application that authorizes gambling if it determines that there are no unapproved processes running on the phone, there are no unapproved applications installed on the phone, and the phone is running an operating system approved for gambling. *See* '382 Patent, Claim 1.

285. During prosecution of the '382 Patent, the Examiner issued two Notices of Allowance ("NOAs") allowing claim amendments in a preliminary amendment and Request for Continued Examination ("RCE").

286. On information and belief, IG filed a preliminary amendment on February 19, 2025 to amend the claims in an effort to avoid challenges under 35 U.S.C. § 101. Specifically, IG amended the claims to include, among other things, a separate limitation for "a memory having instructions stored thereon that, when executed by at least one processor, cause the at least one processor to execute" the functionality of the previously recited applications: the wrapper application and the gambling application. *See* '382 Patent File History, Preliminary Amendment dated Feb. 19, 2025, at 3 (Claim 1 amendments reproduced below).

> 1. (Currently Amended) A smart phone, including:
>
> a memory having instructions stored thereon that, when executed by at least one processor, cause the at least one processor to execute a wrapper application and a gambling application associated with the wrapper application, wherein the gambling application is configured to perform wagering actions in connection with a gambling service; and
>
> ~~a wrapper application associated with the gambling application,~~ wherein the wrapper application is configured to:
>
> determine that the smart phone is authorized to use the gambling service by:
>
> determining that the smart phone is not running an unapproved process;
>
> determining that the smart phone ~~is not running~~ does not have an unapproved application installed; and
>
> determining that an operating system running on the smart phone is approved for use with the gambling service; and
>
> in response to determining that the smart phone is authorized to use the gambling service, ~~initiate execution of~~ enable a user of the smart phone to gamble using the gambling application.

287. In a first NOA issued April 28, 2025, the Examiner identified Lutnick (U.S. Patent Application Publication No. 2008/0182644) and Walker (U.S. Patent Application Publication No. 2004/0127277) as the "best available prior art," but determined that the claims were allowable over those references because, according to the Examiner, they failed to disclose the claimed memory storing instructions for executing the wrapper and gambling applications and the determination "that the smart phone is authorized to use the gambling service by: determining that the smart phone is not running an unapproved process; determining that the smart phone does not have an unapproved application installed." *See* '382 Patent File History, NOA dated Apr. 28, 2025, at 2. Thus, according to the Examiner, these features were material to the allowability of the claims.

288. On May 8, 2025, IG filed a RCE to further amend the claims to recite "comprising" rather than "including" in Claim 1. *See* '382 Patent File History, RCE dated May 8, 2025, at 3. In a second NOA issued July 14, 2025, the Examiner more generally stated that the claims were

allowable because they included "features such as determining whether processes and software within the mobile device is authorized," whereas the prior art "center on the location of the mobile device." *See* '382 Patent File History, NOA dated Jul. 14, 2025, at 2.

> ***Allowability Notice***
>
> Applicant reviewed the submitted non-patentable literature and stated references and Examiner has determined that those references center on the location of the mobile device, whereas the instant application includes other features such as determining whether processes and software within the mobile device is authorized. For these reasons the claims are allowed.

289. Moreover, the Examiner identified IG's May 8 and May 16, 2025 Information Disclosure Statements ("IDSs") in the Notice of Allowability before expressly stating that the claimed features for "determining whether processes and software within the mobile device is authorized" were missing from the identified prior art and therefore allowable. *See generally id.*

290. The '382 Patent claims issued on September 9, 2025. *See* '382 Patent File History, eGrant Notification dated Sep. 9, 2025.

**3. Inequitable Conduct Based on the eDeck Device**

**a. The eDeck Device Was Material to Patentability of the '382 Patent**

291. On information and belief, Applicants knew that the Examiner allowed the claims of the '382 Patent based on the Examiner's belief that the prior art failed to disclose device features for "determining whether processes and software within the mobile device is authorized." *See* '382 Patent File History, NOA dated Jul. 14, 2025, at 2.

292. On information and belief, Applicants knew during prosecution of the '382 Patent that the eDeck device had the features purportedly missing from the prior art.

293. On information and belief, Applicants knew during prosecution of the '382 Patent that the eDeck device was a mobile device.

294. On information and belief, Applicants knew during prosecution of the '382 Patent that the eDeck device contained a memory storing instructions for executing various features.

295. On information and belief, Applicants knew during prosecution of the '382 Patent that the eDeck device determined whether processes and software within the device were authorized.

296. On information and belief, Applicants knew during the prosecution of the '382 Patent that the eDeck device had the features that the Examiner believed were missing from the prior art.

297. Applicants' knowledge of the eDeck device's relevant features is evidenced, for example, by [redacted] published by Cantor Gaming.

298. Specifically, [redacted]

299. First, [redacted] The claimed process authorization feature that the Examiner found missing from the prior art encompasses features for determining and controlling which programs and processes could run on a mobile gaming device during gambling.

300. In this regard, the eDeck operated [redacted]

[redacted] In other words, the eDeck ensures that only approved or authorized programs and processes (*e.g.*, those associated with eDeck's gambling application) are running on the mobile device before allowing gambling in "gaming mode."

301. That the eDeck restricted the programs and processes running on the mobile device to those approved or authorized for gambling (*e.g.*, those associated with eDeck's gambling application) was material to Claim 1's limitation of "determining that the smart phone is not running an unapproved process" during prosecution of the '382 Patent.

302. The Examiner considered Claim 1's limitation of "determining that the smart phone is not running an unapproved process" to be an allegedly patentably distinct feature that led to allowance of the '382 Patent.

303. Second, [redacted] The claimed software authorization feature that the Examiner found missing from the prior art encompasses features for determining whether software installed on the mobile gaming device matched approved versions and/or is authorized before allowing gambling.

304. In this regard, [redacted]

[redacted]

Thus, the eDeck determines whether software installed on the mobile gaming device corresponds to approved software and conditions authorization to gamble on successful verification.

305. That the eDeck verified hash codes of software installed on the mobile device against a list of hash codes of approved software was material to Claim 1's limitation of "determining that the smart phone does not have an unapproved application installed" during prosecution of the '382 Patent.

306. The Examiner considered Claim 1's limitation of "determining that the smart phone does not have an unapproved application installed" to be an allegedly patentably distinct feature that led to allowance of the '382 Patent.

307. But for the failure of Applicants to disclose material eDeck features, the USPTO would not have allowed Claim 1 of the '382 Patent.

308. But for the failure of Applicants to disclose material teachings of [redacted], the USPTO would not have allowed Claim 1 of the '382 Patent.

309. The eDeck features for determining approved processes and software are not cumulative to any prior art before the USPTO because they disclose the very limitations that the Examiner found to be missing from the art of record during prosecution.

310. On information and belief, Mr. Amaitis specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

311. On information and belief, Mr. Tara specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

312. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

313. On information and belief, Mr. Amaitis was motivated to deceive the USPTO to secure allowance of the ’382 Patent claims.

314. On information and belief, Mr. Tara was motivated to deceive the USPTO to secure allowance of the ’382 Patent claims.

315. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’382 Patent claims.

316. On information and belief, Mr. Amaitis knew that the ’382 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’382 Patent from issuing.

317. On information and belief, Mr. Tara knew that the ’382 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’382 Patent from issuing.

318. On information and belief, Ms. Egorova knew that the ’382 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of

the eDeck device would directly undermine Applicants' arguments for patentability and prevent the claims of the '382 Patent from issuing.

319. The inequitable conduct in procuring the '382 Patent has an immediate and necessary relation to the enforcement of the '382 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the '382 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the '382 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the '382 Patent against DraftKings.

### 4. Inequitable Conduct Based on Incorrect Inventorship

320. An affirmative misrepresentation of inventorship to the USPTO also can support a finding of inequitable conduct. *See Advanced Magnetic Closures*, 607 F.3d at 829–30 (affirming unenforceability where the applicant misrepresented inventorship to the USPTO); *PerSeptive Biosystems*, 225 F.3d at 1321–22 (affirming inequitable conduct based on misrepresentations bearing on inventorship). "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Therasense, Inc.*, 649 F.3d at 1292.

321. Mr. Anoop Gopinatha is named as the sole inventor on U.S. Provisional Application Nos. 61/413,089 (attached as Exhibit BG) and 61/413,098 (attached as Exhibit BH), both filed November 12, 2010. Mr. Gopinatha is named as a joint inventor on U.S. Provisional Application No. 61/373,435 (attached as Exhibit BI), filed August 13, 2010, and U.S. Provisional Application No. 61/405,439 (attached as Exhibit BJ), filed October 21, 2010. The '435 Application also lists Sunny Tara as a named inventor. And the '439 Application also lists Lee Amaitis as an inventor.

The ’302 and ’382 Patents claim priority to all four of these provisional applications and claim subject matter disclosed therein.

322. By naming Mr. Gopinatha as an inventor on each of these ’089, ’098, ’435, and ’439 Applications, CFPH—the Cantor Fitzgerald entity responsible for prosecuting the applications—represented to the USPTO that Mr. Gopinatha contributed to the conception of the subject matter they disclose. And by naming him as the sole inventor of the ’089 and ’098 Applications, CFPH represented to the USPTO that Mr. Gopinatha alone conceived the subject matter disclosed in those applications.

323. On March 24, 2011, CFPH filed U.S. Application No. 13/070,893 (the “’893 Application”) under pre-AIA 37 C.F.R. § 1.47, claiming priority to each of the ’089, ’098, ’435, and ’439 Applications. That non-provisional application omitted Mr. Gopinatha as an inventor. Every later application in the family, and every patent issuing from them, likewise omits Mr. Gopinatha. This includes both the ’302 and ’382 Patents, which only list Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette as inventors.

324. Each inventor declaration in the ’302 and ’382 Patents was a sworn statement that the four named individuals were the original and first inventors of the claimed subject matter. And each such inventor declaration was false because it omitted Mr. Gopinatha.

325. At the pleading stage, DraftKings need only to allege facts from which the Court may reasonably infer that a specific individual knew of the falsity of a material misrepresentation and made it with a specific intent to deceive the USPTO. *Exergen Corp.*, 575 F.3d at 1328–29.

326. Those facts are pleaded here. *Who*: Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette—the four named inventors of the ’382 Patent. *What*: the inventor declarations stating that the four named individuals were the original and first inventors, and the

failure to identify Mr. Gopinatha. *When*: on or about November 15, 2011, and continuing through issuance of the ’302 Patent. *Where*: in the ’893 Application and each subsequent application in the ’302 and ’382 Patent family. *How*: the USPTO would have rejected the claims under pre-AIA 35 U.S.C. § 102(f) and/or invalidated the patents under 35 U.S.C. § 256(b), and could not have accepted an oath or declaration lacking Mr. Gopinatha, had it known he was a joint inventor.

327. Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette knew that Mr. Gopinatha contributed to the claimed subject matter of the ’302 and ’382 Patents and, therefore, that Mr. Gopinatha should have been named as an inventor. Those individuals necessarily knew what they did and did not invent. This is particularly true of Mr. Amaitis and Mr. Tara, who necessarily had personal knowledge of Mr. Gopinatha’s contributions because each was named as a co-inventor with Mr. Gopinatha on a provisional application. And they knew of Mr. Gopinatha’s contributions when each of them executed an oath and declaration in which each represented to the USPTO that “I believe the inventor(s) named below to be the original and first inventor(s) of the subject matter which is claimed and for which a patent is sought.” That misrepresentation was but-for material. Had the USPTO known that Mr. Gopinatha was a joint inventor, it would not have allowed the claims without naming him.

328. Upon information and belief, CFPH did not name Mr. Gopinatha as an inventor in the ’893 Application with the specific intent of deceiving the USPTO (and the public) into believing Mr. Gopinatha did not contribute to the claimed subject matter. Upon information and belief, CFPH did not want the USPTO or the public to know that Mr. Gopinatha contributed to the claimed subject matter in the ’302 and ’382 Patents because it did not want to be burdened with the additional paperwork associated with correcting inventorship, including the requirement under pre-AIA 37 C.F.R. § 1.47 that supporting facts be provided. Mr. Gopinatha’s departure from Cantor

Gaming months before the non-provisional filing further supports an inference of specific intent to deceive. Thus, each of Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette individually deceived the USPTO when executing this oath and declaration with the intent of obtaining allowance of claims without naming Mr. Gopinatha. The ’302 and ’382 Patents are therefore also unenforceable for inequitable conduct based on inventorship.

**D. The ’404 Patent**

329. The ’404 Patent is unenforceable due to material omissions to the USPTO during prosecution of the ’404 Patent.

330. On June 27, 2024, IG filed U.S. Patent Application No. 18/757,136, which issued as the ’404 Patent on February 10, 2026. The ’404 Patent names Paul Williams, Matthew Morrissette, and Stephane Minisini as inventors and is assigned to IG. IG’s Chief Technology and IP Counsel—Olga Egorova—was involved in prosecuting the ’404 Patent at the USPTO. *See* ’404 Patent File History, Power of Attorney dated June 27, 2024.

331. Here, the individuals who owe duties of candor and disclosure include at least: Mr. Williams, Mr. Morrissette, and Mr. Minisini, named inventors of the ’404 Patent, and prosecution counsel Ms. Egorova (collectively, “Applicants”), all of whom, on information and belief, were substantively involved in the preparation and prosecution of the ’404 Patent.

332. On information and belief, in light of their role in the preparation and prosecution of the ’404 Patent, Applicants were aware of the rules and procedures of the USPTO, including the duty of candor.

333. The Cantor Mobile Device was described in at least one printed publication available to the public at least by September 2003. *See, e.g.*, Exhibit BO (DK_IG_0042383); Exhibit O (DK_IG_0031024).

334. The Cantor Mobile Device was available and publicly demonstrated in the US throughout 2005 and the subject of a commercial offer for sale in 2006. Exhibit AE (DK_IG_0036182); Exhibit BD (DK_IG_0030578); Exhibit BB (DK_IG_0030568); Exhibit AM (DK_IG_0042537); Exhibit A (DK_IG_0029518); Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455).

335. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the Cantor Mobile Device in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660).

336. The Cantor Mobile Device is therefore prior art to the '404 Patent under pre-AIA §§102(a)-(b).

337. The eDeck was described in at least one printed publication available to the public in the United States at least by March 2007. *See, e.g.*, Exhibit BQ (DK_IG_0042371).

338. The eDeck device was the subject of a commercial offer for sale in 2006, Exhibit BK (DK_IG_0042438); Exhibit BL (DK_IG_0042731) at 13-14, was publicly demonstrated in 2007, Exhibit BM (DK_IG_0030489) at 2, was field tested at the Venetian in 2008, Exhibit BN (DK_IG_0042797) at 14-15; Exhibit J (DK_IG_0030517) at 185:10–186:8, and commercially offered at the M Resort in March 2009, Exhibit BD (DK_IG_0030578); Exhibit B (DK_IG_0029660) at 21.

339. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the eDeck in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660).

340. The eDeck device is therefore prior art to the ’404 Patent under pre-AIA §§102(a)-(b).

341. In 2006, Cantor Gaming—IG’s predecessor—published [redacted] describes features and functionality of the eDeck device that is prior art to the ’404 Patent under pre-AIA §§102(a)-(b).

**1. Individuals With Knowledge of Cantor Mobile Device and eDeck Features**

342. On information and belief, Applicants were aware of the existence of the Cantor Mobile Device and eDeck, and functionality of those devices material to the ’404 claims, during prosecution of the ’404 Patent.

343. As named inventors of the ’404 Patent, Mr. Williams and Mr. Minisini each owed the duty of candor and disclosure described above. Ms. Egorova likewise owed that duty because she was substantively involved in directing the preparation and prosecution of the application on IG’s behalf.

**a. Mr. Stephane Minisini**

344. Mr. Minisini was employed by BGC Partners from about November 2007 to about December 2010 as an Infrastructure Design and Security Engineer.

345. Mr. Minisini was employed by Cantor Gaming from about January 2011 to about February 2015 as Director of IT Infrastructure and Operations.

346. His responsibilities at Cantor Gaming included at least engineering and building infrastructure for Cantor Gaming’s gambling products and race and sports books, and implementing the security standards and technologies required to meet NGCB standards. The

earliest provisional application to which the ’404 Patent claims priority was filed on February 28, 2012, while Mr. Minisini was employed by Cantor Gaming. Through his employment, Mr. Minisini knew of the eDeck and at least some of its functions and operations before the ’404 Patent’s earliest claimed priority date. Mr. Minisini was aware that Cantor Gaming offered the eDeck, that Cantor Gaming offered the eDeck at the M Casino in 2009, and that the eDeck was subject to Nevada regulations governing mobile wagering devices. On information and belief, Mr. Minisini designed, selected, reviewed, or built at least some of the functions and operations of the eDeck, and managed at least one Cantor Gaming employee who did so.

347. Therefore, Mr. Minisini was aware of the eDeck device and system, and its use for mobile gambling and wagering services, during prosecution of the ’404 Patent. Despite his knowledge of these preexisting functionalities and their materiality to the ’404 Patent claims, Mr. Minisini declined to disclose them to the USPTO during prosecution of the ’404 Patent. On information and belief, Mr. Minisini did so with the specific intent of improving the likelihood of the issuance of the claims of the ’404 Patent. The single most reasonable inference that can be drawn from Mr. Minisini’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**b. Mr. Paul Williams**

348. Mr. Williams held senior technology positions with Cantor Fitzgerald and its affiliates from at least 2000 through 2013.

349. Mr. Williams also had knowledge of the Cantor Mobile Device. Mr. Williams was a senior technology executive at Cantor Fitzgerald when Cantor Index developed, launched, and sold the Cantor Mobile Device. From January 2003 to January 2009, Mr. Williams was Senior Vice President and Global Head of Trading Systems at Cantor Fitzgerald in London, where he

supported Cantor Fitzgerald's voice and electronic trading systems. From 2003 to March 2011, he was also Executive Vice President and Global Head of Trading Infrastructure and Operations at BGC Partners.

350. Cantor Index used eSpeed's trading network for the Cantor Mobile Device, and the Cantor Mobile Website identified eSpeed as the hosting environment for the Cantor Mobile system. Exhibit H (DK_IG_0030436). On information and belief, through his senior trading-systems and infrastructure roles at Cantor Fitzgerald in London during the period in which Cantor Index launched and sold the Cantor Mobile Device, Mr. Williams knew of the Cantor Mobile Device and its features and functionality.

351. Mr. Williams was Chief Information Technology Officer of Cantor Gaming from 2009 to 2013.

352. In this role, Mr. Williams led Cantor Gaming's mobile gaming technology teams. During that period, Cantor Gaming's chief executive, Lee Amaitis, publicly stated that Cantor Gaming's in-game wagering algorithms were variations of those created by Cantor Index and that he had presented Cantor's United Kingdom wireless wagering system to the NGCB as evidence that the wireless component of Cantor Gaming's system was sound and secure. Exhibit BB (DK_IG_0030568). On information and belief, Mr. Williams and others at Cantor Gaming used designs and know-how learned from commercializing the Cantor Mobile Device to commercialize Cantor Gaming's mobile wagering products.

353. From October 2010 to September 2013, Mr. Williams was Global Chief Technology Officer and Chief Operating Officer of CG Technology in Las Vegas, Nevada, where he directed all information-technology strategy for research and development, infrastructure, and operations for Cantor Gaming.

354. Mr. Williams also had knowledge of the eDeck. In the roles described above, Mr. Williams created and built the technology teams of Cantor Gaming focused on interactive, mobile, and intranet-based gaming and race and sports book solutions, and deployed products through mobile application markets, the internet, and public and private WiFi networks. Mr. Williams was also responsible for location-aware software that restricted transactions to approved jurisdictions, including Nevada. Mr. Williams thus held Cantor Gaming's top technology position in 2009, the year Cantor Gaming launched the eDeck at the M Resort, and while Cantor Gaming offered the eDeck to the public in Nevada. On information and belief, through these roles Mr. Williams knew of the eDeck and its functions and operations, including its restriction of wagering to approved gaming areas, before the '404 Patent's earliest claimed priority date, and Mr. Williams and the technology teams he led supported, maintained, or further developed the eDeck.

355. Mr. Williams is also a named inventor of the '302 Patent. The '302 Patent's specification describes gaming positioning client software for determining the location of a mobile device and states that a user accessing an M Resort communication network for gaming may be determined to be in the M Resort. *See* '302 Patent, 63:51–64:55.

356. The '404 Patent, on which Mr. Williams is the first-named inventor, likewise reflects Cantor Gaming's Nevada mobile wagering operations. Its representative figure depicts a "Cantor Sports Book" application, and its specification describes an AIR mobile gaming client as an NGCB-approved application through which customers sign in and play mobile games. '404 Patent at (57); *id.*, 62:17–22. The earliest provisional application to which the '404 Patent claims priority was filed on February 28, 2012, while Mr. Williams was Chief Information Technology Officer of Cantor Gaming. On information and belief, through his positions at Cantor Gaming, his involvement with Cantor Gaming's mobile wagering business, and his contributions to the '302

and ’404 patent applications, Mr. Williams knew of the eDeck, its public demonstration, use, and commercial offering in Nevada, and its restriction of wagering to approved gaming areas, before the ’404 Patent’s earliest claimed priority date.

357. As discussed above, Mr. Williams had knowledge of the eDeck, including its features and functionality, such as location restriction. Components of the eDeck including hardware, software, algorithms, and server connectivity were taken from the Cantor Mobile Device. Exhibit AO (DK_IG_0043150). On information and belief, the components used in the eDeck from the Cantor Mobile Device would have included location determination and restriction. On information and belief, Mr. Williams knew of the earlier Cantor Mobile Device at least in part through the components in the eDeck from the Cantor Mobile Device. Furthermore, and on information and belief, Mr. Williams knew of the specific operations of the Cantor Mobile Device including location determination and restriction.

358. Therefore, Mr. Williams was aware of the Cantor Mobile Device and system and the eDeck device and system, and their use for mobile gambling and wagering services, during prosecution of the ’404 Patent. Despite his knowledge of these preexisting functionalities and their materiality to the ’404 Patent claims, Mr. Williams declined to disclose them to the USPTO during prosecution of the ’404 Patent. On information and belief, Mr. Williams did so with the specific intent of improving the likelihood of the issuance of the claims of the ’404 Patent. The single most reasonable inference that can be drawn from Mr. Williams’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**c. Ms. Olga Egorova**

359. As Chief Technology and IP Counsel and Head of Patents at Cantor Fitzgerald, Ms. Olga Egorova was involved in the prosecution of the application for the ’404 Patent. Ms. Egorova

signed the Power of Attorney for the patent applicant in U.S. Patent Application No. 18/757,136, which ultimately issued as the '404 Patent. Not only that, but she was also Vice President and Assistant General Counsel of Cantor Gaming during the eDeck's commercialization and was personally involved in filing for trademark protection for the eDeck device. *See, e.g.*, Exhibit R (DK_IG_0031751); Exhibit S (DK_IG_0031789).

360. On June 3, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 77/092,087 for the "EDECK" mark to the USPTO, representing that the mark had been "use[d] ***in commerce***" since at least April 30, 2008 in connection with "mobile and wireless gaming and gambling machines," "computer gaming and gambling hardware," and other "wireless telecommunications devices." Exhibit R (DK_IG_0031751) at 5 (emphasis added); *see also* Exhibit S (DK_IG_0031789) at 5-6 (U.S. Trademark Application No. 77/593,896). Ms. Egorova's submission included photographs of the eDeck device (Exhibit R (DK_IG_0031751) at 8-9) and an "eDeck Wireless Gaming" brochure (*id.* at 10-12) expressly representing that Cantor Gaming was "the first company licensed by the Nevada Gaming Commission to manufacture, distribute and operate a mobile gaming system in the state" (*id.* at 10). The eDeck Wireless Gaming brochure also describes the device's use for casino games and sports wagers in authorized areas, as well as its availability at the Venetian, M Resort, and Palazzo. *Id.* at 11. The eDeck Wireless Gaming brochure confirms the public nature of the use of the eDeck product and its qualification as prior art to the '404 Patent under 35 U.S.C. § 102. The eDeck Wireless Gaming brochure also confirms that Ms. Egorova knew that Cantor Gaming had developed and commercialized the eDeck device and that its operation was subject to Nevada's licensing requirements and gaming regulations (*id.* at 10), including Nevada's technical standards for device security and authorization mechanisms as discussed above (*see* Exhibit Q (DK_IG_0031160)).

361. In addition, the brochure included in Ms. Egorova's 2011 trademark submission further described the eDeck as "a unique mobile device developed by Cantor" that allows patrons to "play casino games" and "place sports wagers" from "a secure account" on the device when in "authorized areas." Exhibit R (DK_IG_0031751) at 11. Therefore, on information and belief, Ms. Egorova knew that the eDeck device had mechanisms for security and authorization.

362. On January 25, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 85/225,931 for the "Cantor" mark to the USPTO, representing that the mark had been "use[d] ***in commerce***" since at least May 1, 2009 in connection with "mobile and wireless gambling machines" and "computer hardware and software for wireless gambling"; and since at least September 29, 2005 in connection with "providing telecommunication channels for mobile gambling and gaming services[.]" Exhibit BP (DK_IG_0030735) at 1-3, 5-6. Ms. Egorova's submission included a photograph of the eDeck (*id.* at 9), the "eDeck Wireless Gaming" brochure (*id.* at 11-13), and a "Cantor Gaming Proprietary Technology" brochure (*id.* at 14). The "Cantor Gaming Proprietary Technology" brochure states, "Cantor Gaming has developed a proprietary end-to-end mobile gaming solution[,]" the "[t]echnology is based on Cantor Fitzgerald's highly secure financial trading platform[,]" the system uses an 802.11 private wireless network to connect the mobile devices to servers, the network is protected with several layers of encryption, and the "system contains integrated location tracking and fencing capabilities, including a positioning engine to determine player location and a visibility platform server to define and monitor permissible gaming zones[,]" and the system uses "[u]nique access methods and identification procedures" to validate gamblers as required by Nevada regulations. *Id.* at 14. Accordingly, on information and belief, Ms. Egorova knew that the eDeck device had mechanisms for security and authorization.

363. Thus, well before her involvement in prosecuting the ’404 Patent, Ms. Egorova knew that Cantor Gaming had commercialized a mobile gaming device in the same field as the claimed invention. On information and belief, Ms. Egorova also knew of wireless gaming systems leading to the eDeck that were publicly available and on-sale before the priority date of the ’404 Patent, including the Cantor Mobile Device. Nevertheless, Ms. Egorova withheld information about the eDeck, its features, functionality, development, and documentation. Ms. Egorova also withheld information about the features, functionality, development, and documentation of wireless gaming systems leading to the eDeck that were publicly available and on-sale before the priority date of the ’404 Patent, including the Cantor Mobile Device, from submission to the USPTO. The single most reasonable inference that can be drawn from Ms. Egorova’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

***

364. On information and belief, Applicants—specifically Mr. Minisini, Mr. Williams, and Ms. Egorova—violated 37 C.F.R. § 1.56 by deliberately withholding material features of the Cantor Mobile Device and eDeck Device from the USPTO during prosecution of the ’404 Patent with the specific intent to deceive the Examiner into allowing claims that would not have issued but for the nondisclosure.

**2. Prosecution of the ’404 Patent**

365. During prosecution of the ’404 Patent, the Examiner issued an Office Action on October 10, 2024, rejecting all pending claims.

366. On December 4, 2024, Applicants’ representatives and the Examiner discussed the October 10, 2024 rejection in a telephone interview. According to Applicants, the participants agreed that the then-pending claims were not invalid over the prior art of record because that art did not disclose a “multi-level location determination hierarchy.”

367. On January 24, 2025, the Examiner allowed all pending claims.

368. On April 11, 2025, the Applicant filed a Request for Continued Examination and amended Claims 1, 11, and 21. As amended, then-pending Claim 1, for example, recited:

> 1. A system, comprising:
>
> one or more server computers associated with a gambling service, each of the one or more server computers including at least one processor, and ~~the one or more server computers being collectively configured to:~~
>
> an application executable on a smartphone, the application configured to:
>
> ~~determine that a smartphone is attempting to access the gambling service; and in response to determining that~~ when the application ~~smartphone~~ is attempting to access at least one gambling activity of the gambling service:
>
> attempt to determine a location of the smartphone based on GPS data of the smartphone;
>
> determine whether the GPS data is not determinable;
>
> ~~in response to at least the determination that the location of the smartphone cannot be determined based on GPS data, perform operations including:~~
>
> attempt to determine the location of the smartphone based on ~~cell tower~~ triangulation; and
>
> determine the location of the smartphone based on the ~~cell tower~~ triangulation;
>
> provide information indicative of the determined location to the one or more server computers;
>
> receive, from the one or more server computers, an indication ~~determine~~ that the smartphone is in a U.S. state where gambling is allowed based on the information indicative of the ~~determined~~ location ~~of the smartphone~~; and
>
> ~~in response to at least the determination that the smartphone is in the U.S. state where gambling is allowed,~~ enable the ~~smartphone~~ application to access the gambling service to engage in the at least one gambling activity based on the indication.

369. On May 28, 2025, the Examiner allowed independent Claims 1, 11, and 21, which issued as Claims 1, 10, and 19, respectively.

370. Accordingly, the Examiner found Claims 1, 10, and 19 allowable based on the inclusion of claim elements directed, at most, to an application executable on a smartphone; using a multi-level location determination hierarchy; providing location information to one or more server computers; and receiving, from one or more server computers, an indication that the smartphone is in a location where gambling is allowed based on that information.

### 3. Inequitable Conduct Based on the Cantor Mobile Device

#### a. The Cantor Mobile Device Was Material to Patentability of the ’404 Patent

371. The Cantor Mobile Device, its features, function, and related documentation were material to the patentability of at least Claims 1, 10, and 19 of the ’404 Patent.

372. The function and operation of the Cantor Mobile Device were described in materials that Cantor Mobile and its partners published while the device was being publicly sold. These include a Cantor Mobile Demo (Exhibit O (DK_IG_0031024)), a Cantor Mobile technology overview (Exhibit E (DK_IG_0030404)), a Cantor Mobile User Guide (Exhibit D (DK_IG_0030358)), Cantor Mobile Website pages describing the supported devices and their specifications (Exhibit AB (DK_IG_0036162); Exhibit AL (DK_IG_0036206)), and mobile device user manuals (Exhibit W (DK_IG_0035098); Exhibit X (DK_IG_0035186); Exhibit Y (DK_IG_0035344)). The Cantor Mobile Device and system included back-end servers hosted in eSpeed’s hosting environment.

373. The Cantor Mobile Device disclosed, suggested, or taught, alone or in combination with the art of record relied upon by the Examiner, each of the limitations of Claims 1, 10, and 19.

374. First, the Cantor Mobile Device included an application executable on a smartphone. The Cantor Mobile Demo walked users through the features of the Cantor Mobile application. Exhibit O (DK_IG_0031024). Cantor Mobile stated that its software was designed for

the Microsoft Pocket PC Phone Edition operating system and should work on any mobile-phone-enabled PDA running that operating system with a valid GPRS-enabled SIM card. Exhibit AB (DK_IG_0036162). Cantor Mobile described these devices as an integrated personal digital organizer and mobile phone. Exhibit AC (DK_IG_0036163); Exhibit AD (DK_IG_0036165); Exhibit AG (DK_IG_0036190).

375. Second, on information and belief, the Cantor Mobile Device used a multi-level location determination hierarchy. In 2003, mobile wagering operators had to determine whether a mobile bettor was in a jurisdiction where betting was legal, and did so using GPS components built into mobile phones or by matching the country code in the user's phone number. *See, e.g.*, Exhibit BE (Europe Bets on Mobile Gambling, Las Vegas Sun (Apr. 14, 2003)), at 2; Exhibit G (DK_IG_0030418). On information and belief, the Cantor Mobile Device was location-restricted, determined when GPS data could not establish the handset's location, and in that case relied on network-based information, such as the phone number or network country code, or treated the device as outside a permitted jurisdiction.

376. Third, on information and belief, the Cantor Mobile Device provided location information to one or more server computers. The Cantor Mobile application communicated with the Cantor Mobile servers over the GPRS network, and servers performed permissions, security, and session management. Exhibit E (DK_IG_0030404). On information and belief, the Cantor Mobile application sent servers GPS, phone-number, or network information indicating the device location, and the servers used that information to enforce country-based restrictions on wagering.

377. Fourth, on information and belief, the Cantor Mobile Device received, from one or more server computers, an indication that the handset was in a location where gambling is allowed based on that location information. In 2003, mobile wagering was legal only in certain

jurisdictions: mobile phones could be used to bet on sporting events in the Netherlands, Sweden, Germany, Britain, and Austria, while interactive betting was illegal in the United States. *See, e.g.*, Exhibit (BE) (Europe Bets on Mobile Gambling, Las Vegas Sun (Apr. 14, 2003)) at 2. Mobile betting in Europe was offered through regulated, jurisdiction-specific channels. *See, e.g.*, Exhibit BF (Nicolae Sfetcu, Gaming Guide – Gambling in Europe 788 (2018)); Exhibit AE (DK_IG_0036182) (the Cantor Mobile Device became available in the US in 2005). On information and belief, wagering through the Cantor Mobile application was restricted to permitted jurisdictions; the servers determined from the device's location information whether it was in such a jurisdiction and then sent the application an indication that enabled or disabled wagering.

378. Had the functionality of the Cantor Mobile Device been disclosed to the Examiner during prosecution of the '404 Patent, at least Claims 1, 10, and 19 would have been obvious under pre-AIA 35 U.S.C. § 103 in view of the Cantor Mobile Device, the art of record relied upon by the Examiner, and the knowledge of a person of ordinary skill in the art.

379. But for the failure of Applicants to disclose material Cantor Mobile Device features, the USPTO would not have allowed Claims 1, 10, or 19 of the '404 Patent.

380. The Cantor Mobile Device features for allowing or restricting mobile wagering based on determined location are not cumulative to any prior art before the USPTO because they disclose the very limitations that the Examiner found to be missing from the art of record during prosecution.

381. On information and belief, Mr. Williams specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

382. On information and belief, Mr. Minisini specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

383. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

384. On information and belief, Mr. Williams was motivated to deceive the USPTO to secure allowance of the ’404 Patent claims.

385. On information and belief, Mr. Minisini was motivated to deceive the USPTO to secure allowance of the ’404 Patent claims.

386. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’404 Patent claims.

387. On information and belief, Mr. Williams knew that the ’404 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’404 Patent from issuing.

388. On information and belief, Mr. Minisini knew that the ’404 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’404 Patent from issuing.

389. On information and belief, Ms. Egorova knew that the ’404 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’404 Patent from issuing.

390. The inequitable conduct in procuring the ’404 Patent has an immediate and necessary relation to the enforcement of the ’404 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims

of the ’404 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’404 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’404 Patent against DraftKings.

### 4. Inequitable Conduct Based on the eDeck Device

#### a. The eDeck Was Material to Patentability of the ’404 Patent

391. The eDeck, its features, function, and related documentation were material to patentability of at least Claims 1, 10, and 19 of the ’404 Patent.

392. The eDeck was a handheld mobile wagering device. Exhibit M (DK_IG_0030848). It included a display screen with a user interface, which gave the user the opportunity to place wagers. Exhibit M (DK_IG_0030848). The eDeck was offered under Nevada regulations that required user, device, and location authorization before a user was allowed to place a wager. Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455); Exhibit C (DK_IG_0030141).

393. Cantor Gaming created reports describing the function and operation of the eDeck while the eDeck was being developed, publicly demonstrated, and commercially offered. [redacted]

[redacted] Cantor Gaming publicly described the eDeck on its website no later than March 15, 2008. Cantor Gaming, Mobile Gaming (Mar. 15, 2008), https://web.archive.org/web/20080315175331/http://www.cantorgaming.com/mobilegaming.asp, at 1–2. The eDeck Tutorial accurately describes the features and operation of the eDeck as Cantor Gaming itself presented them to the public. Exhibit BC (DK_IG_0030572). On information and belief, the eDeck publicly demonstrated, field tested, and offered before February 28, 2012 operated as these materials describe.

394. The eDeck disclosed, suggested, or taught, alone or in combination with the art of record relied upon by the Examiner, each of the limitations of Claims 1, 10, and 19.

395. First, the eDeck included an application executable on a smartphone. [redacted]

[redacted] Cantor Gaming told the public that using the eDeck was as simple as using a cell phone or an iPhone. Exhibit BC (DK_IG_0030572).

396. Second, the eDeck used a multi-level location determination hierarchy. [redacted]

397. Third, the eDeck provided information indicative of the device's location to one or more server computers. [redacted]

398. Fourth, the eDeck received, from the one or more server computers, an indication that the device was in a location where gambling is allowed based on that location information. The eDeck operated in Nevada under Nevada mobile gaming regulations. Exhibit C (DK_IG_0030141). [redacted] Cantor Gaming told the public that the eDeck worked only in approved mobile gaming areas and that it would notify the user with a screen prompt if the user moved outside those areas. Exhibit BC (DK_IG_0030572). Mr. Amaitis confirmed this operation before the NGCB, testifying that Cantor Gaming tested signal bleed and that the device shut off. Exhibit K (DK_IG_0030537).

399. But for the failure of Applicants to disclose material eDeck features, the USPTO would not have allowed Claims 1, 10, or 19 of the ’404 Patent.

400. The eDeck device features for allowing or restricting mobile wagering based on determined location are not cumulative to any prior art before the USPTO because they disclose the very limitations that the Examiner found to be missing from the art of record during prosecution.

401. On information and belief, Mr. Minisini specifically intended to conceal the withheld material features of the eDeck from the USPTO.

402. On information and belief, Mr. Williams specifically intended to conceal the withheld material features of the eDeck from the USPTO.

403. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the eDeck from the USPTO.

404. On information and belief, Mr. Minisini was motivated to deceive the USPTO to secure allowance of the ’404 Patent claims.

405. On information and belief, Mr. Williams was motivated to deceive the USPTO to secure allowance of the ’404 Patent claims.

406. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’404 Patent claims.

407. On information and belief, Mr. Minisini knew that the ’404 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’404 Patent from issuing.

408. On information and belief, Mr. Williams knew that the ’404 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’404 Patent from issuing.

409. On information and belief, Ms. Egorova knew that the ’404 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’404 Patent from issuing.

410. The inequitable conduct in procuring the ’404 Patent has an immediate and necessary relation to the enforcement of the ’404 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the ’404 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’404 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’404 Patent against DraftKings.

**E. The ’518 Patent**

411. The ’518 Patent is unenforceable due to material omissions to the USPTO during prosecution of the ’518 Patent.

412. On May 1, 2024, IG filed U.S. Patent Application No. 18/652,755, which issued as the ’518 Patent on August 26, 2025. The ’518 Patent names Geoffrey M. Gelman, Ronald Rushin, Dean P. Alderucci, and Joseph M. Asher as inventors and is assigned to IG. IG’s Chief Technology and IP Counsel—Olga Egorova—was involved in prosecuting the ’518 Patent at the USPTO. *See* ’518 Patent File History, Power of Attorney dated June 3, 2024.

413. Here, the individuals who owe duties of candor and disclosure include at least: Mr. Alderucci, Mr. Asher, and Mr. Rushin, named inventors of the ’518 Patent, and prosecution counsel Ms. Egorova (collectively, “Applicants”), all of whom, on information and belief, were substantively involved in the preparation and prosecution of the ’518 Patent.

414. On information and belief, in light of their role in the preparation and prosecution of the ’518 Patent, Applicants were aware of the rules and procedures of the USPTO, including the duty of candor.

415. The Cantor Mobile Device was described in at least one printed publication available to the public at least by September 2003. *See, e.g.*, Exhibit BO (DK_IG_0042383); Exhibit O (DK_IG_0031024).

416. The Cantor Mobile Device was available and publicly demonstrated in the US throughout 2005 and the subject of a commercial offer for sale in 2006. Exhibit AE (DK_IG_0036182); Exhibit BD (DK_IG_0030578); Exhibit BB (DK_IG_0030568); Exhibit AM (DK_IG_0042537); Exhibit A (DK_IG_0029518); Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455). Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the Cantor Mobile Device in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660). The Cantor Mobile Device is therefore prior art to the '518 Patent under pre-AIA §§102(a)-(b).

417. The eDeck was described in at least one printed publication available to the public in the United States at least by March 2007. *See, e.g.*, Exhibit BQ (DK_IG_0042371).

418. The eDeck device was the subject of a commercial offer for sale in 2006, Exhibit BK (DK_IG_0042438); Exhibit BL (DK_IG_0042731) at 13-14, publicly demonstrated in 2007, Exhibit BM (DK_IG_0030489) at 2, and later field tested at the Venetian in 2008, Exhibit BN (DK_IG_0042797) at 14-15. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the eDeck in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660); Exhibit J (DK_IG_0030517) at 185:10–186:8. The eDeck device is therefore prior art to the '518 Patent under pre-AIA §§102(a).

419. In 2006, Cantor Gaming—IG's predecessor—published a [redacted] describes features and functionality of the Cantor Mobile and eDeck devices that are prior art to the '518 Patent under pre-AIA §§102(a) and (b).

#### 1. Individuals With Knowledge of Cantor Mobile Device and eDeck Features

420. On information and belief, Applicants were aware of the existence of the Cantor Mobile Device and eDeck, and functionality of those devices material to the '518 claims, during prosecution of the '518 Patent.

421. As named inventors of the '518 Patent, Mr. Ronald Rushin, Mr. Dean Alderucci, and Mr. Joseph Asher each owed the duty of candor and disclosure described above. Ms. Egorova likewise owed that duty because she was substantively involved in directing the preparation and prosecution of the application on IG's behalf.

##### a. Mr. Dean P. Alderucci

422. Mr. Alderucci was the Vice President and Assistant General Counsel of Cantor Fitzgerald Securities.

423. On May 6, 2009, Mr. Alderucci signed and submitted a "Statement of Use" with the USPTO, in relation to Trademark Application No. 77/977,363, for the mark "CANTOR GAMING." Exhibit L (DK_IG_0030838). The '363 Statement of Use states "Applicant … is now

---

[3] The features described in WGS documentation, [redacted] built on the legacy of the Cantor Mobile Device. *E.g.*, Exhibit BB (DK_IG_0030568) ("I actually came to Nevada and presented a way to have intrastate online gaming … [a]nd it was based on the technology that we had been spending quite a bit of time and effort in wireless delivery of financial services info.") Those same features were included in the later released eDeck, and also describe certain aspects of its functionality.

using [the mark] in commerce on or in connection with the following goods/services …: mobile gambling and gaming services" and "[w]agering services … offered via mobile telecommunications devices." Exhibit L (DK_IG_0030838). The Statement of Use states that CANTOR GAMING was first used on those goods/services "at least as early as July 22, 2005 and in commerce at least as early as September 29, 2005."

424. Specimens submitted with the '363 Statement of Use state that "Cantor provides a complete end-to-end mobile gaming solution" and that "in May 2006," Cantor Gaming reached an agreement "for the provision of mobile gaming services to the Venetian Resort Hotel Casino and the Palazzo Resort Hotel Casino."

425. On May 6, 2009, Mr. Alderucci signed and on May 11, 2009 he submitted a "Statement of Use" with the USPTO, in relation to Trademark Application No. 77/095,018, for the mark "CANTOR GAMING." Exhibit M (DK_IG_0030848). The '018 Statement of Use states "Applicant … is now using [the mark] in commerce on or in connection with the following goods/services …: mobile gambling and gaming services" and "[w]agering services … offered via mobile telecommunications devices." Exhibit M (DK_IG_0030848). The Statement of Use states that CANTOR GAMING was first used on those goods/services "at least as early as July 22, 2005 and in commerce at least as early as September 29, 2005."

426. Specimens submitted with the '018 Statement of Use state that "Cantor provides a complete end-to-end mobile gaming solution" and that on "30 June, 2008," Cantor Gaming "introduced mobile Gaming to Nevada via its unique, wireless hand-held gaming device: eDeck™." Exhibit M (DK_IG_0030848). Specimens also state that "eDeck can be played in the High Limit Slot Salon at the Venetian Resort Hotel Casino in Las Vegas," and includes a photograph of the eDeck hand-held gaming device. Exhibit M (DK_IG_0030848).

427. Therefore, Mr. Alderucci was aware of the Cantor Mobile Device and system and the eDeck device and system, and their use for mobile gambling and wagering services, during prosecution of the ’518 Patent. Despite his knowledge of these preexisting functionalities and their materiality to the ’518 Patent claims, Mr. Alderucci declined to disclose them to the USPTO during prosecution of the ’518 Patent. On information and belief, Mr. Alderucci did so with the specific intent of improving the likelihood of the issuance of the claims of the ’518 Patent. The single most reasonable inference that can be drawn from Mr. Alderucci’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**b. Mr. Joseph M. Asher**

428. Mr. Asher was the Managing Director and Vice President of Cantor Gaming, Cantor G&W (Nevada), LLC, Cantor G&W (Nevada), L.P., and Cantor G&W (Nevada) Holdings, L.P. from approximately 2004 through 2007.

429. On April 8, 2005, Mr. Asher attended the meeting of the Nevada Assembly Committee on Judiciary and testified:

> What brings me here today is the mobile gaming bill that Mr. Faiss spoke of.
>
> ...
>
> Cantor has long been committed to developing and utilizing cutting edge technology. The company has invested approximately $400 million to date in technology and was the first to offer its customers fully-interactive electronic bond trading.
>
> …
>
> In 2000 we obtained a bookmaker’s permit and subsequently opened a book-making business in the United Kingdom, operating under the name Cantor Index. Cantor Index offers betting on everything from stocks to soccer games, all of which is, of course, legal in the U.K., and indeed we are regulated in that business by the Financial Services Authority, which is the equivalent in the U.K. of the S.E.C. [Securities and Exchange Commission]. We are great believers in mobile technology, just as electronic trading on computer screens has largely replaced voice brokerage in many parts of the stock and government bond businesses.

> Trading on mobile devices reduces the need for people to sit chained to their desks.
>
> In September 2003, Cantor Index rolled out the first real-time mobile trading device anywhere in the world. We call it Cantor Mobile and it now represents a significant percentage of all of Cantor Index's trading. Indeed, we believe we have more experience than anyone else in providing wagering on mobile devices. Having successfully deployed mobile trading technology, we are aggressively seeking to expand the areas in which we offer it. That is what brings me before you today.

Exhibit V (DK_IG_0031945).

430. On July 2, 2005, the Sarasota Herald Tribune newspaper printed an article by author Fox Butterfield of the New York Times featuring Mr. Asher; the article is entitled "Vegas Betting on Wireless Gambling Devices." Exhibit AZ (DK_IG_0042379).

431. The July 2, 2005 Sarasota Herald Tribune article includes the following image of Mr. Asher:



THE NEW YORK TIMES / JOHN GURZINSKI

Joseph M. Asher, managing director of Cantor G&W (Nevada) LP, holds a mobile gaming device in Las Vegas on Friday. A new state law lets gamblers play using hand-held wireless devices from public spaces in casinos.

Exhibit AZ (DK_IG_0042379).

432. In the image in the preceding paragraph, Mr. Asher is holding a mobile gaming device in the United States as of at least July 2, 2005.

433. Mr. Asher was in possession of a Cantor Mobile Device as of at least July 2, 2005.

434. On August 2, 2005, an article written by Elizabeth White and published by the Marysville Journal Tribune Newspaper stated:

> Cantor Fitzgerald's prototype device isn't much bigger than a checkbook and can slip easily into a coat pocket, and is already used in Britain for sports betting.
>
> Falcone doesn't expect the devices to account for any serious revenues or be a significant driver of growth. And besides, state regulators won't approve them until they're convinced they can be effectively monitored.
>
> Cantor Fitzgerald says that won't be a problem.
>
> Its wireless device uses a form of encryption to ensure security, said Joe Asher, managing director of Cantor G&W.

Exhibit BA (DK_IG_0042455). The article illustrates Mr. Asher holding a mobile gambling device:




**Joseph Asher, Managing Director of Cantor G&W holds an HP PDA with a slot machine program, one of many gambling programs available June 23 in New York City. Nevada became the first state to approve the use of wireless, handheld gambling devices at its hotel-casinos.**

Exhibit BA (DK_IG_0042455).

435. In the image in the preceding paragraph, Mr. Asher is holding a mobile gaming device in the United States as of at least June 23, 2005.

436. Mr. Asher was in possession of a Cantor Mobile Device as of at least June 23, 2005.

437. In September 2006, Mr. Asher published an article in the Gaming Law Section of the State Bar of Nevada entitled "Mobile Gaming Comes to Nevada." Exhibit C (DK_IG_0030141). The article states that Cantor Gaming was "the holder of the first licenses to manufacture, distribute and operate mobile gaming systems" in Nevada. Exhibit C (DK_IG_0030141). The article states that Cantor Gaming had "reached an agreement" to provide "mobile gaming services" to the "Las Vegas Sands Corporation" and is "excited about mobile

gaming and look[s] forward to launching our product in the coming months." Exhibit C (DK_IG_0030141). Mr. Asher's article also summarized the regulations, for which he had lobbied, as "prohibit[ing] use of mobile gaming devices in hotel rooms, parking lots, parking garages" and only allowing game play "on the premises of resort casinos" and "in permitted areas." Exhibit C (DK_IG_0030141).

438. Accordingly, Mr. Asher was aware of the Cantor Mobile Device and system and eDeck device and system, their use for mobile gambling and wagering, and their restriction of gambling to lawful areas, during the prosecution of the '518 Patent. Despite his knowledge of these preexisting functionalities and their materiality to the '518 Patent claims, Mr. Asher declined to disclose them to the USPTO during prosecution of the '518 Patent. On information and belief, Mr. Asher did so with the specific intent of improving the likelihood of the issuance of the claims of the '518 Patent. The single most reasonable inference that can be drawn from Mr. Asher's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**c. Mr. Ronald Rushin**

439. Mr. Rushin was the Chief Technology Officer of Cantor Gaming from approximately 2007 to 2008.

440. Mr. Rushin had direct technical and operational knowledge of the Cantor Mobile Device and its security features. Mr. Rushin was aware, at least through his involvement in the research and development of the Cantor Mobile Device, of its features, functions, and documentation before the earliest priority date of the '518 Patent.

441. Mr. Rushin drafted, [redacted]

442. Accordingly, Mr. Rushin was aware of the Cantor Mobile Device and system, its use for mobile gambling and wagering, and its restriction of gambling to lawful areas, during prosecution of the ’518 Patent. Despite his knowledge of these preexisting functionalities and their materiality to the ’518 Patent claims, Mr. Rushin declined to disclose them to the USPTO during prosecution of the ’518 Patent. On information and belief, Mr. Rushin did so with the specific intent of improving the likelihood of the issuance of the claims of the ’518 Patent. The single most reasonable inference that can be drawn from Mr. Rushin’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**d. Ms. Olga Egorova**

443. As Chief Technology and IP Counsel and Head of Patents at Cantor Fitzgerald, Ms. Olga Egorova was involved in the prosecution of the application for the ’518 Patent. Ms. Egorova signed the Power of Attorney for the patent applicant in U.S. Patent Application No. 18/652,755, which ultimately issued as the ’518 Patent. Not only that, but she was also Vice President and Assistant General Counsel of Cantor Gaming during the eDeck’s commercialization and was personally involved in filing for trademark protection for the eDeck device. *See, e.g.*, Exhibit R (DK_IG_0031751); Exhibit S (DK_IG_0031789).

444. On June 3, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 77/092,087 for the “EDECK” mark to the USPTO, representing that the mark had been “use[d] ***in commerce***” since at least April 30, 2008 in connection with “mobile and wireless gaming and gambling machines,” “computer gaming and gambling hardware,” and other “wireless telecommunications devices.” Exhibit R (DK_IG_0031751) at 5 (emphasis added); *see also* Exhibit S (DK_IG_0031789) at 5-6 (U.S. Trademark Application No. 77/593,896). Ms. Egorova’s submission included photographs of the eDeck device (Exhibit R (DK_IG_0031751) at

8-9) and an "eDeck Wireless Gaming" brochure (*id.* at 10-12) expressly representing that Cantor Gaming was "the first company licensed by the Nevada Gaming Commission to manufacture, distribute and operate a mobile gaming system in the state" (*id.* at 10). The eDeck Wireless Gaming brochure also describes the device's use for casino games and sports wagers in authorized areas, as well as its availability at the Venetian, M Resort, and Palazzo. *Id.* at 11. This confirms the public nature of the use of the eDeck product and its qualification as prior art to the '518 Patent under 35 U.S.C. § 102. It also confirms that Ms. Egorova knew that Cantor Gaming had developed and commercialized the eDeck device and that its operation was subject to Nevada's licensing requirements and gaming regulations (*id.* at 10), including Nevada's technical standards for control program authentication and verification, and associated device security features, as discussed above (*see* Exhibit Q (DK_IG_0031160)).

445. In addition, the brochure included in Ms. Egorova's 2011 trademark submission further described the eDeck as "a unique mobile device developed by Cantor" that allows patrons to "play casino games" and "place sports wagers" from "a secure account" on the device when in "authorized areas." Exhibit R (DK_IG_0031751) at 11. Therefore, on information and belief, Ms. Egorova knew that the eDeck device had mechanisms for security and authorization.

446. On January 25, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 85/225,931 for the "Cantor" mark to the USPTO, representing that the mark had been "use[d] ***in commerce***" since at least May 1, 2009 in connection with "mobile and wireless gambling machines" and "computer hardware and software for wireless gambling"; and since at least September 29, 2005 in connection with "providing telecommunication channels for mobile gambling and gaming services[.]" Exhibit BP (DK_IG_0030735) at 1-3, 5-6. Ms. Egorova's submission included a photograph of the eDeck (*id.* at 9), the "eDeck Wireless Gaming"

brochure (*id.* at 11-13), and a "Cantor Gaming Proprietary Technology" brochure (*id.* at 14). The "Cantor Gaming Proprietary Technology" brochure states, "Cantor Gaming has developed a proprietary end-to-end mobile gaming solution[,]" the "[t]echnology is based on Cantor Fitzgerald's highly secure financial trading platform[,]" the system uses an 802.11 private wireless network to connect the mobile devices to servers, the network is protected with several layers of encryption, and the "system contains integrated location tracking and fencing capabilities, including a positioning engine to determine player location and a visibility platform server to define and monitor permissible gaming zones[,]" and the system uses "[u]nique access methods and identification procedures" to validate gamblers as required by Nevada regulations. *Id.* at 14. Accordingly, on information and belief, Ms. Egorova knew that the eDeck device had features and functionality for location determination and restricting wagering.

447. Thus, well before her involvement in prosecuting the '518 Patent, Ms. Egorova knew that Cantor Gaming had commercialized a mobile gaming device in the same field as the claimed invention. On information and belief, Ms. Egorova also knew of wireless gaming systems leading to the eDeck that were publicly available and on-sale before the priority date of the '518 Patent, including the Cantor Mobile Device. Nevertheless, Ms. Egorova withheld information about the eDeck, its features, functionality, development, and documentation. Ms. Egorova also withheld information about the features, functionality, development, and documentation of wireless gaming systems leading to the eDeck that were publicly available and on-sale before the priority date of the '518 Patent, including the Cantor Mobile Device, from submission to the USPTO. The single most reasonable inference that can be drawn from Ms. Egorova's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

***

448. On information and belief, Applicants—specifically Mr. Alderucci, Mr. Asher, Mr. Rushin, and Ms. Egorova—violated 37 C.F.R. § 1.56 by deliberately withholding material features of the Cantor Mobile Device and eDeck Device from the USPTO during prosecution of the ’518 Patent with the specific intent to deceive the Examiner into allowing claims that would not have issued but for the nondisclosure.

**2. Prosecution of the ’518 Patent**

449. During prosecution of the ’518 Patent, the Examiner issued an Office Action on July 5, 2024 rejecting original Claim 1 over the prior art of record. In a response dated September 16, 2024, Applicant amended Claim 1 to recite, where the underlined text was added by that amendment:

> 1. A system, comprising:
>
> a mobile phone configured to:
>
> …
>
> detect a radio frequency (RF) signal from another mobile phone in the defined geographical area via at least one of a Bluetooth-based connection or a Wi-Fi-based connection between the mobile phone and the other mobile phone;
>
> …
>
> determine a name of a user associated with the other mobile phone based on the RF signal in response to detecting that the other mobile phone in the defined geographical area is located nearby the mobile phone, wherein, to determine the name of the user, the mobile phone is configured to:
>
> match a pattern associated with the RF signal to a plurality of signal patterns maintained in a table stored on the mobile phone, wherein the table associates different names with different signal patterns; and
>
> based on a match of the pattern to one of the plurality of signal patterns, obtain, from the table, the name of the user associated with the matched pattern; and
>
> cause the name of the user to be displayed via the mobile phone.

The Examiner then issued a Notice of Allowance ("NOA") on September 27, 2024, allowing what issued as claims 1-17 because, according to the Examiner, the "amendments and arguments to the independent claims 1, 11, 22, and 26 … are considered persuasive."

450. Accordingly, the Examiner found Claim 1 (and its dependents) allowable based on the inclusion of claim elements directed to looking up and displaying a name of a user on a mobile phone in response to detecting a Bluetooth or Wifi signal.

451. The Examiner's July 5, 2024 Office Action also rejected original claims 22 and 26 over the prior art of record. In a response dated September 16, 2024, Applicant amended then-pending claims 22 and 26 to recite "a mobile phone" detecting "Bluetooth-based signals from one or more beacons" and argued "what is noticeably missing in [prior art reference] Carter is any disclosure that a Bluetooth-based signal is detected from one or more beacons." The Examiner's September 27, 2024 NOA, as noted above, also found Applicant's amendments and arguments persuasive as to then-pending claims 22 and 26, which issued as independent claims 18 and 22.

452. Accordingly, the Examiner found Claim 18 (and its dependents) allowable based on the inclusion of claim elements directed to a mobile phone detecting a Bluetooth-based signal from one or more beacons.

### 3. Inequitable Conduct Based on the Cantor Mobile Device

#### a. The Cantor Mobile Device Was Material to Patentability of the ’518 Patent

453. The Cantor Mobile Device, its features, functionality, and related documentation were material to patentability of at least Claim 1 of the ’518 Patent. The Cantor Mobile Device was offered on various mobile phones having betting functionality. *E.g.*, Exhibit G (DK_IG_0030418); Exhibit AA (DK_IG_0036142) (noting use of "Cantor Mobile" for "gambling and spread betting"). The Cantor Mobile Device operated on several phone models, including the

O2 XDA, O2 XDA II, O2 XDA IIs, O2 XDA IIi, and i-mate JAM. *E.g.*, Exhibit AF (DK_IG_0036188); Exhibit AJ (DK_IG_0036200); Exhibit AK (DK_IG_0036203). Relevant mobile phones supported Wifi and Bluetooth. Exhibit AJ (DK_IG_0036200); Exhibit AK (DK_IG_0036203); Exhibit AG (DK_IG_0036190). The Cantor Mobile Device, as operating on relevant mobile phones, contained records of contacts and provided mechanisms for organizing, retrieving, and displaying contact information. *E.g.*, Exhibit X (DK_IG_0035186) (maintaining and displaying "contacts information" including "detailed records" with name, phone number, email, and SIM information); Exhibit Z (DK_IG_0035587); Exhibit W (DK_IG_0035098); Exhibit Y (DK_IG_0035344); Exhibit AL (DK_IG_0036206). As an example, XDA IIi Pocket PC—one of several phone models on which the Cantor Mobile Device operated—allowed the user to configure various settings related to organizing and displaying contact information, including to "show contact user name." *E.g.*, Exhibit Y (DK_IG_0035344), § 7.2 . The Cantor Mobile Device also provided Bluetooth discovery and connection features, allowing a mobile phone to detect, identify, connect to, and exchange information with nearby Bluetooth phones and devices. *E.g.*, Exhibit AK (DK_IG_0036203); Exhibit Z (DK_IG_0035587) at 8-9 (documenting "discoverable" Bluetooth modes in which "[o]ther Bluetooth devices can now detect your device"); Exhibit W (DK_IG_0035098) at 2 (providing "Bluetooth personal area network"); Exhibit Y (DK_IG_0035344), § 6.7 (providing various Bluetooth features, including discoverability, pairing, personal area networks, and Bluetooth profiles).

454. Applicants' addition of looking up and displaying a name of a user on a mobile phone in response to detecting a Bluetooth or Wifi signal led to Claim 1's allowance.

455. The Cantor Mobile Device features described in this section are material to patentability of Claim 1, and in particular, the claim elements directed to looking up and displaying a name of a user on a mobile phone in response to detecting a Bluetooth or Wifi signal.

456. The Cantor Mobile Device detected RF signals from other mobile phones in the Bluetooth discovery and connection process. The Cantor Mobile Device also stored contact information for other mobile phones, including phone number and name, and displayed contact names in various operations.

457. It would have been obvious, in view of the Cantor Mobile Device features, to lookup and display the name of a contact in response to detecting another Bluetooth phone. Had the functionality of the prior Cantor Mobile Device been disclosed to the Examiner during prosecution of the '518 Patent, at least independent Claim 1 would have been obvious under pre-AIA 35 U.S.C. § 103 in view of the prior Cantor Mobile Device system, the prior art of record, and the knowledge of a person of ordinary skill. The Cantor Mobile Device supplied both the Bluetooth-connection and contact-lookup-and-display features the Examiner found absent from the prior art of record. Implementing those features on then-conventional mobile phones would have preserved the phones' existing functions. Moreover, the Cantor Mobile Device's use for mobile wagering motivated its combination with the mobile-wagering prior art of record, as one of skill in the art would have found it obvious to implement Cantor Mobile Device features in prior art mobile wagering systems. The combination would have had predictable results, requiring only conventional modifications to mobile phone software.

458. The Cantor Mobile Device, its features, function, and related documentation are not cumulative to information already of record as to Claim 1. As explained above with respect to prosecution of the '518 Patent, the Examiner found the prior art of record insufficient to render

Claim 1 unpatentable in view of claim elements directed to looking up and displaying a name of a user on a mobile phone in response to detecting a Bluetooth or Wifi signal. Teachings concerning these features are found in the Cantor Mobile Device and its documentation. On information and belief, had the Examiner known the withheld functionality of the Cantor Mobile Device, at least Claim 1 would not have issued in its present form.

459. The Cantor Mobile Device, its features, function, and related documentation are material to patentability of at least claims 18 and 22 and in particular, the claim element—a mobile phone detecting Bluetooth-based signals from one or more beacons—that led to allowance of claims 18 and 22. As explained above for Claim 1, the Cantor Mobile Device operated on various mobile phones. Exhibit AF (DK_IG_0036188); Exhibit AJ (DK_IG_0036200); Exhibit AK (DK_IG_0036203); Exhibit AG (DK_IG_0036190). The Cantor Mobile Device also supported Bluetooth discovery, pairing, and personal area networks. Exhibit X (DK_IG_0035186); Exhibit Z (DK_IG_0035587); Exhibit W (DK_IG_0035098); Exhibit Y (DK_IG_0035344); Exhibit AL (DK_IG_0036206).

460. The Cantor Mobile Device thus disclosed and rendered obvious a mobile phone detecting Bluetooth-based signals from one or more beacons.

461. Applicants' addition of a mobile phone detecting Bluetooth-based signals from one or more beacons led to the allowance of Claim 18 and Claim 22.

462. Moreover, the Cantor Mobile Device incorporated wireless technology for determining phone location in support of lawful mobile wagering. Cantor proposed and publicly demonstrated the use of "mobile gaming device[s]" for gambling in the U.S. throughout 2005. *E.g.*, Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455); Exhibit V (DK_IG_0031945). Cantor also lobbied Nevada lawmakers in the early 2000s to pass regulations

that permitted mobile wagering, but restricted its lawful location. *See* Exhibit C (DK_IG_0030141). Cantor continued to develop the Cantor Mobile Device in the 2005-2007 timeframe, adding location-determination features for use in Nevada. *See, e.g.*, Exhibit C (DK_IG_0030141) (noting users "could play games in permitted areas"); Exhibit BB (DK_IG_0030568) (describing proposal for "intrastate online gaming" and stating that "2005 mobile gaming bill … allowed people to be able to gamble on handheld devices in the confines of a resort"). Cantor developed a [redacted]

463. Accordingly, it would have been obvious, from the Cantor Mobile Device's location-determination features, to determine whether the mobile phone is in a defined geographical area in which gambling is permitted, as in claims 18 and 22.

[4] This document records a release date of [redacted] It is evident from the other [redacted] cited herein that features described therein were developed before the '518 Patent priority date.

464. The Cantor Mobile Device features described in this section are material to patentability of claims 18 and 22, and in particular, the claim elements directed to a mobile phone detecting Bluetooth-based signals from one or more beacons and to determining whether the mobile phone is in a defined geographical area in which gambling is permitted.

465. Had the functionality of the prior Cantor Mobile Device been disclosed to the Examiner during prosecution of the '518 Patent, at least independent claims 18 and 22 would have been obvious under pre-AIA 35 U.S.C. § 103 in view of the prior Cantor Mobile Device system, the prior art of record, and the knowledge of a person of ordinary skill. The Cantor Mobile Device supplied a mobile phone that detects a Bluetooth signal from one or more beacons, the element the Examiner found absent from the prior art of record. Implementing that feature on then-conventional mobile phones would have preserved the phones' existing functions, and detecting a Bluetooth signal from one or more beacons would have been recognized as an available location-determination technique in light of the prior art and the operation of the Cantor Mobile Device itself. Moreover, the Cantor Mobile Device's use for mobile wagering motivated its combination with the mobile-wagering prior art of record, as one of skill in the art would have found it obvious to implement Cantor Mobile Device features in prior art mobile wagering systems. This is particularly so in view of Nevada's regulations, which restricted wagering to lawful jurisdictions, and Cantor's addition of location-determination features to the Cantor Mobile Device to comply with the law. The combination would also have had predictable results, requiring only conventional modifications to mobile phone hardware or software to detect Bluetooth signals.

466. The Cantor Mobile Device, its features, function, and related documentation are not cumulative to information already of record as to claims 18 and 22. As explained above with respect to prosecution of the application for the '518 Patent, the Examiner found the prior art of

record insufficient to render claims 18 and 22 unpatentable in view of claim elements directed to a mobile phone detecting a Bluetooth-based signal from one or more beacons. Additional teachings concerning these features are found in the Cantor Mobile Device and its documentation. Had the Examiner known the withheld functionality of the Cantor Mobile Device, at least claims 18 and 22 would not have issued in their present form.

467. Applicants' *de minimis* disclosures related to the Cantor Mobile Device during the prosecution of the '518 Patent were insufficient. In an IDS submitted June 18, 2024, Applicant identified a "Final Notice to Cantor Index Limited from the Financial Services Authority, December 30, 2004" addressing promotions of "Xda" phones. That IDS also identified press releases and articles describing Cantor's commercial activities: "Cantor Fitzgerald Launches Cantor Casino and Cantor Gaming"; "O2 and Cantor Index bring gambling to PDAs"; and "O2 XDA II Coming November." Although these disclosures indicate the existence and public availability of the Cantor Mobile Device, and describe Cantor's activities in the UK, none of these disclosures inform the Examiner of Cantor Mobile Device features, functionality, or documentation material to the claims, including those described above. These disclosures during prosecution confirm the materiality of the Cantor Mobile Device, its features, functions, and documentation, to patentability of claims 1, 18, and 22. They also confirm Applicants' knowledge of the Cantor Mobile Device during the relevant period.

468. But for the failure of Applicants to disclose material Cantor Mobile Device features, the USPTO would not have allowed Claim 1 of the '518 Patent.

469. But for the failure of Applicants to disclose material Cantor Mobile Device features, the USPTO would not have allowed claims 18 and 22 of the '518 Patent.

470. The Cantor Mobile Device features described in this section are not cumulative to any prior art before the USPTO because they disclose the very limitations that the Examiner found to be missing from the art of record during prosecution.

471. On information and belief, Mr. Alderucci specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

472. On information and belief, Mr. Asher specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

473. On information and belief, Mr. Rushin specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

474. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

475. On information and belief, Mr. Alderucci was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

476. On information and belief, Mr. Asher was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

477. On information and belief, Mr. Rushin was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

478. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

479. On information and belief, Mr. Alderucci knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

480. On information and belief, Mr. Asher knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

481. On information and belief, Mr. Rushin knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

482. On information and belief, Ms. Egorova knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

483. The inequitable conduct in procuring the ’518 Patent has an immediate and necessary relation to the enforcement of the ’518 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the ’518 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’518 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’518 Patent against DraftKings.

### 4. Inequitable Conduct Based on the eDeck Device

#### a. The eDeck Was Material to Patentability of the ’518 Patent

484. On information and belief, the device features and functionality described above with respect to the Cantor Mobile Device (*supra* § E.3) were also incorporated into the eDeck device. Components of the eDeck, including hardware, software, algorithms, and server

connectivity, were taken from the Cantor Mobile Device. Exhibit AO (DK_IG_0043150). On information and belief, the components used in the eDeck from the Cantor Mobile Device would have included location determination and restriction. Accordingly, the eDeck device, its features, functionality, and related documentation were material to patentability of at least claims 1, 18, and 22 of the ’518 Patent for the same reasons as the Cantor Mobile Device.

485. On information and belief, Mr. Alderucci, Mr. Asher, and Ms. Egorova knew of features and functionality of the eDeck that were publicly available and on-sale before the priority date of the ’518 Patent. This includes the eDeck features material to claims 1, 18, and 22: Bluetooth and contact-lookup-and-display features; a mobile phone detecting Bluetooth signals from one or more beacons; and location-determination features. Nevertheless, Mr. Alderucci, Mr. Asher, and Ms. Egorova withheld information about the eDeck, its features, functionality, development, and documentation. The single most reasonable inference that can be drawn from Mr. Alderucci, Mr. Asher, and Ms. Egorova’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

486. On information and belief, Mr. Alderucci specifically intended to conceal the withheld material features of the eDeck from the USPTO.

487. On information and belief, Mr. Asher specifically intended to conceal the withheld material features of the eDeck from the USPTO.

488. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the eDeck device from the USPTO.

489. On information and belief, Mr. Alderucci was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

490. On information and belief, Mr. Asher was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

491. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’518 Patent claims.

492. On information and belief, Mr. Alderucci knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

493. On information and belief, Mr. Asher knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

494. On information and belief, Ms. Egorova knew that the ’518 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’518 Patent from issuing.

495. The inequitable conduct in procuring the ’518 Patent has an immediate and necessary relation to the enforcement of the ’518 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the ’518 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’518 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’518 Patent against DraftKings.

**F. The ’284 Patent**

496. The ’284 Patent is unenforceable due to material omissions to the USPTO during the prosecution of the ’284 Patent.

497. On May 1, 2024, IG filed U.S. Patent Application No. 18/652,765 (“the ’765 Application”), which issued as the ’284 Patent on September 2, 2025. The ’284 Patent names Howard W. Lutnick, Kevin Burman, Dean P. Alderucci, Geoffrey M. Gelman, Antonio Papageorgiou, and Mark Miller as inventors and is assigned to IG. IG’s Chief Technology and IP Counsel—Olga Egorova—was involved in prosecuting the ’284 Patent at the USPTO. *See* ’284 Patent File History, Power of Attorney dated June 3, 2024.

498. Here, the individuals who owe duties of candor and disclosure include at least: Mr. Lutnick, Mr. Burman, Mr. Alderucci, Mr. Gelman, Mr. Papageorgiou, and Mr. Miller, named inventors of the ’284 Patent, and prosecution counsel Ms. Egorova (collectively, “Applicants”), all of whom, on information and belief, were substantively involved in the preparation and prosecution of the ’284 Patent.

499. On information and belief, in light of their role in the preparation and prosecution of the ’284 Patent, Applicants were aware of the rules and procedures of the USPTO, including the duty of candor.

500. The Cantor Mobile Device was described in at least one printed publication available to the public at least by September 2003. *See, e.g.*, Exhibit BO (DK_IG_0042383); Exhibit O (DK_IG_0031024).

501. The Cantor Mobile Device was available and publicly demonstrated in the US throughout 2005 and the subject of a commercial offer for sale in 2006. Exhibit AE (DK_IG_0036182); Exhibit BD (DK_IG_0030578); Exhibit BB (DK_IG_0030568); Exhibit AM

(DK_IG_0042537); Exhibit A (DK_IG_0029518); Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455).

502. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the Cantor Mobile Device in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660).

503. The Cantor Mobile Device is therefore prior art to the ’284 Patent under pre-AIA §§102(a)-(b).

504. The eDeck was described in at least one printed publication available to the public in the United States at least by March 2007. *See, e.g.*, Exhibit BQ (DK_IG_0042371).

505. The eDeck device was the subject of a commercial offer for sale in 2006, Exhibit BK (DK_IG_0042438); Exhibit BL (DK_IG_0042731) at 13-14, publicly demonstrated in 2007, Exhibit BM (DK_IG_0030489) at 2, and later field tested at the Venetian in 2008, Exhibit BN (DK_IG_0042797) at 14-15. Employees and other individuals associated with Cantor Gaming publicly testified about, displayed, and used the eDeck in a multi-year effort to amend laws and regulations in Nevada in the early 2000s. Exhibit BB (DK_IG_0030568); Exhibit B (DK_IG_0029660); Exhibit J (DK_IG_0030517) at 185:10–186:8. The eDeck device is therefore prior art to the ’284 Patent under pre-AIA §§102(a).

506. In 2006, Cantor Gaming—IG’s predecessor—published [redacted] describes features and functionality of the eDeck device that is prior art to the ’284 Patent under pre-AIA §§102(a)-(b).

### 1. Individuals With Knowledge of Cantor Mobile Device and eDeck Features

507. On information and belief, Applicants were aware of the existence of the Cantor Mobile Device and eDeck, and functionality of those devices material to the ’284 claims, during prosecution of the ’284 Patent.

508. As named inventors of the ’284 Patent, Mr. Lutnick and Mr. Alderucci each owed the duty of candor and disclosure described above. Ms. Egorova likewise owed that duty because she was substantively involved in directing the preparation and prosecution of the application on IG’s behalf.

#### a. Mr. Howard Lutnick

509. Howard Lutnick knew of the Cantor Mobile Device and the eDeck before the issuance of the ’284 Patent.

510. Mr. Lutnick knew that the Cantor Mobile Device and the eDeck were on sale or available to the public before the earliest priority date claimed by the ’284 Patent.

511. In 2003, Mr. Lutnick was the Chairman, President, and Chief Executive Officer of eSpeed, Inc. Cantor Index used eSpeed’s trading network for the Cantor Mobile Device, and the Cantor Mobile Website identified eSpeed as the hosting environment for the Cantor Mobile Device. On information and belief, as Chairman, President, and Chief Executive Officer of eSpeed, Mr. Lutnick knew that the Cantor Mobile Device used eSpeed’s trading network and infrastructure.

512. Mr. Lutnick acknowledged the existence and features of the Cantor Mobile Device in court pleadings. In *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, Civil Action No. 1:13-cv-01654-RA-HBP, (S.D.N.Y.) (“*Refco*”), the plaintiff’s Second Amended Complaint (“SAC”) alleged:

> In September 2003, years before the introduction of the first iPhone by Apple, CIL introduced a key new technology, “Cantor Mobile,” the first real-time mobile trading device in the world. Cantor Mobile, using a handheld PC called an “XDA,” gave mobile access to real time finance and sports news, charting,

> continuous streaming of live prices and instant trading, and allowed users of the handheld devices to wager on financial indices and sporting events with Spread Betting.

*Refco*, Dkt. No. 123, ¶ 62. Mr. Lutnick was a named defendant in *Refco*. And in defendants' Answer to the SAC in *Refco*, Mr. Lutnick admitted that the sentence, "Cantor Mobile, using a handheld PC called an 'XDA,' gave mobile access to real-time finance and sports news, continuous streaming of live prices and instant trading, and allowing users of the handheld device to wager on financial indices and sporting events with Spread Betting" provides a basic description of the Cantor Mobile XDA. *Id.*, Dkt. No. 169, ¶ 62.

513. Additionally, the plaintiff in *Refco* pled in the SAC:

> A November 1, 2010 article in Wired Magazine, entitled Wall Street Firm Uses Algorithms to Make Sports Betting Like Stock Trading, explains that Amaitis "presented his UK setup to the Nevada Gaming Control Board as evidence that the wireless component of his master plan was sound and secure. 'When we applied for our gaming license, Nevada tried cracking into our UK system a couple hundred times,' Amaitis says. 'They bounced in from IP addresses in the States and off of other IP addresses around the world. We always blocked them.'"

*Id.*, Dkt. No. 123, ¶ 110. The defendants' Answer to the SAC in *Refco* says, "Defendants refer to the Wired Magazine article referenced in this paragraph, which speaks for itself." *Id.*, Dkt. No. 169, ¶ 110.

514. As of at least June 14, 2018, Mr. Lutnick knew of the 2010 Wired Magazine article, and that therein, Mr. Amaitis said he "presented his UK setup to the Nevada Gaming Control Board."

515. Mr. Lutnick had knowledge of the Cantor Mobile Device, that it was a wireless gaming device, and that it was publicly known and used in the United States prior to the priority date for the '284 Patent.

516. On information and belief, Mr. Lutnick knew that Cantor Gaming and entities affiliated with Cantor Gaming were seeking to offer mobile wagering devices in the State of Nevada at least by March 23, 2005.

517. On March 23, 2005, Cantor G&W (Nevada), L.P. and three related entities—Cantor G&W (Nevada), LLC; Cantor G&W (Nevada) Holdings, L.P.; and Cantor G&W (Nevada) Holdings, LLC—each submitted an application for registration by holding company/intermediary company to the Nevada Gaming Control Board (the "2005 NGCB Applications"). The 2005 NGCB Applications list Mr. Lutnick as the Chairman and Chief Executive Officer, or the President and Chief Executive Officer, of each of those four entities.

518. Mr. Lutnick substantially controlled Cantor Gaming at least while Cantor Gaming applied for licensure as a manufacturer, distributor, and operator of a mobile gaming system and the eDeck in the State of Nevada. Through the corporate structure of the Cantor Nevada entities, Mr. Lutnick owned approximately 85.6% of Cantor Gaming.



519. On information and belief, Mr. Lutnick knew that Cantor Gaming and entities affiliated with Cantor Gaming were seeking to offer mobile wagering devices in the State of Nevada at least by May 2006.

520. In 2006, Mr. Lutnick appeared before the Nevada Gaming Commission to testify in support of his and Cantor Gaming's license to operate mobile wagering devices in the State of Nevada.

521. On November 30, 2007, Cantor Gaming applied for a nonrestricted gaming license to operate a race book and sports book concurrently with the operation of a mobile gaming system in Las Vegas, Nevada, and Mr. Lutnick was copied on the application.

522. On information and belief, at least through his ownership and executive roles, Mr. Lutnick knew that Cantor Gaming operated the race and sportsbook at the M Resort, including the eDeck by March of 2009.

523. A May 9, 2012 Bloomberg article by Seth Lubove states, "Lutnick says mobile gaming lets bettors take advantage of all that Las Vegas offers, with its restaurants overseen by celebrity chefs and extravagant stage shows. 'People can play and have fun and not have to sit at the green-felt table all day,' Lutnick says. 'It's going to change how much people get to bet because it will free them to play games while they're at dinner or a show.'"

524. In *Refco*, the plaintiff's SAC alleged:

> By February 2007, a Cantor Nevada mobile gaming system, including the eDeck portable gaming device ("eDeck"), was being tested at the Venetian. In April 2008, Cantor Nevada began mobile gaming field trials at the Venetian and the Palazzo
>
> On July 7, 2008, owners of the M Resort Spa Casino ("M Resort"), announced a deal by which Cantor Nevada would provide mobile gaming and operate a sports book when the resort opened in early 2009.
>
> On November 24, 2008, following extensive testing at the Venetian, Cantor Nevada announced that it had received approval from the Nevada Gaming

> Commission, on recommendation from the Gaming Control Board, to begin operating mobile gaming systems, and specifically eDeck, in Nevada.

*Refco*, Dkt. No. 123, ¶¶ 83-85.

525. The *Refco* defendants, in their Answer to the SAC, "admit[ted] that in April 2008, mobile gaming field trials began at the Venetian and the Palazzo[,]" *id.*, Dkt. No. 169, ¶ 83; "admit[ted] the allegations in Paragraph 84 of the SAC[,]" *id.*, ¶ 84; and "admit[ted] the allegations in Paragraph 85 of the SAC[,]" *id.*, ¶ 85. By way of the defendants' Answer to the SAC in *Refco*, Mr. Lutnick admitted the statements in paragraphs 83 through 85 of the *Refco* SAC.

526. As of at least June14, 2018 when the defendants in *Refco* filed their Answer to the SAC, Mr. Lutnick knew that the eDeck field trials began in April 2008 at the Venetian and the Palazzo.

527. As of at least June 14, 2018 when the defendants in *Refco* filed their Answer to the SAC, Mr. Lutnick knew that on July 7, 2008, owners of the M Resort announced a deal by which Cantor Gaming would provide mobile gaming and operate a sports book when the resort opened in early 2009.

528. As of at least June 14, 2018 when the defendants in *Refco* filed their Answer to the SAC, Mr. Lutnick knew that on November 24, 2008, following extensive testing at the Venetian, Cantor Gaming announced that it had received approval from the Nevada Gaming Commission, on recommendation from the Gaming Control Board, to begin operating mobile gaming systems, and specifically eDeck, in Nevada.

529. In *Refco*, Paragraph 109 of the plaintiff's SAC alleges, "On or about December 28, 2009, Amaitis admitted to the New York Times that eDeck's 'algorithms are variations of those created by a sister company, [Cantor Index] . . . .'" *Refco*, Dkt. No. 123, ¶ 109. The defendants' Answer to the SAC in *Refco* responded to the allegations in Paragraph 109 by stating, "Defendants

refer to the New York Times article cited in this Paragraph, which speaks for itself." *Id.*, Dkt. No. 169, ¶ 109. As of at least June 14, 2018, Mr. Lutnick knew of the December 28, 2009 New York Times article, and that the article said the eDeck's "algorithms are variations of those created by a sister company, Cantor Index[.]"

530. At least by January 1, 2008, Mr. Lutnick was a named inventor on a patent that was held by a court to be unenforceable.

531. At least by January 1, 2008, Mr. Lutnick was a named inventor on a patent that was held to be unenforceable due in part to his own inequitable conduct.

532. At least by January 1, 2008, Mr. Lutnick knew that withholding material information from the United States Patent and Trademark Office during prosecution of a patent application could result in any granted patent being held unenforceable.

533. On information and belief, Mr. Lutnick understood that, as a named inventor of the '284 Patent, he had a duty of candor to the USPTO.

534. Mr. Lutnick did not disclose the eDeck to the USPTO during the prosecution of the '284 Patent.

535. Therefore, Mr. Lutnick was aware of the Cantor Mobile Device and system and the eDeck device and system, and their use for mobile gambling and wagering services, during prosecution of the '284 Patent. Despite his knowledge of the eDeck functionalities and their materiality to the '284 Patent claims, Mr. Lutnick declined to disclose them to the USPTO during prosecution of the '284 Patent. On information and belief, Mr. Lutnick did so with the specific intent of improving the likelihood of the issuance of the claims of the '284 Patent. The single most reasonable inference that can be drawn from Mr. Lutnick's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**b. Mr. Dean P. Alderucci**

536. DraftKings hereby incorporates by reference its discussion of Mr. Alderucci's knowledge of the Cantor Mobile Device in Section E.1.a. DraftKings reasserts and re-alleges Section E.1.a as if fully set forth herein.

537. Therefore, Mr. Alderucci was aware of the Cantor Mobile Device and system and the eDeck device and system, and their use for mobile gambling and wagering services, during prosecution of the '284 Patent. Despite his knowledge of these preexisting functionalities and their materiality to the '284 Patent claims, Mr. Alderucci declined to disclose them to the USPTO during prosecution of the '284 Patent. On information and belief, Mr. Alderucci did so with the specific intent of improving the likelihood of the issuance of the claims of the '284 Patent. The single most reasonable inference that can be drawn from Mr. Alderucci's non-disclosure of material information is that it was done with the intent to mislead the USPTO.

**c. Ms. Olga Egorova**

538. As Chief Technology and IP Counsel and Head of Patents at Cantor Fitzgerald, Ms. Olga Egorova was involved in the prosecution of the application for the '284 Patent. On June 3, 2024, Ms. Egorova signed the Power of Attorney for the patent applicant in U.S. Patent Application No. 18/652,765, which ultimately issued as the '284 Patent.

539. Not only that, but she was also Vice President and Assistant General Counsel of Cantor Gaming during the eDeck's commercialization and was personally involved in filing for trademark protection for the eDeck device. *See, e.g.*, Exhibit R (DK_IG_0031751); Exhibit S (DK_IG_0031789).

540. On June 3, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 77/092,087 for the "EDECK" mark to the USPTO, representing that

the mark had been "use[d] ***in commerce***" since at least April 30, 2008 in connection with "mobile and wireless gaming and gambling machines," "computer gaming and gambling hardware," and other "wireless telecommunications devices." Exhibit R (DK_IG_0031751) at 5 (emphasis added); *see also* Exhibit S (DK_IG_0031789) at 5-6 (U.S. Trademark Application No. 77/593,896). Ms. Egorova's submission included photographs of the eDeck device (Exhibit R (DK_IG_0031751) at 8-9) and an "eDeck Wireless Gaming" brochure (*id.* at 10-12) expressly representing that Cantor Gaming was "the first company licensed by the Nevada Gaming Commission to manufacture, distribute and operate a mobile gaming system in the state" (*id.* at 10). The eDeck Wireless Gaming brochure also describes the device's use for casino games and sports wagers in authorized areas, as well as its availability at the Venetian, M Resort, and Palazzo. *Id.* at 11. This confirms the public nature of the use of the eDeck product and its qualification as prior art to the '284 Patent under 35 U.S.C. § 102. It also confirms that Ms. Egorova knew that Cantor Gaming had developed and commercialized the eDeck device and that its operation was subject to Nevada's licensing requirements and gaming regulations (*id.* at 10), including Nevada's Mobile Gaming Policy that requires a player be notified that they are in a non-gaming area and transactions are suspended until the player reenters the gaming-allowed area as discussed above (*see* Exhibit P (DK_IG_0031077) at 4).

541. In addition, the brochure included in Ms. Egorova's 2011 trademark submission further described the eDeck as "a unique mobile device developed by Cantor" that allows patrons to "play casino games" and "place sports wagers" from "a secure account" on the device when in "authorized areas." Exhibit R (DK_IG_0031751) at 11. Therefore, on information and belief, Ms. Egorova knew that the eDeck device had location verification and related notifications.

542. On January 25, 2011, Ms. Egorova signed and submitted a Statement of Use in U.S. Trademark Application No. 85/225,931 for the "Cantor" mark to the USPTO, representing that the mark had been "use[d] ***in commerce***" since at least May 1, 2009 in connection with "mobile and wireless gambling machines" and "computer hardware and software for wireless gambling"; and since at least September 29, 2005 in connection with "providing telecommunication channels for mobile gambling and gaming services[.]" Exhibit BP (DK_IG_0030735) at 1-3, 5-6. Ms. Egorova's submission included a photograph of the eDeck (*id.* at 9), the "eDeck Wireless Gaming" brochure (*id.* at 11-13), and a "Cantor Gaming Proprietary Technology" brochure (*id.* at 14). The "Cantor Gaming Proprietary Technology" brochure states, "Cantor Gaming has developed a proprietary end-to-end mobile gaming solution[,]" the "[t]echnology is based on Cantor Fitzgerald's highly secure financial trading platform[,]" the system uses an 802.11 private wireless network to connect the mobile devices to servers, the network is protected with several layers of encryption, and the "system contains integrated location tracking and fencing capabilities, including a positioning engine to determine player location and a visibility platform server to define and monitor permissible gaming zones[,]" and the system uses "[u]nique access methods and identification procedures" to validate gamblers as required by Nevada regulations. *Id.* at 14. Accordingly, on information and belief, Ms. Egorova knew that the eDeck device had mechanisms to notify players when they exited the mobile gaming area.

543. Thus, well before her involvement in prosecuting the '284 Patent, Ms. Egorova knew that Cantor Gaming had commercialized a mobile gaming device in the same field as the claimed invention. On information and belief, Ms. Egorova also knew of wireless gaming systems leading to the eDeck that were publicly available and on-sale before the priority date of the '284 Patent, including the Cantor Mobile Device. Nevertheless, Ms. Egorova withheld information

about the eDeck, its features, functionality, development, and documentation. Ms. Egorova also withheld information about the features, functionality, development, and documentation of wireless gaming systems leading to the eDeck that were publicly available and on-sale before the priority date of the ’284 Patent, including the Cantor Mobile Device, from submission to the USPTO. The single most reasonable inference that can be drawn from Ms. Egorova’s non-disclosure of material information is that it was done with the intent to mislead the USPTO.

***

544. On information and belief, Applicants—specifically Mr. Lutnick, Mr. Alderucci, and Ms. Egorova—violated 37 C.F.R. § 1.56 by deliberately withholding material features of the Cantor Mobile Device and eDeck Device from the USPTO during prosecution of the ’284 Patent with the specific intent to deceive the Examiner into allowing claims that would not have issued but for the nondisclosure

**2. Prosecution of the ’284 Patent**

545. On September 4, 2024, the Examiner rejected then-pending Claims 1 and 25 as obvious over the prior art of record. On December 20, 2024, Applicants amended Claims 1 and 25 to recite:

> 1. A mobile phone, comprising:
>
> At least one computer processor configured to execute a mobile application that causes the at least on computer to:
>
> …
>
> <u>prevent the user of the mobile phone from playing the mobile application while a player prevention alert is displayed on the touch screen of the mobile phone, wherein the player prevention alert comprises a warning that a location of the mobile phone cannot be determined;</u>
>
> <u>receive input from the user, the input indicating an interaction with the touch screen of the mobile phone or a button of the mobile phone;</u>

> based on the received input, remove the player prevention alert;
>
> determine that the user is enabled to play the mobile application; and
>
> based on a determination that the user is enabled to play the mobile application, allow the user to play the mobile application.
>
> 25. A mobile phone, comprising:
>
> …
>
> means for preventing the user of the mobile phone from playing the mobile application while a player prevention alert is displayed on the touch screen of the mobile phone, wherein the player prevention alert comprises a warning that a location of the mobile phone cannot be determined;
>
> means for receiving input from the user, the input indicating an interaction with the touch screen of the mobile phone or a button of the mobile phone;
>
> means for removing the player prevention alert based on the received input;
>
> means for determining that the user is enabled to play the mobile application; and
>
> means for allowing the user to play the mobile application based on a determination that the user is enabled to play the mobile application.

546. On January 2, 2025, the Examiner allowed Claims 1, 4, 7, 9–17, 25–26, and 31–46 (the "First Notice of Allowance").

547. On April 2, 2025, the Applicant filed a Request for Continued Examination and amended then-pending Claims 1 and 25 to remove the limitation "while a player prevention alert is displayed on the touch screen of the mobile phone, wherein the player prevention alert comprises a warning that a location of the mobile phone cannot be determined" and to replace the claimed user "playing" the mobile application with "placing a wager via" the claimed mobile application.

548. On April 16, 2025, the Examiner allowed the '765 Application a second time (the "Second Notice of Allowance").

549. Accordingly, the Examiner found then-pending Claims 1 and 25 allowable based on the inclusion of claim elements directed to displaying a player prevention alert, preventing the user from placing a wager via the mobile application based on a determination that the mobile phone is not in a gaming area; receiving input through the touch screen or a button and, based on that input, removing the player prevention alert; determining that the user is enabled to place a wager; and allowing the user to place the wager based on that determination.

### 3. Inequitable Conduct Based on the Cantor Mobile Device

#### a. The Cantor Mobile Device Was Material to Patentability of the ’284 Patent

550. The Cantor Mobile Device, its features, function, and related documentation were but-for material to the patentability of at least Claims 1 and 25 of the ’284 Patent. As alleged above, the Examiner allowed then-pending Claims 1 and 25 only because he found that the prior art of record did not teach all the limitations of Claims 1 and 25.

551. Cantor Index offered the Cantor Mobile application on several mobile phones, including the O2 XDA II, XDA IIs, XDA IIi, i-mate JAM, and Vodafone v1620. Exhibit AH (DK_IG_0036196); Exhibit AI (DK_IG_0036197). Cantor Mobile described these devices as an integrated personal digital organizer and mobile phone. *See, e.g.*, Exhibit O (DK_IG_0031024). Each had a processor and a touch screen. Exhibit O (DK_IG_0031024). The Cantor Mobile Demo accurately describes at least some of the features and operation of the Cantor Mobile application as Cantor Index itself presented them to the public in 2003, including how to execute trades, receive live financial and sports news, and display charts.

552. The Cantor Mobile Device disclosed, suggested, or taught, alone or in combination with the art of record relied upon by the Examiner, each of the limitations of Claims 1 and 25.

553. First, on information and belief, the Cantor Mobile Device displayed a player prevention alert and prevented the user from placing a wager based on a determination that the device was not in a gaming area. Cantor Index and the Cantor Mobile Device were regulated through the Financial Services Authority. Exhibit O (DK_IG_0031024). A user could not access the Cantor Mobile service without agreeing to be bound by the terms and conditions supplied with the application. Exhibit O (DK_IG_0031024). In 2003, the legality of mobile wagering in Europe depended on where the bettor was located. *See, e.g.*, Exhibit BE (Europe Bets on Mobile Gambling, Las Vegas Sun (Apr. 14, 2003)). Operators were able to determine the location based on information from the phone, including GPS components. *Id.* On information and belief, wagering through the Cantor Mobile Device was restricted to permitted jurisdictions, and in September 2003 one permitted jurisdiction was the United Kingdom. On information and belief, the Cantor Mobile Device displayed an alert as part of that restriction and prevented wagering when the device was not in a permitted area.

554. Second, the Cantor Mobile Device received input from the user through the touch screen or a button and, on information and belief, based on that input, removed the player prevention alert. Users interacted with the Cantor Mobile application by tapping the touch screen, including an on-screen keyboard used to enter an account number and password. Exhibit O (DK_IG_0031024) at 5–6. After a wager was submitted, for example, the application displayed a notice that the trade request was being processed, and the user was instructed to click "ok" to continue. Exhibit O (DK_IG_0031024). On information and belief, the Cantor Mobile Device used the same tap-to-dismiss mechanism for alerts stating that wagering was unavailable, and removed the alert based on that user input. On information and belief, after the alert was removed, the user

could access other features of the application, such as news, account management, and trading hours, even when wagering was unavailable. Exhibit O (DK_IG_0031024).

555. Third, the Cantor Mobile Device determined that the user was enabled to place a wager. The user had to enter a Cantor account number and password to log on to the Cantor Mobile Device before placing a wager. Exhibit O (DK_IG_0031024).

556. Fourth, the Cantor Mobile Device allowed the user to place the wager based on the determination the user was allowed to wager. Clicking on a price launched the trading screen. Exhibit O (DK_IG_0031024). Had the functionality of the Cantor Mobile Device been disclosed to the Examiner during prosecution of the ’284 Patent, at least Claims 1 and 25 would have been obvious under pre-AIA 35 U.S.C. § 103 in view of the Cantor Mobile Device, the art of record relied upon by the Examiner, and the knowledge of a person of ordinary skill in the art.

557. But for the failure of Applicants to disclose material Cantor Mobile Device features, the USPTO would not have allowed Claims 1 or 25 of the ’284 Patent.

558. The Cantor Mobile Device features for player prevention alerts, touch screen input, and allowing or restricting mobile wagering based on determined location are not cumulative to any prior art before the USPTO because they disclose the very limitations that the Examiner found to be missing from the art of record during prosecution.

559. On information and belief, Mr. Lutnick specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

560. On information and belief, Mr. Alderucci specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

561. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the Cantor Mobile Device from the USPTO.

562. On information and belief, Mr. Lutnick was motivated to deceive the USPTO to secure allowance of the ’284 Patent claims.

563. On information and belief, Mr. Alderucci was motivated to deceive the USPTO to secure allowance of the ’284 Patent claims.

564. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’284 Patent claims.

565. On information and belief, Mr. Lutnick knew that the ’284 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’284 Patent from issuing.

566. On information and belief, Mr. Alderucci knew that the ’284 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’284 Patent from issuing.

567. On information and belief, Ms. Egorova knew that the ’284 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the Cantor Mobile Device would directly undermine Applicants’ arguments for patentability and prevent the claims of the ’284 Patent from issuing.

568. The inequitable conduct in procuring the ’284 Patent has an immediate and necessary relation to the enforcement of the ’284 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the ’284 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the ’284 Patent

unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the ’284 Patent against DraftKings.

**4. Inequitable Conduct Based on the eDeck Device**

**a. The eDeck Was Material to Patentability of the ’284 Patent**

569. The eDeck, its features, function, and related documentation were but-for material to the patentability of at least Claims 1 and 25 of the ’284 Patent. The Examiner allowed then-pending Claims 1 and 25 only because he found that the prior art of record did not teach all the limitations.

570. The eDeck was a handheld mobile wagering device. Exhibit M (DK_IG_0030848). It included a display screen with a user interface, which gave the user the opportunity to place wagers. Exhibit M (DK_IG_0030848). The eDeck was offered under Nevada regulations that required user, device, and location authorization before a user was allowed to place a wager. Exhibit AZ (DK_IG_0042379); Exhibit BA (DK_IG_0042455); Exhibit C (DK_IG_0030141).

571. Cantor Gaming created reports, while the eDeck was being developed, describing features and functionality used in the eDeck, including in public demonstrations. [redacted]

[redacted] On information and belief, the eDeck publicly demonstrated at G2E in November 2007 operated as these reports describe.

572. The eDeck disclosed, suggested, or taught, alone or in combination with the art of record relied upon by the Examiner, each of the limitations of then-pending Claims 1 and 25.

573. First, the eDeck displayed a player prevention alert and prevented the user from placing a wager based on a determination that the device was not in a gaming area. [redacted] Mr. Amaitis confirmed this operation before the NGCB: when asked whether the eDeck warned a player who was leaving the permitted area, he explained that the device does not lose the game because the game data is kept on the server. Exhibit K (DK_IG_0030537).

574. Second, the eDeck received input from the user through the touch screen or a button and, based on that input, removed the player prevention alert. [redacted]

575. Third, the eDeck determined that the user was enabled to place a wager. [redacted]

576. Fourth, based on that determination, the eDeck allowed the user to place the wager. [redacted]

577. Had the functionality of the eDeck been disclosed to the Examiner during prosecution of the '284 Patent, at least Claims 1 and 25 would have been obvious under pre-AIA

35 U.S.C. § 103 in view of the eDeck, the art of record relied upon by the Examiner, and the knowledge of a person of ordinary skill in the art.

578. The eDeck, its features, function, and related documentation are not cumulative to information already of record during prosecution of the ’284 Patent. As explained above, the Examiner found the art of record insufficient to anticipate or render obvious then-pending Claims 1 and 25. The eDeck and its documentation disclose, teach, or suggest the remaining limitations.

579. But for the failure of Applicants to disclose material eDeck features, the USPTO would not have allowed Claims 1 or 25 of the ’284 Patent.

580. On information and belief, Mr. Lutnick specifically intended to conceal the withheld material features of the eDeck from the USPTO.

581. On information and belief, Mr. Alderucci specifically intended to conceal the withheld material features of the eDeck from the USPTO.

582. On information and belief, Ms. Egorova specifically intended to conceal the withheld material features of the eDeck from the USPTO.

583. On information and belief, Mr. Lutnick was motivated to deceive the USPTO to secure allowance of the ’284 Patent claims.

584. On information and belief, Mr. Alderucci was motivated to deceive the USPTO to secure allowance of the ’284 Patent claims.

585. On information and belief, Ms. Egorova was motivated to deceive the USPTO to secure allowance of the ’284 Patent claims.

586. On information and belief, Mr. Lutnick knew that the ’284 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of

the eDeck would directly undermine Applicants' arguments for patentability and prevent the claims of the '284 Patent from issuing.

587. On information and belief, Mr. Alderucci knew that the '284 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants' arguments for patentability and prevent the claims of the '284 Patent from issuing.

588. On information and belief, Ms. Egorova knew that the '284 Patent was not patentable and that, if disclosed to the USPTO, the teachings of the withheld material features of the eDeck would directly undermine Applicants' arguments for patentability and prevent the claims of the '284 Patent from issuing.

589. The inequitable conduct in procuring the '284 Patent has an immediate and necessary relation to the enforcement of the '284 Patent in this case. By failing to disclose material, non-cumulative prior art that they were aware would have led to the invalidation of certain claims of the '284 Patent, Applicants violated the duty of candor, good faith, and honesty owed by patent applicants to the USPTO. This constitutes inequitable conduct and renders the '284 Patent unenforceable in its entirety. DraftKings therefore seeks a declaration that IG may not enforce the '284 Patent against DraftKings.

### G. Failure to Name Proper Inventors

590. At least the '302 and '382 Patents are invalid under 35 U.S.C. §§ 102(f) and 256(b) for uncorrectable nonjoinder of inventor Anoop Gopinatha.

591. Title 35, Section 102(f) of the United States Code states that "[a] person shall be entitled to a patent ***unless*** . . . he did not himself invent the subject matter sought to be patented."

Pre-AIA 35 U.S.C. § 102(f) (emphasis added). In other words, a patent is invalid if one or more inventors did not invent the subject matter claimed.

592. Similarly, 35 U.S.C. § 256(b) states that "[t]he error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected." The necessary and opposite implication is that a patent is invalid for the error of omitting inventors when that error cannot be corrected. At least the '302 and '382 Patents are invalid under 35 U.S.C. §§ 102(f) and 256(b) for nonjoinder of inventor Anoop Gopinatha.

593. Mr. Anoop Gopinatha is named as the sole inventor on the '089 Application and the '098 Application, both filed November 12, 2010. Mr. Gopinatha is named as a joint inventor on the '435 Application, filed August 13, 2010, and the '439 Application, filed October 21, 2010. The '435 Application also lists Sunny Tara as a named inventor. And the '439 Application also lists Lee Amaitis as an inventor. The '302 and '382 Patents claim priority to all four of these provisional applications and claim subject matter disclosed therein.

594. By naming Mr. Gopinatha as an inventor on each of these '089, '098, '435, and '439 Applications, CFPH—the Cantor Fitzgerald entity responsible for prosecuting the applications—represented to the USPTO that Mr. Gopinatha contributed to the conception of the subject matter they disclose. And by naming him as the sole inventor of the '089 and '098 Applications, CFPH represented to the USPTO that Mr. Gopinatha alone conceived the subject matter disclosed in those applications.

595. On March 24, 2011, CFPH filed the '893 Application under pre-AIA 37 C.F.R. § 1.47, claiming priority to each of the '089, '098, '435, and '439 Applications. That non-provisional application omitted Mr. Gopinatha as an inventor. Every later application in the family, and every patent issuing from them, likewise omits Mr. Gopinatha. This includes both the '302 and '382

Patents, which only list Lee Amaitis, Paul Williams, Sunny Tara, and Matthew Morrissette as inventors.

596. Upon information and belief, Mr. Gopinatha is an inventor of and contributed to claimed subject matter in the ’302 and ’382 Patents. Both patents claim priority to ’089 and ’098 Applications. And Mr. Gopinatha is the sole named inventor of the subject matter of the ’098 and ’089 Applications. There would be no need to claim priority to the ’098 and ’089 Applications if they did not disclose subject matter claimed in the ’302 and ’382 Patents. And pursuant to pre-AIA 35 U.S.C. § 119(e)(1), at least the ’302 Patent—which was filed pre-AIA—should have named Mr. Gopinatha as an inventor to enjoy the benefit of those priority claims.

597. The ’098 and ’089 Applications disclose subject matter claimed in the ’302 and ’382 Patents. For example, independent Claims 1 and 22 of the ’302 Patent recite a distance-based recheck interval, which is described as part of the “Continuous Security Validation Protocol” at pages 19–20 of the ’089 Application. And independent Claims 1, 14, 26 and 27 of the ’382 Patent are directed to a smart phone running a wrapper application alongside a gambling application, which are described as an Android Wrapper Application (AWA) running alongside an AIR Mobile gaming Client (ABC) in the “Actors” at page 15 and “Client and User Validation” at page 18 of the ’089 Application. Mr. Gopinatha’s contributions to the claimed subject matter are not insignificant in quality when measured against the full scope of that subject matter. Thus, the ’302 and ’382 Patents are invalid for incorrect inventorship under 35 U.S.C. §§ 102(f) and 256(b).

## PRAYER FOR RELIEF

598. For these reasons, DraftKings respectfully requests the following relief:

a. That the Court dismiss IG’s claims in its Complaint against DraftKings with prejudice, and enter judgment on the Complaint in favor of DraftKings and against IG;

b. That the Court deny all relief from DraftKings requested by IG in its Complaint;

c. That the Court enter judgment in favor of DraftKings and against IG on DraftKings' Counterclaims;

d. That the Court find and enter a declaratory judgment that DraftKings does not infringe, and has not infringed, either directly or under the doctrine of equivalence, or indirectly or willfully infringed any valid and enforceable claim of the Asserted Patents;

e. That the Court find and enter a declaratory judgment that each of the asserted claims of the Asserted Patents is invalid;

f. That the Court find and enter a declaratory judgment that each of the asserted claims of the Asserted Patents is unenforceable due to inequitable conduct;

g. That the Court grant DraftKings all reasonable attorneys' fees, experts' fees, and costs; and

h. That the Court grant DraftKings such further relief as the Court deems proper and just.

## JURY DEMAND

599. DraftKings hereby demands a jury trial on all issues properly triable to a jury.

Dated: November 24, 2026

/s/ *Brian M. Seeve*

Jamie R. Lynn (BBO No. 667350)
Thomas C. Martin *(pro hac vice)*
Andrew D. Wilson (*pro hac vice*)
Chelsea Zhang (*pro hac vice*)
Michael J. Kachmarik *(pro hac vice)*
Erica R. Rose (*pro hac vice*)
BAKER BOTTS L.L.P.
700 K St. N.W.
Washington, D.C. 20001
(202) 639-7786

Kurt M. Pankratz (*pro hac vice*)
Clarke W. Stavinoha *(pro hac vice*)
Jacob McDonald (*pro hac vice*)
Jacqueline Chan (*pro hac vice*)
BAKER BOTTS L.L.P.
2001 Ross Ave
Suite 900
Dallas, TX 75201
(214) 953-6500

Brian M. Seeve (BBO No. 670455)
Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
Tel: (617) 456-8000
bseeve@princelobel.com

*Attorneys for Defendant and Counterclaim-Plaintiff DraftKings, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that true and correct copies of the foregoing document were caused to be served on November 24, 2026 on the following counsel in the manner indicated:

**VIA E-MAIL:**

Richard Crudo
Anna G Phillips
Chandrika Vira
Daniel S. Block
Igor Helman
Michael E. Joffre
Steven Pappas
Tyler Dutton
William Milliken
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street NW
10th Floor
Washington, DC 20005
202-371-2600
rcrudo@sternekessler.com
aphillips@sternekessler.com
cvira@sternekessler.com
dblock@sternekessler.com
ihelman@sternekessler.com
mjoffre@sternekessler.com
spappas@sternekessler.com
tdutton@sternekessler.com
wmilliken@sternekessler.com
InteractiveGames_DK@sternekessler.com

Candice Leanna Ellis
David A. Paul
Matthew F Dexter
CANTOR FITZGERALD L.P.
110 East 59th Street, 7th Floor
New York, NY 10022
212-610-2255
candice.ellis@cantor.com
dpaul@cantor.com
matthew.dexter@cantor.com

Craig R. Smith
ARNALL GOLDEN GREGORY LLP
One Financial Center
Boston, MA 02111
857-758-9739
craig.smith@agg.com